Exhibit A

FILED IN MY OFFICE
DISTRICT COURT CLERK
8/5/2013 5:30:39 PM
STEPHEN T. PACHECO
RV

**STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT**

**DAVID PESHLAKAI,** *et al.,*

    **Plaintiffs,**

**vs.**            **No. D -101-CV-2010-02669**

**JAMES RUIZ,** *et al.,*

    **Defendants.**

## PLAINTIFFS' MOTION TO MODIFY SCHEDULING ORDER

    Plaintiffs, by and through the undersigned counsel, respectfully move the Court pursuant to Rule 1-016(B)(8) NMRA to modify the scheduling order for the sole purpose of allowing Plaintiffs to add W. Gill Woodall, Ph.D. as a specially retained expert witness. Plaintiffs contacted Defendants Applebee's International, Inc. ("Applebee's") and AmRest, LLC ("AmRest") on August 5, 2013 by electronic mail to seek their concurrence on this Motion. Both Defendants have advised that the object to the Motion. However, in support of this Motion, Plaintiffs state as follows:

## I. Introduction

1.  The people of New Mexico, through their elected representatives and appointed regulatory officials, have made it patently clear that servers of alcohol are expected to recognize when they are serving a patron to a BAC approaching .08% and that they are not to serve a patron to or beyond a BAC .08%. Plaintiffs' specially retained expert witness, Randy Durnal, has testified that this is the standard of care expected of alcohol servers not only in New Mexico, but throughout the United States. Defendants respond to this opinion in two ways: First, Defendant AmRest proffers an expert witness, an industry lobbyist from the New Mexico Restaurant Association (NMRA), who conducts alcohol server

1

training programs in New Mexico.  This witness bases her opinion upon materials that Plaintiffs have only recently learned are adulterated, unofficial versions of New Mexico's officially approved Alcohol Server Training materials.  Second, Defendants Applebee's and AmRest have very recently moved to exclude Mr. Durnal's opinion by making *ad hominem* attacks upon Mr. Durnal and by submitting affidavits from two out-of-state, un-designated experts, at least one of whom is yet another restaurant or alcohol beverage industry lobbyist.

2.      In New Mexico it is not open for debate: alcohol servers and liquor serving establishments are expected to recognize when they are serving a patron to a BAC approaching .08% and not serve a patron to or beyond that point.  This matter is succinctly stated in New Mexico's official Alcohol Sever Training materials ("The NewMAST materials"), and any doubt will be put to rest by the testimony of W. Gill Woodall, Ph.D., who authored the NewMAST materials at the behest and direction of the New Mexico Regulation & Licensing Department, Division of Alcohol & Gaming.  Plaintiffs therefore move to modify the scheduling order for the sole purpose of allowing Plaintiffs to designate Dr. Woodall as a specially retained expert witness.

## II.  Factual Background

1.      Pursuant to the Court's Amended Rule 16(B) Scheduling Order, entered June 26, 2012, the Plaintiffs were to file a list of expert witnesses who were expected to testify at trial on or before September 28, 2012.  Plaintiffs did so.  The Court's subsequent Amended Rule 16(B) Scheduling Order, entered March 11, 2013, ordered that "Witnesses shall be disclosed consistent with the deadlines in the Court's prior scheduling order."  The March 11, 2013 scheduling order also ordered that discovery is to be completed by September 26,

2013, unless otherwise ordered by the Court.  In other words, there are still nearly two months remaining before discovery is to be closed in this case.

2.      On or before September 28, 2012, Plaintiffs designated Randy Durnal as their expert on liquor law enforcement and hospitability standard of care.  Defendants deposed Mr. Durnal on February 12, 2013.  In his deposition, Mr. Durnal testified several times on what he believes the standard of care is in the hospitality industry for responsible service of alcohol.  He testified that he based his opinion on various alcohol server training programs he has attended around the country and on his review of the training materials disseminated by those programs.  In Mr. Durnal's expert opinion, the standard of care for alcohol service training requires that alcohol servers recognize when they are serving a patron sufficient alcohol to bring his BAC close to .08% and that they are not to serve a patron to or beyond a BAC .08%.  *See* Attachment A, Durnal Deposition, at 134:9-135:16; 192:21-193:5; and 240:8-21.  3.      AmRest designated Victoria Sanchez-Martinez as their expert witness on the standard of care for alcohol service by liquor licensees and liquor liability, among other things.  Ms. Sanchez-Martinez is an alcohol server trainer and a lobbyist for the New Mexico Restaurant Association.  Plaintiffs deposed Ms. Sanchez-Martinez on March 5, 2013.  Ms. Sanchez-Martinez brought to her deposition several requested items, including: (1) the NewMAST Participant Workbook, (2) the New Mexico Restaurant Association's "NewMAST Participant Guide," and (3) the NewMAST Instructor Guide.  *See* Attachment B, Sanchez-Martinez Deposition, at 35:10-36:14. These materials were marked as Exhibits 125-127, respectively.

4.      All three exhibits have cover pages showing the materials to be "NewMAST" materials, and include a special insignia by the New Mexico Regulation & Licensing

3

Department, Division of Alcohol & Gaming.   Exhibit 125 is called a "Participant Workbook," Exhibit 126 is called an "Instructor Guide," and Exhibit 127 is called a "Participant Guide."  After this deposition Plaintiffs learned, and will show, that Exhibit 125, the Participant Workbook, and Exhibit 126, the Instructor Guide, are the official NewMAST materials, are still in use, and were the only curriculum approved by the Division of Alcohol & Gaming for use in 2010.   *See* Attachments C and D, respectively, Affidavit of Sean Lyons and Affidavit of W. Gill Woodall, Ph.D.  Plaintiffs also learned, and will show, that Exhibit 127, the NMRA Participant Guide, is an adulterated, unofficial version of the NewMAST Participant Workbook that was created by the New Mexico Restaurant Association.  *See* id.

5.    Ms. Sanchez-Martinez testified that she relies upon the NMRA Participant Guide, Exhibit 127, for her opinions in this case.   *See* Attachment B at 48:8-20; 53:3-8. She testified that the NMRA does not use the NewMAST Participant Workbook, Exhibit 125, in their alcohol server training.  *See id*. at 48:8-20.6.  It was not until after March 29, 2013, which was the date on which Plaintiffs' counsel received the transcript of Sanchez-Martinez's Deposition and the attached exhibits, that Plaintiffs began to understand the lengths to which the Defendants and the New Mexico Restaurant Association have gone to attempt to lower the standard of care applicable to this case and dram shop cases like it. *See* Attachment C at ¶¶ 2-4.   Since that date, Plaintiffs have diligently sought the identity and cooperation of the most authoritative witness on the NewMAST materials who is available to come forth and bring clarity to this subject for the Court and/or jury.  *See* Attachment C at ¶¶ 5-12; and Attachment D at ¶¶ 43-45. These efforts are described in detail in the attached affidavit of Sean Lyons and Affidavit of W. Gill Woodall Ph.D., and

are likewise evidenced by the Alcohol & Gaming Division's IPRA Response Letter dated June 5, 2013. *Id.; see also Attachment E,* Alcohol & Gaming Division's IPRA Response Letter

7.     Further, on July 10, 2013, Defendant Applebee's moved to exclude Mr. Durnal's opinion that the applicable industry standard is that servers of alcohol are expected to recognize when they are serving a patron to a BAC approaching .08% and that they are not to serve a patron to or beyond a BAC .08%.  On July 16, 2013, Defendant AmRest joined in Applebee's Motion to Exclude Durnal's opinion as to the standard of care for alcohol servers.  In their motion Defendants launch an *ad hominem* attack upon Mr. Durnal.  They wrongly accuse him of falsifying his qualifications and refer misleadingly to affidavits from out-of-state, undesignated witnesses.

8.     On July 17, 2013, Dr. W. Gill Woodall agreed to act as Plaintiffs' specially retained expert witness.  Plaintiffs now move to modify the scheduling order for the sole purpose of allowing Plaintiffs to designate Dr. Woodall as their specially retained expert witness.

9.     Under the current Amended Rule 16(B) Scheduling Order, the deadline for filing motions for summary judgment expires on August 26, 2013 and discovery closes on September 26, 2013, leaving time for the Applebee's Defendants to depose Dr. Woodall.

### III. <u>Applicable Law</u>

1.     Pretrial scheduling is governed by Rule 1-016(B) of the New Mexico Rules of Civil Procedure.   That rule provides that, "A scheduling order shall not be modified except by order of the court upon a showing of good cause."   NMRA 1-016(B).   Amendment or modification is discretionary with the court and a decision to modify a scheduling order will be reviewed under an abuse of discretion standard.   *Gallegos v. Yeargin W.*

*Constructors,* 104 N.M. 623, 625, 725 P.2d 599, 600 (N.M. Ct. App. 1986) (citing *State ex rel. State Highway Department v. Branchau*, 90 N.M. 496, 565 P.2d 1013 (1977); *Herrera v. Springer Corp.,* 89 N.M. 45, 546 P.2d 1202 (Ct.App.1976)).

2.      Appellate courts in New Mexico have historically denied motions to modify a scheduling order to add an additional witness when the request is made at trial.  *Gallegos, 104 N.M. at 625,* 725 P.2d at 600-01.  However, results have varied where the requesting party makes the request after the deadline but in advance of trial.  *Id.* at 624-625.  The analysis to a large degree turns upon the extent to which the late designation causes prejudice to the opposing party.  *Id.* at 625.  One appellate court decision upheld a trial court ruling that allowed an expert designation as late as 17 days before trial, whereas another appellate court decision upheld a trial court ruling denying an expert designation as little as five days before trial.  *Id.*  Where appellate courts find that the late expert designation causes prejudice to the opposing party they will uphold a trial court's order permitting such a designation.  *See, e.g. Collins v. Old Republic Title Co*., No: 96-2246-GTV, 1997 U.S. Dist. LEXIS 5308, at **3-5 (D. Kan. Apr. 14, 1997).

3.      Interpreting the substantially similar Federal Rule of Civil Procedure 16(b), the United States Court of Appeals for the Tenth Circuit has on more than one occasion applied the following factors to determine whether a trial court abused its discretion in granting or denying a motion to modify to designate an additional expert witness:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Rimbert v. Eli Lilly & Co*., 647 F.3d 1247, 1254 (10th Cir. N.M. 2011)(citing *Summers v.*

*Missouri Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997)).  The Tenth Circuit, in *Rimbert,* recognized that a scheduling order can have an outcome-determinative effect on the case and that "total inflexibility is undesirable."  *Id.*  Additionally, the Tenth Circuit has advised that "A scheduling order which results in the exclusion of evidence is, moreover, 'a drastic sanction.' "  *Id.* (citing *Summers*, 132 F.3d at 604).

3.     In both *Rimbert* and *Summers* the appellate court applied the four factors discussed above to reverse a trial court's denial of a party's motion to modify the scheduling order. The analysis in *Summers* is the more instructive of the two here.  The Tenth Circuit found as to the first and second factors that the Defendant had time to cure any prejudice through review of the new experts' reports and depositions.  *Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d at 605.  As to the third factor, the court found there would be no disruption in trial because the motion for a new scheduling order was filed eighty days prior to trial and the plaintiffs had acted "promptly to find new experts." *Id*.  Finally, as to the fourth factor, the Court found that there had been no bad faith on the part of the plaintiffs, who acted diligently and whose original experts were doctors to whom the plaintiffs had been referred by the defendant.  This last fact was significant to the Court because it indicated that the defendant may have had a hand in the plaintiffs' predicament.  *Id.*

## IV. <u>Argument</u>

.     Plaintiffs move hereby to modify the scheduling order one-hundred and thirteen (113) days before trial and fifty-two (52) days before the deadline to complete discovery, so that Plaintiffs may designate W. Gill Woodall, Ph.D. as an expert witness.  No argument can be made that there has been delay in his designation, or that any delay in his designation will cause the Defendants prejudice, or that Defendants will be unfairly prejudiced by this

7

designation.

There is certainly good cause to modify the scheduling order.  The people of New Mexico, through their elected representatives and appointed regulatory officials, have established a standardized curriculum to train servers of alcohol and liquor license holders. Attachment D at ¶¶ 10-40.  This standardized curriculum is the only approved curriculum for alcohol server training in New Mexico.  *Id.* at ¶¶ 27-28.   Servers are to be trained

> To keep patrons from becoming intoxicated, you must control the rate of service. The charts below show the maximum number of drinks per hour to keep the patron's BAC under .08%, the point of intoxication. Serving more than the maximum will result in a BAC over .08% and the patron will be intoxicated.

*Id.* at ¶ 35. Server trainees are to be given a chart to help them learn to count drinks and estimate a patron's potential BAC.  They are instructed that

> As long as there are no warning signs (Step Three), continue to serve at the rate in the chart, up to the maximum. Slow down or cut off service if there are signs the patron is approaching or has exceeded .08%.

*Id.* at ¶ 37.  Finally, they are told the reason why it is critical that they count drinks and not allow their patrons to reach or exceed a BAC of .08%:

> Caution: Do not exceed the drink limits on the chart. Even if the patron is not showing signs of intoxication, he or she will have a BAC at or close to .08%.  Recall that some heavy drinkers develop tolerance, and you never know if this applies to the person you are serving.

*Id.* at ¶ 38.  This is the standard of care that governs the service of alcohol by licensed professionals in New Mexico according to the Alcohol & Gaming Division.

All of these instructions and admonitions, and more, were deleted from the NMRA's unauthorized version of the NewMAST materials.  Attachment D at ¶ 53.  Dr. Woodall will testify that, "The NMRA Participant Guide does not describe the standard of care expected of alcohol servers in New Mexico, but rather appears to be an effort to lower it." *Id.* at ¶ 60.

8

Defendants now plan to parade before the jury four witnesses who profess to be experts in alcohol service standards of care and who will say that Randy Durnal is incorrect --that the standard of care does not require that servers recognize when they have served a patron sufficient alcoholic beverages to bring the patron's BAC to .08% and that they are not to serve a patron to or beyond a BAC .08%.  It would be highly misleading to allow the jury to hear these witnesses' opinions on the standard of care without allowing them to hear from Dr. Woodall.

First, it is important to note that at least three of the Applebee's Defendants' expert witnesses--Randy Nations, Victoria Sanchez-Martinez, and Scott Ellis--work for or lobby on behalf of the restaurant and bar or alcoholic beverage service industry.  *See Defendant AmRest, LLC D/B/A Applebee's Neighborhood Grill and Bar's Expert Witness List* (Oct. 29, 2012) at 24-26 (showing curriculum vitae for Sanchez-Martinez, which lists her current employment as the Development Director for the NMRA); *see also Applebee's Preliminary Expert Witness List* (Oct. 29, 2012 ) at 13, APP000289 (showing curriculum vitae for Randy Nations, which states that his company acts as the administrative agent on 400 liquor licenses in Arizona and is contracted by approximately 500 liquor establishments across that State); *and* Affidavit of Scott Ellis, Attachment C to *Defendant Applebee's International, Inc.'s Motion to Exclude Testimony and Opinions of Plaintiffs' Expert Randy Durnal* (July 10, 2013), at ¶ 1 (noting that he is the current Executive Director of the Michigan Licensed Beverage Association).  Second, at least two of the witnesses who have submitted expert testimony to this Court on behalf of Defendant Applebee's -Adam Chafetz and Scott Ellis--have not even been designated yet and are from out-of-state.  Lastly, AmRest's liquor liability expert--Sanchez-Martinez--is basing her opinion on the NMRA's

9

NewMAST Participant Guide, which is unauthorized for use in training alcohol servers in New Mexico and is now known to be a misleading revision of the NewMAST Participant Workbook.

In view of these facts, there is good cause to modify the scheduling order and allow Plaintiffs to designate Dr. Woodall as a specially retained expert on the standard of care for alcohol servers in New Mexico. Without Dr. Woodall's testimony, Ms. Sanchez-Martinez' attempt to proffer the NMRA's Participant Guide as a NewMAST publication and to represent that this Guide reflects the standard of care that applies to the alcohol servers and to training of alcohol servers in New Mexico will not be addressed. The jury will be confused about the standard of care in New Mexico despite the clear intent of the state of New Mexico to make the standard expected of alcohol servers unmistakably clear and to establish a professional standard of care for those who are licensed to serve and sell alcohol. Without Dr. Woodall's testimony, the Defendants and the NMRA will succeed in what is only now revealed to be an obvious plot to protect Defendants and NMRA members from dram shop liability while undermining the efforts of the Alcohol & Gaming Division to lower injuries and deaths from DWIs in New Mexico.

Finally, when the instant Motion is analyzed according to the four factors that are the Tenth Circuit outlined in the *Rimbert* and *Summers* decisions, it is clear that:

1) There is no surprise to the Defendants, and there is no prejudice caused by any delay;

2) Any potential prejudice caused by delay is curable because Dr. Woodall's CV and a detailed affidavit containing his opinions are provided along with the filing of this

motion, and there are 113 days between now and trial and in which to take the deposition of Dr. Woodall;

3) Listing Dr. Woodall at this time will not disrupt the orderly and efficient trial of the case;

4) Plaintiffs acted at all times in good faith and with diligence to comply with the Court's Amended Rule 16(B) Scheduling Order, and those efforts are evidenced clearly by the affidavits of Sean Lyons and W. Gill Woodall, Ph.D. Also, to borrow the phrase from *Summers,* it is without question the Defendants had a hand in the Plaintiffs' predicament.

*Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d at 605. For these reasons, there is good cause to modify the scheduling order.

   **WHEREFORE**, Plaintiffs request that the Court modify the scheduling order to allow Plaintiffs to designate W. Gill Woodall, Ph.D. as a specially retained expert witness and for other and further relief, both general and special, at law and in equity, to which the Plaintiffs may show themselves justly entitled.


Dated: August 5, 2013.

                          Respectfully submitted:

                          /s/ *Sean Lyons*
                          Sean Lyons
                          HENDLERLAW, P.C.
                          1301 W. 25th Street
                          Suite 400
                          Austin, Texas 78705
                          (512) 439-3200
                          (512) 439-3201 - Fax
                          slyons@hendlerlaw.com
                          Attorney for Plaintiffs Admitted Pro Hac
                   Vice

and

/s/ *Zackeree S. Kelin*
Zackeree S. Kelin
Kelin Law Firm, P.C.
111 Tulane Drive S.E.
Albuquerque, New Mexico 87106

*Attorneys for Plaintiffs*

## CERTIFICATE OF MAILING

**I HEREBY CERTIFY THAT A TRUE** and correct copy of the *Plaintiffs' Motion to Modify Scheduling Order* was electronically filed through the ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing this 5th day of August 2013.

/s/ Sean Lyons
Sean Lyons

| | |
|---|---|
| Scott Hendler<br>HENDLERLAW, P.C.<br>1301 W. 25th Street<br>Suite 400<br>Austin, Texas 78705<br>*Co-counsel for Plaintiffs* | Zackeree S. Kelin<br>Kelin Law Firm, P.C.<br>111 Tulane Drive S.E.<br>Albuquerque, New Mexico 87106<br>*Co-counsel for Plaintiffs* |
| Deena BuchananWilliams<br>OLSEN PARDEN WILLIAMS, P.C.<br>4253 Montgomery Blvd. NE, Suite G-130<br>Albuquerque, NM 87109<br>*Attorney for Applebee's International, Inc.*<br>*Defendant* | Ronald C. Archibeque<br>ARCHIBEQUE LAW FIRM, L LC<br>Post Office 94837<br>Albuquerque, New Mexico 87199-4837<br>*Attorney for Applebee's International, Inc.*<br>*Defendant* |
| Mark L. Klecan<br>Klecan and Childress<br>6000 Uptown Boulevard N. W.<br>Suite No. 305<br>Albuquerque, New Mexico 87110<br>*Attorney for Gilbert Mendoza, Defendant* | Robert M. Doughty III<br>Doughty & West, P.A.<br>20 First Plaza N. W.<br>Suite No. 412<br>Albuquerque, New Mexico 87102<br>*Attorney for James Ruiz, Defendant* |

| | |
|---|---|
| Jose Blanton<br>RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.<br>201 Third Street N.W.<br>Suite 2200<br>Albuquerque, New Mexico 87102<br>*Attorney for AmRest, LLC, Defendant* | Ray, Valdez, McChristian & Jeans, P.C.<br>Jeff Ray and Doug Compton<br>5822 Cromo Dr.<br>El Paso, Texas 79912<br>Tel: (915) 832 -7200<br>Facsimile: (915) 832 - 7333<br>*Attorney for AmRest, LLC, Defendant* |

IN THE STATE OF NEW MEXICO

COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT


| | |
|---|---|
| DAVID PESHLAKAI, DARLENE THOMAS, | ) |
| CHARLES REYNOLDS AS THE PERSONAL | ) |
| REPRESENTATIVE OF THE WRONGFUL | ) |
| DEATH ESTATES OF DEL LYNN | ) |
| PESHLAKAI(DECEASED), AND DESHAUNNA | ) |
| PESHLAKAI(DECEASED), et al., | ) |
| | ) |
| Plaintiffs, | )D-101-CV-2010-02669 |
| | ) |
| vs. | ) |
| | ) |
| JAMES RUIZ, GILBERT MENDOZA, | ) |
| AMREST, LLC, DBA APPLEBEE'S | ) |
| NEIGHBORHOOD GRILL AND BAR, AND | ) |
| APPLEBEE'S INTERNATIONAL, INC., | ) |
| | ) |
| Defendants. | ) |

. . . . . . . . . . . . . . . . . . . . . . . . .

DEPOSITION OF RANDY DURNAL

February 12, 2013

Tucson, Arizona

. . . . . . . . . . . . . . . . . . . . . . . . .

Transcript Prepared by Kimberley W. Gauthier

Certified Court Reporter No. 50767


ATTACHMENT A

 1   because no one disputes that he was served bottles of

 2   beer, meaning -- well, with regard to Eric Roybal, he

 3   doesn't recall what he was drinking.

 4        Q.    (By Mr. Mowery)  Did you say nobody disputes

 5   the bottles of beer?

 6        A.    I misspoke.  What I meant to say is pursuant

 7   to Eric Roybal.  He didn't testify that he wasn't

 8   drinking those bottled beers.

 9        Q.    If you've already conceded that they did not

10   violate New Mexico law by their service of alcohol to

11   these individuals, where would I find the basis for

12   the standard of care that you're describing?

13        A.    In your ServSafe manual, in your Barcode

14   manual, in your TIPS manuals.

15        Q.    Be specific.  What is it in those manuals

16   that I should be looking for?

17        A.    Well, what they do in these manuals -- and

18   you can't just look at the manual.  And I'm going to

19   use ServSafe as an example.  You can't merely look at

20   this manual and say that's the standard in and of

21   itself.  This sets the standard, and then you have a

22   live trainer.

23                    Or in the case where it's on-line

24   that's going through the training, what they say is,

25   count the drinks you serve.  They equate out what a

1    standard drink is, okay?  They talk about estimate his

2    or her approximate weight.  Use the chart next to

3    calculate his or her BACs.

4                    Now, you go to the charts, and when you

5    reach that .08 threshold, that's when you become

6    dangerous.  So in and of itself, they are telling you,

7    Look, it's a danger to drive at .08.  Now, I don't

8    know a bar in the country that would promote serving

9    people to the BAC of .08 or more and telling them to

10   drive.  It just makes no sense whatsoever.

11                   This training is about .08.  If you

12   look at this training, they talk about -- and some of

13   it even gets specific for a large person, two the

14   first hour, or two or three the first hour and one

15   every subsequent hour.  So it's specific to keep them

16   under that threshold.

17        Q.   If -- I know you don't believe this, but if

18   you assume that Mr. Ruiz was served only four Brutus

19   beers, you would agree that he should have been below

20   a .08 at the time he left Applebee's?

21        A.   Just under a .08.

22        Q.   So if that fact were assumed by you, then

23   there was no breach of the standard of care as you've

24   articulated it.

25        A.   In and of itself overservice?

```
 1   manager, correct?
 2        A.     Before the third.
 3        Q.     Before the third?
 4        A.     Correct.
 5        Q.     This is a darn good policy?
 6        A.     Before the third, you bet.  It's dependent on
 7   the size of the person, let me qualify that.  If it's
 8   a 100-pound lady, it's not good.  Because two Brutuses
 9   will probably put her pretty high.
10        Q.     But we're not talking about a 100-pound lady,
11   are we?
12        A.     No.  But you're asking a general question
13   about their policy, and I want to clarify, it's good
14   if you're relating it to a 250-pound guy.
15        Q.     This -- back to this national standard.
16   Anywhere in the ServSafe material, does it reflect the
17   adoption of this .08 national standard that you should
18   not serve somebody up to that point?
19        A.     It doesn't specifically say that, okay?  It
20   doesn't say that.
21        Q.     So how do you equate that to the national
22   standard then?
23        A.     Because other programs follow the same
24   guidelines as ServSafe.  And remember, I explained to
25   you there's actual people who give these classes.
```

 1   These aren't just, you know, Here's your training
 2   program and you read it.  You're given instruction on
 3   this stuff.  And the instruction from class, to class,
 4   to class is .08, you can't drive.  What do you do with
 5   them when they get there?
 6       Q.   Who was driving the Mendoza vehicle when they
 7   arrived at Applebee's?
 8       A.   I believe Mr. Mendoza.
 9       Q.   Who was the driving the vehicle when they
10   left Applebee's?
11       A.   I believe Mr. Mendoza.
12       Q.   You were asked questions about Mr. Ruiz's
13   consumption of the vodka, and you gave an opinion --
14   you gave testimony that why would Ruiz go to the truck
15   and drink the vodka when he has perfectly good alcohol
16   in front of him?  In a roundabout way that's what you
17   said, the IPA and the Crown Royale, correct?
18                 MR. LYONS:  Objection, form.
19       A.   Yes.
20       Q.   (By Mr. Archibeque)  Would you agree with me
21   that you're not -- in order to formulate that opinion,
22   if it is an opinion, you're not relying on any
23   scientific data that helps you to formulate the
24   opinion that why would Ruiz have gone to the vehicle
25   to drink vodka if he's got alcohol in front of him?

Page 240

```
 1    aren't necessarily about New Mexico law.  They're
 2    about the standard of care and training guidelines,
 3    that's what they're about.  New Mexico law is just in
 4    addition to it.
 5         Q.    You've confirmed that the standard of care
 6    you testified to may exceed what is required by law?
 7         A.    Sure.
 8         Q.    Okay.  Is a license holder expected to know
 9    the blood alcohol concentration of each of its
10    customers?
11         A.    Not definitively, but they're required to
12    have an understanding of a ballpark figure of that.
13    And your ServSafe training is a perfect example that
14    your Applebee's people took.  They give them weight,
15    how long they've been drinking, BAC chart and what
16    they've been drinking and the strength of the drink,
17    equate it.  So it's clear that they're taught that
18    way.
19         Q.    And they should have at least a ballpark of
20    what their blood alcohol concentration is?
21         A.    Sure.
22         Q.    And it's an interesting term that you used.
23    There are liquor licenses issued to ballparks
24    literally, aren't there?
25         A.    Yes.
```

David Peshlakai, et al. v. James Ruiz, et al.                       March 5, 2013
Victor  Sanchez-Martinez                                        D-101-CV-2010-02669

Page 1

FIRST JUDICIAL DISTRICT COURT
COUNTY OF SANTA FE
STATE OF NEW MEXICO
No. D-101-CV-2010-02669
DAVID PESHLAKAI, DARLENE THOMAS,
CHARLES REYNOLDS AS THE PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATES OF DEL LYNN PESHLAKAI
(DECEASED) AND DESHAUNNA
PESHLAKAI (DECEASED), DANELL
PESHLAKAI, DARNELL PESHLAKAI,
SHAWN BEGAY, DELACEY PESHLAKAI, and
DAVID PESHLAKAI, JR.,
            Plaintiffs,
      vs.
JAMES RUIZ, GILBERT MENDOZA,
AND AMREST, LLC, DBA
APPLEBEE'S NEIGHBORHOOD
GRILL AND BAR, APPLEBEE'S
INTERNATIONAL, INC.,
            Defendants.

VIDEO DEPOSITION OF VICTORIA SANCHEZ MARTINEZ
                  March 5, 2013
                   1:33 p.m.
          Rodey, Dickason, Sloan, Akin & Robb, PA
           201 Third Street, NW, Suite 2200
           Albuquerque, New Mexico  87102

        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE THIS DEPOSITION WAS:

TAKEN BY:  MR. ZACKEREE S. KELIN
           ATTORNEY FOR THE PLAINTIFFS

REPORTED BY: Penny E. McAlister, CCR, NM CCR #250
           TRATTEL COURT REPORTING & VIDEOGRAPHY
           P.O. Box 36297                    ATTACHMENT B
           Albuquerque, New Mexico  87176-6297

1e3e5213-a965-43d4-8593-f597ed1a3428

David Peshlakai, et al. v. James Ruiz, et al.                                          March 5, 2013
Victor  Sanchez-Martinez                                                          D-101-CV-2010-02669

Page 35

1        **A.  -- copyright date?  I believe this is the first**
2   **edition.  A handout from previous alcohol server education**
3   **programs.**
4        Q.  Okay.  And let's go ahead and mark that one.
5        **A.  Sure.**
6        Q.  We'll mark that as 124.
7        **A.  Okay.**
8                **(Exhibit 124 was marked for**
9                  **identification.)**
10       **A.  The participant -- the "NewMAST Participant**
11  **Workbook" --**
12       Q.  Okay.
13       **A.  -- provided by the State of New Mexico Alcohol**
14  **and Gaming Division.**
15       Q.  Okay.  And we're going to mark that as 125.
16                (Exhibit 125 was marked for
17                  identification.)
18       **A.  Okay.  That's the Participant Guide.  The**
19  **Instructor Guide.**
20       Q.  And we'll mark the Instructor Guide as 126.
21       **A.  Okay.**
22                **(Exhibit 126 was marked for**
23                  **identification.)**
24       Q.  And the Participant Guide.  Wait.  You know what?
25  We have two copies.

1e3e5213-a965-43d4-8593-f597ed1a3428

David Peshlakai, et al. v. James Ruiz, et al.                                     March 5, 2013
Victor  Sanchez-Martinez                                                         D-101-CV-2010-02669

Page 36

1           MR. MOWERY:  This should be --

2       A.  Oh, this is a -- this is a different handout for

3  alcohol -- it's the NewMAST handout, the Participant Guide

4  being used by the association right now.

5       Q.  Okay.  And that is different than the

6  Participant --

7       A.  Yeah.  This was just an older version.

8       Q.  Okay.

9       A.  So --

10          MR. MOWERY:  Referring to Exhibit 124.

11          (Exhibit 127 was marked for

12            identification.)

13      Q.  Okay.  And we've -- we've marked the Participant

14  Guide as 127.  Okay.  Are there any other things that you

15  reviewed that weren't provided to you?

16      A.  Let me make sure.

17          MR. MOWERY:  Excuse me, Doug?  Doug?

18          MR. COMPTON:  Yeah.

19          MR. MOWERY:  You're making a lot of noise.

20  Is there any chance you could press mute on your end?

21          MR. COMPTON:  Yeah.  How about now?  Is it

22  gone?

23          MR. MOWERY:  Yup.

24          MR. KELIN:  It's actually still happening,

25  Doug.

1e3e5213-a965-43d4-8593-f597ed1a3428

David Peshlakai, et al. v. James Ruiz, et al.
Victor  Sanchez-Martinez

March 5, 2013
D-101-CV-2010-02669

Page 48

1  in direct violation of the law, like refusing service to a

2  pregnant woman.  You can't do that.

3      Q.  Okay.  Let me -- let me break it up.  The New

4  Mexico Restaurant Association Alcohol Server Education

5  Program that's in Exhibit 124, do you believe that this is

6  consistent with the law, the materials that are in here?

7      A.  Yes.

8      Q.  Okay.  The Participant Workbook, which we've

9  marked as Exhibit 125, the NewMAST materials, do you

10  believe those materials are consistent with the law?

11      A.  This booklet here?

12      Q.  Yes.

13      A.  I would have to go through and look for their

14  service of pregnant women.  Part of the reason we didn't do

15  use this workbook outright and the reason we're using this

16  is because our attorney told us this was in violation of

17  constitutional law.

18          MR. MOWERY:  Referring to?

19      A.  Referring to the service of pregnant women.

20          MR. MOWERY:  Exhibit 125.

21      Q.  Anything besides the service of pregnant women in

22  Exhibit 125 that you believe is inconsistent with the law?

23      A.  This has not been updated since 2005, so there

24  have been regulatory and some changes in particular to

25  signage that's required, carrying a concealed weapon onto a

David Peshlakai, et al. v. James Ruiz, et al.                                    March 5, 2013
Victor  Sanchez-Martinez                                                    D-101-CV-2010-02669

Page 53

1          A.  You'll receive your permit within 90 days.  If

2     you don't, call AGD.

3          Q.  Okay.  Perfect.  Thank you.  Copies of any other

4     literature that you've reviewed in connection with this

5     litigation and/or that you intend to rely upon for any

6     opinions that you have formed in this case and/or that you

7     intend to refer to in any trial of this matter.  Okay.

8          A.  These documents here.

9          Q.  Other than what we've marked, anything else?

10         A.  No.

11         Q.  Okay.  All bills and invoices submitted to

12    Defendants or their attorneys in connection with this

13    lawsuit and a detailed backup for the same.

14         A.  This is what has been submitted thus far.

15         Q.  Okay.  And since this time -- and I'm going to go

16    ahead and mark this.

17         A.  I don't know.  Does it matter which one you mark?

18    So there is a copy of the invoice and then a copy of the

19    invoice as paid.

20         Q.  Oh.

21         A.  Does it matter?

22         Q.  I'm just going to mark the invoice.

23         A.  Sure.

24         Q.  And I'm going to mark this as Exhibit 130.

25         A.  Okay.

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

**DAVID PESHLAKAI,** *et al.*,

        **Plaintiffs,**

**vs.**                                **No. D-101-CV-2010-02669**

**JAMES RUIZ,** *et al.*,

        **Defendants.**

## <u>AFFIDAVIT OF SEAN LYONS</u>

Upon my oath, I, Sean Lyons, do hereby state that the following facts are true and accurate to the best of my knowledge:

1.     I am over 18 years of age and competent to give testimony.

2.     On or about March 29, 2013, I received a copy of the Victoria Sanchez-Martinez deposition transcript and reviewed it shortly thereafter. Before this date I had never seen official version of either Exhibit 125, the NewMAST Participant Workbook or Exhibit 127, the NewMAST Instructor Guide.

3.     I had seen before a partial copy of what I now understand to be the New Mexico Restaurant Association's (NMRA) "NewMAST Participant Guide." At that time, due to its cover page, I believed it to be the official, approved NewMAST material.

4.     On April 3, 2013 I printed out Exhibit 125, the NewMAST Participant Workbook and Exhibit 126, the NMRA "NewMAST" Participant Guide, compared them, and noticed the many differences between them.

5.     After making inquiries I learned that W. Gill Woodall, Ph.D. was the principle author of the official, approved NewMAST materials. After considerable effort I first reached W. Gill Woodall, Ph.D. by telephone on April 23, 2013. I discussed with him the history of the NewMAST materials and his role in that history. I explained to him that the NMRA appeared to be using and distributing a modified version of the NewMAST Participant Workbook in their alcohol server training classes. He explained that as far as he knew there were no materials approved for training in 2010 other than the official NewMAST materials he authored along with his colleagues. He explained that he did not believe the NMRA was authorized to do this, because it would defeat the purpose of creating the standardized NewMAST curriculum.

<span style="color:red">**ATTACHMENT C**</span>

6.  Dr. Woodall agreed to review and compare the materials, and suggested that I contact the Alcohol & Gaming Division to learn whether the NMRA had been approved to use substitute or modified materials in their alcohol server training classes.

7.  On April 23, 2013, after the above described telephone call, I emailed Exhibits 125 and 127 to Dr. Woodall.

8.  I called the Alcohol & Gaming Division on several occasions attempting to speak to Jennifer M. Anderson, the current Director, or someone who could tell me whether the NMRA had been authorized to use their "Participant Guide." I spoke with Desirae Griego, who declined to answer directly, but suggested we file an Inspection of Public Records Act request.

9.  We mailed our IPRA request to the New Mexico Regulation and Licensing Department, Alcohol & Gaming Division on May 20, 2013.

10. On June 5, 2013, the Alcohol & Gaming Division responded to our IPRA request telling us it had no documents reflecting that it authorized the NMRA to use modified materials and that, "The NewMAST materials are currently the only approved server training program in New Mexico."

11. I began attempting to reach Dr. Woodall soon after receiving that letter, and after some difficulty I reached him on or about July 16, 2013. I informed him of the Alcohol & Gaming Division's response to our IPRA letter.

12. On July 17, 2013 Dr. Woodall agreed to act as a specially retained expert witness and he emailed to me his curriculum vitae and rates.

FURTHER AFFIANT SAYETH NAUGHT.

**SUBSCRIBED AND SWORN TO** before me this 5th day of $August$, 2013 by $Sean\ Lyons$ .

Notary Public

My commission expires: $9/12/14$

KATIE HOENER
Notary Public, State of Texas
My Commission Expires
September 12, 2014

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**

**DAVID PESHLAKAI,** *et al.,*

     **Plaintiffs,**

**vs.**                              **No. D-101-CV-2010-02669**

**JAMES RUIZ,** *et al.,*

     **Defendants.**

## AFFIDAVIT OF W. GILL WOODALL Ph.D.

Upon my oath, I, W. GILL WOODALL, Ph.D. do hereby state that the following facts are true and accurate to the best of my knowledge:

1.     I am over 18 years of age and competent to give testimony.

### Qualifications

2.     I am a professor at the University of New Mexico and have a master's degree and a Ph.D. in communications. I serve in two principle roles at the University of New Mexico: I am a full professor in the Department of Communications and Journalism, teaching in the area of communications; I am also a Senior Research Scientist in the University of New Mexico's Center on Alcoholism, Substance Abuse and Addictions (CASAA).

3.     I completed my Ph.D. in communications at the University of Florida in 1978.

4.     In 2011, I received the eighth annual Creative Award in recognition for disclosed copyrights—Uconsiderthis: A website to prevent risky college student alcohol consumption; and WayToServe.org, a Responsible Beverage Service Training website.

5.     Professional organizations of which I am a member include the Research Society on Alcoholism and Society for Prevention Research.

6.     I have authored and co-authored published, peer-reviewed articles on the subject of alcohol abuse and specifically on the subject of prevention of driving while intoxicated. I have received and worked under research grants from the U.S. Department of Education and the National Institutes of Health for research in the area of alcohol and substance abuse prevention, prevention of driving while intoxicated, and training for responsible service of alcoholic beverages.

<div align="center">1</div>

<div align="right" style="color:red">ATTACHMENT D</div>

7. From 2005 to 2010, I served as a member of the Governor's DWI Leadership Team, State of New Mexico.

8. From 1991 to 2000, I served as Director of the Prevention and Education Division of CASAA, and member of the CASAA executive committee. My direct role on the CASAA Executive Committee was to help set policy and provide guidance for the general mission of CASAA. Further, I oversaw the CASAA Treatment Division prevention committee, a committee that conducted prevention activities as part of the federal pass through funding for substance abuse treatment. Additionally, a task connected with this role is the promotion of faculty grant efforts that are connected to prevention research.

9. My qualifications and publications are more completely described in my curriculum vitae, which is attached as Exhibit A.

## Creation of the NewMAST Participant Workbook and Instructor Guide

10. Until the mid-1990s, New Mexico had one of the worst rates of fatalities and injuries from drunk driving. On Christmas Eve, 1992 a terrible drunk driving accident occurred that inspired legislation aimed at lowering drunk driving accidents in New Mexico.

11. One result of this legislation was the Alcohol Server Training Education Act (the "Act"), passed in 1993, New Mexico Statutes Annotated 1978, Chapter 60, Article 6E. The Act mandates that every seller or server of alcohol in the State of New Mexico complete a program based on an approved curriculum and taught by approved schools and instructors.

12. Three of the stated purposes of the Act are to:

A. enhance the professionalism of the persons employed in the alcoholic beverage service industry;

B. establish a program for servers, licensees and their lessees that includes the study of… (1) the effect alcohol has on the body and behavior, including the effect on a person's ability to operate a motor vehicle when intoxicated; (2) state law concerning liquor licensure, liquor liability issues and driving under the influence of intoxicating liquor; (3) methods of recognizing problem drinkers and techniques for intervening with problem drinkers;

C. reduce the number of persons who drive while under the influence of intoxicating liquors and mitigate the physical and property damage caused by that behavior." NMSA 1978, §60-6E-2 (A)-(C).

2

13.  In New Mexico, a person is per se guilty of Driving Under the Influence of alcohol if the alcohol concentration in one's blood or breath measures .08% or higher within three hours of driving. NMSA 1978 § 66-8-102 (C)(1).

14.  The .08% BAC level found in New Mexico code is the consistent with the DUI level in all 50 states and based upon review of studies by the National Highway Traffic Safety Administration finding that virtually all drivers ability to drive is impaired at .08%.

15.  The Act empowers the New Mexico Alcohol and Gaming Division to develop and oversee the program to train servers.

16.  Drunk driving incidents in New Mexico declined after the 1993 legislation in New Mexico began to take effect, including the institution of the Act.

17.  New Mexico is now one of fourteen states in the country that require alcohol servers to be trained.

18.  In the 1990s, CASAA, under my directorship, conducted studies in New Mexico to research the rates at which establishments refused service to an apparently intoxicated person ("Rates of Refusal").     These rates increased from 18.5% pre-Act to 34-35% post-Act. However, by 2004, CASAA studies showed that the refusal rates had plateaued at that level and it became recognized that drunk driving incidents were again on the rise in New Mexico.

19.  Gary Tomada, the secretary of the New Mexico Alcohol & Gaming Division, contacted CASAA and contracted with us to study the problem, which entailed attending many alcohol server training classes.

20.  We found that alcohol server training services used varying curricula, and that the quality of training done from class to class varied greatly as well.   We concluded and advised the Alcohol and Gaming Division that inconsistencies in alcohol server training were a significant source of the problem, and that the standardization of alcohol server training would likely further lower DWIs and drunk driving incidents.

21.  In 2004, the Alcohol & Gaming Division responded to this conclusion and advice by contracting again with the University of New Mexico, CASAA, to develop a single, standardized and uniform curriculum to be used by all services and trainers who provide alcohol server training in New Mexico. All servers were to be certified using this curriculum alone and all trainers to teach this material to create a professional standard for the service of alcohol in New Mexico.

22.  As a result, CASAA developed the New Mexico Alcohol Server Training ("NewMAST") materials, which consist of the NewMAST Participant Workbook and the NewMAST Instructor Guide, attached as Exhibit B and Exhibit C, respectively.

3

23.     The Alcohol & Gaming Division approved the NewMAST materials and introduced, disseminated and put them into use beginning in January of 2005.

24.     The NewMAST materials used for Alcohol Server Training are still in use today and there have so far been no amendments or updates to the version approved and distributed in 2005.

25.     The principle authors of the NewMAST Participant Workbook and NewMAST Instructor Guide are Paula Stanghetta and I.

26.     The cover pages of these materials bear the name and acronym: New Mexico Alcohol Server Training (NewMAST). The cover pages also bear an insignia from the New Mexico Regulation & Licensing Department, Division of Alcohol & Gaming, reflecting approval and authorization for use by that entity.

27.     Importantly, on page three of the NewMAST Instructor Guide, a boxed text at the bottom reads:

> "Important Note to Instructor: It is imperative that the NewMAST program content and activities are the same whenever the program is delivered. Do not add or change any part of the program unless you receive written approval from AGD."

28.     We very deliberately added that statement to the materials in this conspicuous manner after a discussion we had with Gary Tomada in which it was determined we should make it very clear to all instructors that the NewMAST materials were the curriculum to use and instructors were not to depart from this set of materials. The standardization of curriculum was the major purpose of our undertaking. It is our belief that standardization of curriculum is what is needed to further decrease DWI incidents in New Mexico.

## How Servers are Trained in the NewMAST Participant Workbook

29.     To serve alcohol in New Mexico, an individual must attend and complete an approved Alcohol Server Training class. The server (server, bartender, manager, owner, operator or licensee) is to be given his or her own copy of the NewMAST Participant Workbook. The instructor must be certified to instruct the class, and he or she is to use the NewMAST Instructor Guide to instruct the class.

30.     The 30 page NewMAST Participant Workbook and the 42 page NewMAST Instructor Guide are organized to emphasize the purposes of responsible service of alcohol training, which includes most importantly the reduction of DWIs and incidences of alcohol-related problems throughout New Mexico.

4

31.     The first judgment a server must make about a patron is whether or not he or she is sober.

32.     That can really only be done by observing for signs of intoxication. Once the server starts serving, he or she should serve only to below the point of intoxication. Drink counting is the only reliable technique that can be used. I along with my colleagues have studied the use of observation combined with drink counting, and when a reliable program of drink counting training is used rates of refusal can be improved to 70%.

33.     The Workbook provides the server trainee with four principle skills:

1.     How to manage intoxicated patrons who intend to drive
2.     Identifying Impairment and Intoxication
3.     Six step ID Check
4.     Calculating Drink Capacity

34.     The fourth skill, drink counting, is the heart of the NewMexico Alcohol Server Training. As the Workbook states on page 2, "Responsible serving practices work because they control drinking at the point of sale - they come into play before too much alcohol is consumed."

35.     The skill of drink counting is taught at pages 20-21 of the Workbook. Using the concept of the standard drink, which is taught on page 13, the Workbook provides charts to be filled in by the server in training and advises:

> To keep patrons from becoming intoxicated, you must control the rate of service. The charts below show the maximum number of drinks per hour to keep the patron's BAC under .08%, the point of intoxication. Serving more than the maximum will result in a BAC over .08% and the patron will be intoxicated.

36.     Servers are taught they must look for signs of intoxication before they serve and continue to monitor for such signs as they serve. We then provide the server with the four steps required to control service by counting drinks. They are instructed to estimate the weight of the person, note the person's gender, and then estimate how many drinks the person can have the first hour and then for each additional hour.

37.     For the fourth step they are instructed:

> **Step Four**: As long as there are no warning signs (Step Three), continue to serve at the rate in the chart, up to the maximum. Slow down or cut off service if there are signs the patron is approaching or has exceeded .08%.

38.     We close this section reemphasizing that drink counting, not just observing for signs of intoxication, is required to responsibly serve alcohol:

> **Caution**: Do not exceed the drink limits on the chart. Even if the patron is
> not showing signs of intoxication, he or she will have a BAC at or close to
> .08%. Recall that some heavy drinkers develop tolerance, and you never
> know if this applies to the person you are serving.

39.  The concept of tolerance is taught at page 16. Servers are taught that some patrons may
     not show signs of intoxication, even when their BACs are above .08%. We instruct, "For
     this reason you should not exceed the drink limits for each patron."

40.  This is the responsible service of alcohol training required to be taught to each and every
     server in New Mexico. The standard of care taught to and expected of alcohol servers in
     New Mexico is to count the number of standard drinks being served and slow or stop
     service of alcohol to keep the patron from reaching .08% BAC, even if he or she is not
     yet showing signs of intoxication.

**The NMRA Participant Guide**

41.  Attached as Exhibit D is what the New Mexico Restaurant Association (NMRA)
     apparently calls the NewMAST Participant Guide. For the sake of clarity I will call it the
     NMRA Participant Guide, leaving out "NewMAST" to delineate it from the NewMAST
     Participant Workbook.

42.  The NMRA's Participant Guide appears to be the NMRA's own version of the
     NewMAST Participant Workbook.

43.  I first saw the NMRA Participant Guide in April of 2013, when it was emailed to me by
     Sean Lyons. At that time I explained to Mr. Lyons that, as far as I was aware, the New
     Mexico Alcohol & Gaming Division had not authorized the NMRA or anyone else to use
     any curriculum in place of the NewMAST Participant Workbook and NewMAST
     Instructor Guide. Authorizing the NMRA to use the Participant Guide in place of the
     NewMAST Participant Workbook would be inconsistent with the purposes for creating
     the NewMAST materials, especially since NMRA instructs so many alcohol servers state
     wide.

44.  In that initial call in April of 2013, Mr. Lyons and I discussed the history and purpose of
     the NewMAST materials, described above, and I suggested to Mr. Lyons that he ask the
     Alcohol and Gaming Division whether they had authorized the NMRA to use any such
     substitute materials and get back to me.

45.  Mr. Lyons has now shared with me the New Mexico Alcohol and Gaming Division's
     letter sent to him in response to his request for documents. The letter is attached as
     Exhibit E. The letter confirms that NMRA did not receive authorization to use modified
     NewMAST materials in their alcohol server training classes. The division states: "The

6

NewMAST materials are currently the only approved server training program in New Mexico."

46. The letter clarifies that a training program may supplement or use additional materials, but it does not appear that is what the NMRA is doing with these materials.

47. The NMRA Participant Guide bears a cover page that declares it to be a *NewMAST* Participant Guide and it includes the insignia of the New Mexico Regulation & Licensing Department, Division of Alcohol & Gaming. It has its own table of contents and contains some content that overlaps the content of the NewMAST Participant Workbook. On its face it appears structurally similar to the NewMAST Participant Workbook. I assume then that the NMRA used the NMRA Participant Guide in place of the NewMAST Participant Workbook.

48. I have several criticisms:

49. First, and most obvious, the NMRA appears to have ignored the boxed text at the bottom of page 3 of the NewMAST Instructors Guide, which makes it clear that the NewMAST materials are to be the only curriculum used for alcohol server training.

50. Second, the NMRA Participant Guide reaches the subject of DWI and alcohol-related incidents only at page 16 of their 21 page guide. The NewMAST Participant Workbook by contrast puts the information on DWI facts on page 9, in one of its first areas of content. We did this to stress its importance and set the context for what is taught. The NMRA has buried the issue of drunk driving further down in their manual, obscured it, and diminished its impact upon the server trainee. Further, this section discusses DWI in title only. The NMRA does not provide statistics or describe the social problem of driving while intoxicated. They instead occupy these pages with a discussion of third party liability. Nowhere in their guide, and not in this section, does NMRA discuss alcohol-related crashes, injuries and deaths and other societal harms as discussed by the NewMAST Participant Workbook on page 9.

51. Third, the NMRA Participant Guide provides no system for counting. They do not train servers to count. The NMRA says "follow a system of drink counting" but they do not tell servers how to do it. In fact, the NMRA guide provides a lot of unnecessary, confusing information that might actually lead a server to conclude it is useless to attempt counting drinks.

52. This is a critical departure from the NewMAST materials. Our system, described on page 20 and 21, instructs the server in a four step process for counting drinks using the provided drink counting chart. The NewMAST Participant Workbook clearly teaches and tells servers that they are expected to recognize when they are serving a patron to a BAC approaching .08% and that they are expected not to serve a patron to or beyond a

.08% BAC. The NMRA Participant Guide has deleted this clear message, including specifically the clear language quoted above.

53.     The diminishment of drink counting and the deletion of clear language instructing servers to not serve a patron to a BAC of .08 takes away the core of what NewMAST was trying to accomplish by creating this standardized curriculum.

54.     Fourth, the NMRA's Participant Guide's section on the effects of alcohol, impairment and intoxication, at pages 12-13, differs greatly from the NewMAST Participant Workbook's section on impairment and intoxication, at pages 15-16. One important difference is the NewMAST delineates between signs of impairment from signs of intoxication in order to (1) aid the server in observing and understanding signs of impairment so that they can slow or stop service alcohol so that the patron does not reach the point of intoxication, and (2) aid the server in observing signs of intoxication so they can know when not only to stop service but attempt to keep a patron from attempting to drive. The NMRA Participant Guide by contrast blends the signs of impairment and intoxication as if there is no difference between the two. The NMRA guide offers a litany of non-specific signs of intoxication which do not appear to be evidence based, are too confusing, and too overwhelming.

55.     Further, a great deal of the information provided in the effects of alcohol section of the NMRA Participant Guide—such as altitude, medication, and the NMRA's own description of tolerance—does not matter to a server and will not help a server know what to do. The effect of the NMRA's overall approach is to diminish the focus on what really matters to a server: number of drinks, time in the restaurant, gender and body weight. The NMRA's guide is therefore counterproductive.

56.     Finally, the NMRA Participant Guide departs greatly, and tellingly, from the NewMAST Participant Workbook on the concept of tolerance. At page 16 the NewMAST Participant Workbook explains:

> Long-term heavy drinkers can develop a tolerance for alcohol. When this happens, they may show fewer signs of intoxication even when their BACs are above .08%. For this reason, you should not exceed the drink limits for each patron (see the next section of this workbook).

57.     The NMRA replaces this paragraph at its page 12 with:

> Tolerance and intoxication are two very different things. Intoxication is the visual effects of excessive alcohol consumption. Tolerance is not a substitute for intoxication; tolerance is a mask of Intoxication. Tolerance is developed by drinking alcohol. A heavy drinker or alcoholic develops a tolerance for alcohol by drinking alcohol. Alcoholics often can drink

amounts of alcohol that would make non-alcoholics sick and still show few signs of intoxication.

58.     This paragraph is needlessly confusing and contains wrong information. It is wrong to say and very wrong to train servers that "[i]ntoxication is the visual effects of excessive alcohol consumption." The whole point of teaching the concept of tolerance to servers is to teach them that a person might not look intoxicated but may nonetheless be quite intoxicated and therefore a danger to themselves and others if they drive. The point of teaching servers about tolerance is to stress that a server must count drinks instead of just observing and monitoring for signs of intoxication. The NMRA, teaching servers instead that "[i]ntoxication is the visual effects of excessive alcohol consumption," teaches the opposite and therefore greatly undermines the purpose behind alcohol server training.

59.     In summary, there is little overlap in content between what is in the NMRA Participant Guide and the NewMAST Participant Workbook. The NMRA Participant Guide makes big departures. The overall effect of the NMRA Participant Guide is no doubt counter-productive to alcohol server training in New Mexico.

60.     The NMRA Participant Guide does not describe the standard of care expected of alcohol servers in New Mexico, but rather appears to be an effort to lower it.

FURTHER AFFIANT SAYETH NAUGHT.

**SUBSCRIBED AND SWORN TO** before me this 1st day of August , 2013 by
William A. Woodall

Notary Public
My commission expires:

OFFICIAL SEAL
BARBARA D. MAEZ
Notary Public
State of New Mexico
My Comm. Expires 6-3-2016

9



**Susana Martinez**
GOVERNOR

**J. Dee Dennis, Jr.**
SUPERINTENDENT

**Mary Kay Root**
DEPUTY
SUPERINTENDENT

**James C. McKay**
CHIEF GENERAL
COUNSEL

**Jennifer M. Anderson**
DIRECTOR

**New Mexico Regulation and Licensing Department**
ALCOHOL AND GAMING DIVISION
Toney Anaya Building ▪ 2550 Cerrillos Road ▪ Santa Fe, New Mexico 87505
PO Box 25101, Santa Fe, New Mexico 87505-5101
(505) 476-4875 ▪ Fax (505) 476-4595 ▪ www.rld.state.nm.us

June 5, 2013

Sean M. Lyons
1301 W. 25th Street, Suite 400
Austin, TX 78705

RE:     Inspection of Public Records Request

Dear Mr. Lyons:

The Regulation and Licensing Department is in receipt of your Inspection of Public Records Request dated May 20, 2013.

You requested the following items:

Any and all records that concern training materials used by the New Mexico Restaurant Association (NMRA) in alcohol education courses. Specifically, any and all records that reflect that the NMRA either did or did not receive from the Alcohol and Gaming division approval to use modified NewMAST materials or alcohol server training materials other than the NewMAST materials in their alcohol server education courses.

RESPONSE:

The Division has no records responsive to your request in its possession. The NewMAST materials are currently the only approved server training program in New Mexico. However, NewMAST materials represent the minimum content that must be included in courses taught by certified providers and instructors. All certified providers and instructors are allowed to supplement NewMAST with additional information.

Please contact me at marlene.montoya@state.nm.us or by phone at 505-476-4556 if you have questions.

Sincerely,

Marlene Montoya
Alcohol and Gaming Division

Alcohol and Gaming Division
(505) 476-4875

Boards and Commissions Division
(505) 476-4600

Construction Industries Division
(505) 476-4700

Financial Institutions Division
(505) 476-4885

Manufactured Housing Division
(505) 476-4770

Securities Division
(505) 476-4580

Administrative Services Division
(505) 476-4800

<span style="color:red">ATTACHMENT E</span>