# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DAVID PESHLAKAI, DARLENE THOMAS,
CHARLES REYNOLDS AS THE PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATES OF DEL LYNN PESHLAKAI
(DECEASED) AND DESHAUNNA PESHLAKAI
(DECEASED), DANELL PESHLAKAI, DARNELL
PESHLAKAI, SHAWN BEGAY, DELACEY
PESHLAKAI, and DAVID PESHLAKAI, JR.,

        Plaintiffs,

vs.                            No. CIV 13-0752 JB/ACT

JAMES RUIZ, GILBERT MENDOZA, AMREST, LLC
d/b/a APPLEBEE'S NEIGHBORHOOD GRILL AND BAR,
and APPLEBEE'S INTERNATIONAL, INC.,

        Defendants.

## UNSEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) Defendant AmRest, LLC's Motion in

Limine to Exclude Evidence of Applebee's Guest Contact Reports, filed March 3, 2014

(Doc. 159)("Guest Report Motion"); (ii) AmRest, LLC's Opposed Motion in Limine to Exclude

References to and Evidence Regarding Prior Incidents and Prior Liquor Law Violations at Any

AmRest Restaurant, filed March 5, 2014 (Doc. 162)("Prior Conduct Motion"); (iii) Defendant

AmRest, LLC's Motion in Limine to Exclude Evidence of Subsequent Liquor Law Violations at

---

[1]In its Sealed Memorandum Opinion and Order, filed April 28, 2014 (Doc. 370)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information in the Sealed MOO before the Court published a public version of the Sealed MOO. See Sealed MOO at 1 n.1. The Court gave the parties fourteen calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF, the Court's Case Management/Electronic Case Files, to indicate that they have any proposed redactions. Consequently, the Court is now refiling the Sealed MOO in an unsealed form. The only changes are this footnote and certain line spacing changes.

Any AmRest Locations, filed February 26, 2014 (Doc. 144)("Subsequent Liquor Law Violations Motion"); (iv) Defendant AmRest, LLC's Motion in Limine to Exclude Evidence of its Post-Accident Conduct, filed March 10, 2014 (Doc. 196)("Post-Accident Conduct Motion"); and (v) Defendant AmRest, LLC's Motion in Limine to Exclude "Cumulative Conduct" Evidence of Alleged Wrongful Acts by AmRest That Did Not Cause, and Are Not Similar to Conduct That Caused, Plaintiffs' Injuries, filed March 10, 2014 (Doc. 200)("Cumulative Conduct Motion"). The Court held hearings on April 1, 2014, and April 2, 2014.  The primary issues are: (i) whether the Court should exclude evidence of reports from guests at the Applebee's Neighborhood Grill and Bar in Santa Fe, New Mexico relating to alcohol service; (ii) whether the Court should exclude evidence about incidents and liquor law violations that occurred before the events of March 5, 2010, out of which this case arises; (iii) whether the Court should exclude evidence about liquor law violations that occurred after March 5, 2010; (iv) whether the Court should exclude evidence of AmRest, LLC's other conduct after March 5, 2010; and (v) whether the Court should exclude evidence of certain other wrongful acts by AmRest, LLC, both before and after the event, on the basis that they violate the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of America.  The Court will grant in part and deny in part the Guest Report Motion, the Prior Conduct Motion, and the Cumulative Conduct Motion, and will deny the other motions.  With respect to the Guest Report Motion and the Prior Conduct Motion, the Court will admit the first complaint -- which involves a complaint of overservice in April, 2008 -- the third complaint -- in which an anonymous person alleges that a bartender had been suspended because she refused to serve intoxicated patrons -- and the fourth complaint -- about overservice on May 4, 2010 -- to show that AmRest, LLC was on notice of problems with overservice.  The Court will exclude the second complaint, which relates to the

noise level in the Santa Fe Applebee's Neighborhood Grill & Bar, because it is irrelevant, and because it is hearsay not within any exception.  In all other respects, the Court denies the Guest Report Motion and the Prior Conduct Motion.  With respect to the Cumulative Conduct Motion, the Court will admit evidence of subsequent overservice within Debbie Passmore's and Jake Gandhi's area for the limited purpose of showing AmRest, LLC's state of mind on March 5, 2010; it will not admit evidence of violations and acts that do not relate to overservice.  The Court will deny the other motions in full.

## FACTUAL BACKGROUND

The Court takes its facts from the Plaintiffs' Third Amended Complaint for Wrongful Death, Personal Injuries, Loss of Consortium and Other Damages, filed in state court January 16, 2013, filed in federal court August 14, 2013 (Doc. 2-1)("Complaint").  Two restaurants in Santa Fe, New Mexico -- Applebee's Neighborhood Grill and Bar, and the Blue Corn Café and Brewery -- served alcohol to Defendants James Ruiz and Gilbert Mendoza, as well as non-party Veronica Castro, despite that it was reasonably apparent that they were drunk.  See Complaint ¶¶ 26-29, at 4-5.  Defendant AmRest, LLC is the franchisee responsible for the Applebee's Neighborhood Grill in Santa Fe; Defendant Applebee's International, Inc. is the franchisor responsible for that restaurant.  See Complaint ¶ 17, at 3; id. ¶ 26, at 4.  Ruiz, Mendoza, and Castro then got into Mendoza's car, with Ruiz driving -- until he crashed into a vehicle that carried Plaintiffs David Peshlakai and Darlene Thomas, who lived together as common-law husband and wife, and their daughters DeShauna and Del Lynn Peshlakai.  See Complaint ¶¶ 30-31, at 5; id. ¶¶ 81-84, at 16.  The crash badly injured David and Darlene, and it killed Del Lynn and DeShauna, who were then nineteen and seventeen years old.  See Complaint ¶¶ 1-2, at 1.  Ruiz ran away without trying to help the family.  See Complaint ¶¶ 32, at 2.

- 3 -

## PROCEDURAL BACKGROUND

The Plaintiffs allege seven causes of action in their Complaint.  Against AmRest, LLC and Applebee's International, they bring: (i) common-law and statutory dram-shop liability claims, see Complaint ¶¶ 33-48, at 8-9; and (ii) negligence claims related to alcohol marketing and distribution, see Complaint ¶¶ 49-58, at 9-12.  Regarding the individual Defendants, the Plaintiffs bring: (i) negligence and negligence per se claims against Ruiz and Mendoza related to driving while intoxicated, see Complaint ¶¶ 59-68, at 12-14; and (ii) a negligent-entrustment claim against Mendoza for allowing Ruiz to drive Mendoza's vehicle while intoxicated, see Complaint ¶¶ 69-79, at 14-15.  Against all Defendants, (i) David Peshlakai and Darlene Thomas bring a negligent infliction of emotional distress claim, see Complaint at ¶¶ 80-85, at 15-16; and (ii) all Plaintiffs bring a loss-of-consortium claim, see Complaint ¶¶ 86-89, at 16-17.

1.   **Guest Report Motion.**

AmRest, LLC moves the Court to exclude "evidence that AmRest had complaints submitted through Applebee's Guest Services System regarding the service of alcohol at the" Santa Fe Applebee's Neighborhood Grill.  Guest Report Motion at 1.  After reviewing the case's facts, see Guest Contact Report Motion at 1-2, AmRest, LLC explains that discovery has revealed information about the following four guest contacts reports about that restaurant:

> The first complaint involved a customer who believed the restaurant over served an individual on April 22, 2008. AmRest did not even own the Santa Fe Applebee's at that time.  AmRest did not have an ownership interest in the restaurant until *July* of 2008.
>
> The second complaint was received on January 23, 2009. It involved a customer who was upset because she and her friends were asked to keep their noise level down during a happy hour.
>
> The third complaint was made by an anonymous person on February 11, 2010.  This person claimed that a bartender was suspended for refusing to serve drinks to two intoxicated patrons.

The fourth complaint also was left by an anonymous person.  On May 4, 2010, this person complained that some male customers were being really loud, they kept being served drinks, and they were over served.  This complaint was made *after* the date of the automobile accident at issue herein.

During discovery, Plaintiffs have asked multiple witnesses questions regarding each of the complaints.  In the deposition of [Andrea Beals, a former bartender for the Santa Fe Applebee's Neighborhood Grill], it appeared that Plaintiffs' intent was to use evidence of the Guest Contact Report to support an argument that AmRest had a history of reprimanding bartenders who cut off patrons from further alcohol service.  Ms. Beals was questioned regarding the February 11, 2010, incident, at which time she denied she had ever been reprimanded for refusing to serve a patron.  Ms. Beals' immediate supervisor while she was a bartender, Anthony Bonnefil, has confirmed that he was aware Ms. Beals had cut off a couple of customers from further alcohol service, that she was not demoted for having done so, and that he instead supported any bartender's decision to cut off a customer.

Guest Report Motion at 2-3 (emphasis in original)(citations omitted).

AmRest, LLC argues that the Court should exclude this evidence under rules 402 and 403 of the Federal Rules of Evidence.  <u>See</u> Guest Report Motion at 4.  It contends that this evidence is irrelevant, because their existence "does not make it any more or less probable that Defendants allegedly over served Ruiz and Mendoza."  Guest Report Motion at 4.  It notes that

one of these complaints occurred before AmRest began operating the Santa Fe Applebee's (April 22, 2008, complaint), one complaint occurred after the automobile accident at issue herein (May 4, 2010, complaint), one complaint did not allege that anyone was over served (January 23, 2009, complaint), and one anonymous complaint improperly assumed a bartender was reprimanded for refusing to serve a patron (February 11, 20 I 0, complaint).  As such, evidence of these complaints should be excluded because they have no relevance to Plaintiffs' claims in this matter.

Guest Report Motion at 4.  What is more, in its view, even if the evidence is relevant, the Court should exclude it under rule 403, because it "would tend to mislead the jury into thinking that AmRest is a bad company," which would unfairly prejudice AmRest, and because it would require AmRest, LLC to explain unrelated conduct, which would distract the jury.  Guest Report

Motion at 5.

AmRest, LLC also asks the Court to exclude the evidence under rule 404(b) of the Federal Rules of Evidence, because the Plaintiffs could use it "to suggest to the jury that AmRest and its employees are bad actors who have been negligent before and therefore must have been negligent in their treatment of Ruiz and Mendoza." Guest Report Motion at 6. Accordingly, in its view, "evidence of any complaint in the Guest Contact Reports should be excluded from evidence at the trial of this matter." Guest Report Motion at 6.

AmRest, LLC also asks the Court to exclude this evidence, because it is hearsay. <u>See</u> Guest Report Motion at 6. It explains that it anticipates

> that Plaintiffs will attempt to admit into evidence testimony or exhibits regarding complaints contained in the Guest Contact Reports to demonstrate complaints at the
> property at issue regarding the service of alcohol. Such out-of-court statements regarding unsubstantiated complaints are hearsay and do not meet the evidentiary standard for admissibility. Two of the four complaints were provided anonymously. With regard to the complaint involving Ms. Beals, it was based on misinformation and false assumptions. Due to the fact that it is not possible to assure the reliability of these statements, they should be excluded as impermissible hearsay, and AmRest
> respectfully requests that this motion *in limine* be granted.

Guest Report Motion at 7.

In the Plaintiffs' Response to AmRest, LLC's Motion *in Limine* to Exclude Evidence of Applebee's Guest Contact Reports, filed March 17, 2014 (Doc. 231)("Guest Report Response"), the Plaintiffs ask the Court to deny the Guest Report Motion. Guest Report Response at 1. The Plaintiffs contend that the evidence is relevant to AmRest, LLC's state of mind and for liability under the New Mexico Wrongful Death Act, N.M. Stat. Ann. 1978, § 41-2-1 to -4.[2] <u>See</u> Guest

---

[2] The Plaintiffs also argue that the guest contact reports are relevant as against Defendant Applebee's International, both for purposes of control and as to comparative fault <u>See</u> Guest Report Response at 2. Because the Court understands that Applebee's International has settled,

Report Response at 3.  The Plaintiffs argue that "[i]t is also particularly relevant what AmRest may or may not have done with the subject complaints, including whether they did anything of substance.  The evidence tends to show that AmRest had a routine practice of doing nothing with" such complaints, "showing that [responsible service of alcohol] was not taken seriously, which is relevant to the jury's aggravating circumstances analysis and for determining whether punitive damages are to be imposed, including in what amounts."  Guest Report Response at 3 (citing Fed. R. Evid. 406).  The Plaintiffs explain:

> For example, the third complaint was from a bartender who was questioned about the events that led to her demotion from the bar to the floor.  AmRest gives a truncated version of her testimony.  In addition to the quoted testimony from AmRest, the bartender testified that she felt like she was doing her job the evening that led to the incident where she was suspended.  It is of no concern that her direct supervisor testified that she was not disciplined for cutting the customers off, primarily because he was not the person who performed the demotion.  That person was Jake Ghandi, who was also the area coach for the geographical area from which all three complaints were generated.

Guest Report Response at 4 (citations omitted).

The Plaintiffs contend that the evidence is admissible as a business record under rule 803(6) of the Federal Rules of Evidence.  See Guest Report Response at 4.

> Only one of the complaints is an actual statement, in the form of an electronic mail, of a customer.  The rest are summaries drafted by intake workers, viz, mental impressions of the Defendant, which can be admitted against the Applebee's Defendants under Fed. R. Evid. Rule 801(d)(2).  The repeated complaints regarding [responsible service of alcohol] issues show a conscious disregard for responsible service of alcohol issues and inadequate policies and procedure for the safe service of alcohol.

Guest Report Response at 4 (citations omitted).  The Plaintiffs also argue that, as they have explained, they are not offering this information to show that AmRest, LLC is "a bad company,"

---

it will omit the Plaintiffs' argument that focus on Applebee's International from its discussion of the Guest Report Response.  The Court will also omit discussion of related issues in its discussion of AmRest, LLC's Reply in Support of AmRest, LLC's Motion in Limine to Exclude Evidence of Applebee's Guest Contact Reports, filed March 31, 2014 (Doc. 293).

but, rather, for other purposes; therefore, in its view, the evidence is not unduly prejudicial. Guest Report Response at 4.

In AmRest, LLC's Reply in Support of AmRest, LLC's Motion in Limine to Exclude Evidence of Applebee's Guest Contact Reports, filed March 31, 2014 (Doc. 293)("Guest Report Reply"), AmRest, LLC contends that "[l]ittle of what Plaintiffs argue is straightforward," and addresses the Plaintiffs' arguments that the evidence is admissible under rule 404(b) and rule 406. Guest Report Reply at 1.

> As best as AmRest can tell, Plaintiffs are arguing that the Guest Contact Reports are admissible under Rules 404(b) and 406 to prove their statutory dram shop claim. Black letter principles bar both attempts. The premise that can be gleaned from Plaintiffs' arguments, such as they exist, helps to explain why. Pieced together, Plaintiffs' arguments reveal that Plaintiffs seek to use the so-called "over service complaints" to argue that, just as on other occasions there was a mindset to over serve customers, so it was on the night of the accident in this case.

Guest Report Reply at 1-2. It argues that, because the Plaintiffs have not demonstrated "that they are not seeking to introduce the Guest Contact Reports for an improper propensity purpose, Rule 404(b) does not provide an opening through which the reports can be admitted as evidence." Guest Report Reply at 2 (citing Bhandari v. VHA Sw. Cmty. Health Corp., 778 F. Supp. 2d 1155, 1168)(D.N.M. 2011)(Browning, J.).

> AmRest, LLC asserts that the evidence is not habit evidence under rule 406:
>
> Apart from numbering less than a handful (at most three, considering AmRest's non-involvement in the first Guest Contact Report), the Guest Contact Reports include descriptions of various factual situations and various responses to them. As such, the reports are insufficient to establish the alleged routine practice. 3 M. Graham, Handbook of Federal Evidence §406:1, at 569 (7[th] ed. 2012)(in determining whether proponent of evidence "has established 'one' regular response to a repeated specific situation, evaluation of adequacy of the sample and uniformity of response are key factors"); accord 23 C. Wright & K. Graham, Federal Practice and Procedure § 5274, at 47-48 (1980).

Guest Report Reply at 2-3.

AmRest, LLC contends that the Plaintiffs' arguments regarding the degree of culpability lack a sound basis. See Guest Report Reply at 2. AmRest, LLC states that, because the guest contact reports at issue do not discuss the facts of this case, they "do not provide an evidentiary foundation upon which the jury properly could compare fault." Guest Report Reply at 3. With respect to the punitive damages argument, AmRest, LLC asserts that State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408 (2003), requires that evidence about other incidents "be substantially similar to the one at issue," and argues that the Plaintiffs did not make that showing. See Guest Report Reply at 3-4. In its view, the evidence is not, therefore, admissible for a punitive damages award under the Wrongful Death Act or "to show a culpable mental state for punitive damages apart from the Wrongful Death Act." Guest Report Reply at 3-4.

With respect to compensatory damages, AmRest, LLC argues that "aggravating circumstances refers not to the alleged culpability of a defendant's conduct but rather to the damages suffered." Guest Report Reply at 4. It points to Beller v. United States, 296 F Supp. 2d 1277 (D.N.M. 2003)(Johnson, J.), in which the Honorable William P. Johnson, United States District Judge for the District of New Mexico, held that the Supreme Court of New Mexico has "made clear that the degree of the defendant state's culpability or the nature of its conduct was not a factor to be considered in assessing 'compensatory' damages under the wrongful death statute." Guest Report Reply at 4 (quoting Beller v. United States, 296 F Supp. 2d at 1282). In its view, the Plaintiffs' offer this evidence to prove a culpable mental state, and, therefore, "the incidents are irrelevant to aggravating circumstances analysis as it relates to compensatory damages under the Wrongful Death Act, making the evidence inadmissible." Guest Report Reply at 4.

Moreover, AmRest, LLC asserts that, even if the evidence is relevant, rule 403 bars its admission; it notes that the Plaintiffs did not respond to its rule 403 arguments and states that they have, therefore, "in effect conceded that the arguments are meritorious." Guest Report Rely at 4-5. Further, it points out that the Plaintiffs' argument under rule 406 does not allow them to evade its rule 403 arguments. See Guest Report Reply at 5.

With respect to the hearsay arguments, AmRest, LLC states that the "Plaintiffs try to get around the hearsay issue by simply declaring that the Guest Contact Reports fit within the hearsay exceptions for business records." Guest Report Reply at 5. AmRest, LLC states that this conclusory declaration does not demonstrate that the exception applies, putting out that, under Hertz v. Luzenac Am., Inc., 370 F.3d 1014 (10th Cir. 2004), there must be a foundational showing for a document to be a business records to fit within the rule's meaning. See Guest Report Reply at 5. AmRest, LLC continues:

> From that point on, Plaintiffs flail [sic] in their attempts to get around the hearsay issue. After arguing that "[o]nly one of the complaints is an actual statement, in the form of an electronic mail, of a customer[,]" Plaintiffs argue that the three remaining the Guest Contact Reports "are summaries drafted by intake workers, viz, mental impressions of the Defendant," making them admissible as non-hearsay statements under Federal Rule of Evidence 801(d)(2). Apart from neglecting to specify which "Defendant" they have in mind, Plaintiffs neglect to specify the provision under Rule 801(d)(2) upon which they are relying and to show that any applicable foundational requirements are met.
>
> Even if Plaintiffs could establish that the Guest Contact Reports fit within either of the preceding hearsay exceptions, the contents of the reports nevertheless constitute hearsay under Federal Rule of Evidence 801(c). The contents include out of court statements made by a customer that Plaintiffs seek to introduce as the truth of the matter asserted.

Guest Report Reply at 5-6 (citations omitted).

## 2.    **Prior Conduct Motion.**

AmRest, LLC moves the Court to exclude "evidence and references to prior incidents of

alleged over-service of alcohol and prior liquor law citations or violations at any AmRest restaurant." Prior Conduct Motion at 1. AmRest, LLC states that it is relevant "whether AmRest's employees served alcoholic beverages to James Ruiz while he was intoxicated, and whether AmRest's employees knew from the circumstances and from what was reasonably apparent that Mr. Ruiz was intoxicated," and acknowledges that the Plaintiffs seek punitive damages. Prior Conduct Motion ¶ 1, at 1-2. AmRest, LLC argues that certain evidence that the Plaintiffs seek to introduce

> regarding AmRest's alleged prior incidents of over-service of alcohol and other incident reports at the Santa Fe Applebee's not related to the incident in question[]and prior liquor law violations at all AmRest restaurants . . . is inadmissible because it is irrelevant, is hearsay, is inadmissible character evidence and unfairly prejudicial, and will confuse the issues and mislead the jury.

Prior Conduct Motion ¶ 2, at 2. AmRest, LLC urges that the prior incidents "have zero tendency to make any fact of consequence in this matter more or less probable." Prior Conduct Motion ¶ 4, at 2-3. It notes that these violations "include service to minors, sale without a service permit, failure to timely notify a commissioner of disciplinary action taken against an employee, and not having a liquor license posted," and argues that none of those violations "occurred at the Santa Fe Applebee's or involved the over-service of alcohol." Prior Conduct Motion ¶ 4, at 2. AmRest, LLC argues that "[t]he incident reports regarding over-service at the Santa Fe Applebee's, in addition to being inadmissible hearsay under Rule 801, are irrelevant." Prior Conduct Motion ¶ 5, at 3. It contends that the Plaintiffs seem to offer those statements for the truth of the matters asserted, and that rule 802 of the Federal Rules of Evidence, therefore, renders those statements inadmissible. See Prior Conduct Motion ¶ 5, at 3. AmRest, LLC also asserts that "[t]he prior incidents and violations have no bearing on whether AmRest violated the Dram Shop Liability Act or whether AmRest's conduct warrants punitive damages," and that,

therefore, the "Court should exclude all evidence of or reverences to any alleged prior incidents and/or liquor law violations at the Santa Fe Applebee's and at any other AmRest restaurant." Prior Conduct Motion ¶ 6, at 3.

AmRest, LLC also contends that the Plaintiffs intend to submit this evidence as character evidence, and that rule 404(b), therefore, bars its admission.  See Prior Conduct Motion ¶¶ 7-8, at 3-4.  AmRest, LLC also argues that rule 403 bars this evidence as well, because the risks of unfair prejudice, of confusion of the issues, and of misleading the jury substantially outweigh the evidence's probative value.  See Prior Conduct Motion ¶¶ 9-11, at 4-5.  It contends that "[t]he jury should render its verdict based on AmRest's actions on March 5, 2010, not based on alleged prior incidents and prior liquor law violations at other restaurants."  Prior Conduct Motion ¶ 11, at 5.

In the Plaintiffs' Response to AmRest, LLC's Motion *in Limine* to Exclude Prior References to and Evidence of Prior Incidences [sic] and Prior Liquor Law Violations at Any AmRest Restaurant, filed March 19, 2014 (Doc. 236)("Prior Conduct Response"), the Plaintiffs contend that the violations and incidents

> are relevant in this lawsuit and admissible for several reasons.  The violations and incidences, along with other evidence, show the motive, intent, preparation, plan, knowledge, absence of mistake -- i.e., the state of mind -- as well as the routine practices of Defendant AmRest on the subject of responsible service of alcohol. These issues and the inferences that the jury draws from them will be critical to many questions that must be determined by the jury including AmRest's overall liability, whether AmRest acted with the requisite willfulness and recklessness to assess punitive damages, and the amount of damages under the Wrongful Death Act.  In addition, the evidence of the incidences in question overcomes hearsay objections because they are admissions by a party opponent, and because they are not offered to assert the truth of the matter.

Prior Conduct Response at 1-2.

First, the Plaintiffs detail their view of the evidence.  The Plaintiffs note that Applebee's

International has produced a series of four Guest Contact Reports, no date provided, filed March 19, 2014 (Doc. 236-1), "which are reports made to a wholly owned Applebee's subsidiary named Applebee's Services, Inc."  Prior Conduct Response at 2.

> The first guest contact is dated April 19, 2008.  [Guest Contact Reports] at App001.  It is made by a woman identified as April Ortega, who leaves her address and phone.  Id.  She complains that a man was "at the bar being over served. He passed out several times and was still being served. I called and spoke to the manager Jen.  She did not seem to care.  I thought this was a very dangerous issue and someone should know about it." Jake Gandhi, the area coach over the Santa Fe Applebee's on April 8, 2008, was asked about this complaint and he testified he did not remember it.  Deposition of Jake Gandhi, at 7:2-10; 25:9-13; and 191:7-16, [taken December 7, 2012, filed March 19, 2014 (Doc. 263-2)].  Upon reading it, Gandhi was immediately dismissive, saying "That just doesn't -- that doesn't happen.  It just doesn't happen." Id. at 197:20-198:12.  Gandhi explains that it was his job to follow up on a complaint if it was manager related.  Id. at 196:3-197:2.  He admits this complaint involved both a bartender and a manager acting inappropriately.  Id. at 197:20-24.  The Applebee's record shows no resolution or follow-up of the matter by Applebee's or AmRest.  See Guest Contact Reports, App001-App002[.]

> AmRest likewise can show no follow up or handling of this complaint.  AmRest Brand President for Applebee's, Michael Muldoon, was asked why AmRest could provide no paper trail for the series of customer complaints provided by Applebee's, and he could provide no explanation.  See Deposition of Michael Muldoon[, taken January 31, 2013, filed 19, 2014 (Doc. 263-3)]), at 36:8-22, attached as Exhibit C.  Further, Plaintiffs requested from AmRest "All AmRest, LLC documents, electronic or otherwise, that show how it handled all reports and complaints generated from January 1, 2008 to December 31, 2010 describing rude, loud or intoxicated behavior by any customer of the Santa Fe Applebee's." See Defendant AmRest, LLC's First Supplemental Responses to Plaintiffs' Fourth Set of Requests for Production, at 5, attached as Exhibit D.  The response, supplemented after Mr. Muldoon's first deposition, includes emails only related to a complaint dated May 29, 2010.  Id. at 7-9.  There is no record that anyone did anything to follow up on the April 19, 2008 incident, or the other two guest contacts described below.  Id.

Prior Conduct Response at 2-3.

According to the Plaintiffs, the second guest contact involved a call from a guest who left her name, address, and telephone number reporting her unhappiness that she and other guests, who had been drinking during happy hour, were asked to be quiet.  See Prior Conduct Response

at 3-4.   The Plaintiffs note that this guest complained that the restaurant was known for its happy-hour crowd and for the regulars who attended at that time.   See Prior Conduct Response at 3-4.   "There is no record of follow up regarding this guest contact."   Prior Conduct Response at 4.

The Plaintiffs contend that the third guest contact, which the Prior Conduct Motion addresses, occurred on February 10, 2010 --"less than one month before the incident that is the basis of this lawsuit."   Prior Conduct Response at 4.   The Plaintiffs note that this complaint, made anonymously, states as follows:

> One of the bar tenders, Andrea, got suspended for overserving two men a couple months ago.   The bartender actually had cut these people off.   These people complained with the supervisor, Tony, saying Andrea was rude.   Andrea was suspended from the bar. Last night, I learned Andrea was suspended again because she cut the same people off.   I've seen these men.   They get very obnoxious when they drink.   I know Andrea is doing the right thing by cutting them off.
>
> You lost a customer. I'm there at least twice a week. I'm upset the bartender has been punished for cutting people off.
>
> I've been trying to get in touch with the managers but there are not available.

Prior Conduct Response at 4 (quoting Guest Contact Reports at APP00006).   The Plaintiffs assert that they deposed that bartender, Andrea Beals, and that she had not known a guest had complained about how she had been treated.   See Prior Conduct Response at 4.   Beals noted that the complaint "'makes [her] feel good . . . [b]ecause somebody observed me doing my job. . . .   Responsible service of alcohol is my job.'"   Prior Conduct Response at 4 (quoting Deposition of Andrea Beals at 64:18-24, taken September 11, 2012, filed March 19, 2014 (Doc. 236-5)).   Beals further remembered the names of the regulars -- Charley and Andrew Catnach --stated that she was pulled off of bar service because of this incident, and that she "felt

vindicated hearing this statement read to her, because she felt like she was suspended from the bar for doing her job." Prior Conduct Response at 4.

The Plaintiffs also note that the bar manager, Anthony Bonnefil,

confirmed Beals' identification of the two regulars who complained about Beals. He said the two brothers contacted area coach Jake Gandhi directly. He testified they made sure they had the area manager's cell phone number at all times, they thought they owned the place, and they tried "to constantly push the envelope on what my bartenders were allowed to do. . ." in terms of responsible service of alcohol. He recalled that Beals had cut them off a couple times, appropriately, because they started acting like "overgrown children." Bonnefil testified that Beals did a good job on responsible service of alcohol issues, and would cut off those who needed to be cut off.

Prior Conduct Response at 4-5 (citations omitted). The Plaintiffs contend that Gandhi also testified that he remembered getting an electronic mail transmission regarding this contact, but "did not remember if he heard about Beals cutting guests off, other than receiving this guest contact." Prior Conduct Response at 5. He also could not, during his deposition, remember which customers had complained. See Prior Conduct Response at 5. He stated that he had not spoken to Beals about the situation. See Prior Conduct Response at 5. He remembered that the general manager, Barry Jenkins, had "defended Beals and did not wish to pull her from the bar, but [stated] that he took her out of the bar anyway," Prior Conduct Response at 5, explaining: "'There is nothing doing. She is just -- she is pissing guests off . . . she needs to go.'" Prior Conduct Response at 5.[3] The Plaintiffs note that there is no record, either from Applebee's International or from AmRest, LLC, of follow-up with respect to this complaint. See Prior Conduct Response at 5.

The Plaintiffs also note that, soon before AmRest, LLC pulled Beals from the bar,

---

[3] The Prior Conduct Response states that this quotation is found in Gandhi's deposition. See Prior Conduct Response at 5. The Court does not see this quotation in the excerpted sections of the deposition or the deposition pages that the parties have provided to the Court.

AmRest, LLC and Applebee's International rolled out a "Late Night" promotion "that doubled the happy hours at AmRest-operated Applebee's restaurants from 3 to 6 hours every[]day . . . that was intended to 'put the "bar" back into Applebee's Neighborhood Grill & Bar.'"  Prior Conduct Response at 6(quoting Late Night Rollout Guide, no date provided, filed March 17, 2014 (Doc. 226-2)).  The Plaintiffs stated that the Late Night "campaign successfully raised bar percentages in 2010, especially in New Mexico, where bar sales percentages at AmRest-operated Applebee's were already higher than the AmRest national average."  Prior Conduct Response at 6.  The Plaintiffs note that part of the Late Night promotion was "casting" the bar using "traffic driving bartenders" whom guests come to see.  Prior Conduct Response at 6 (internal quotation marks omitted).  The Plaintiffs also note that a fourth guest contact report is not relevant to the Prior Conduct Motion, because the report occurred after March 5, 2010.  See Prior Conduct Response at 6.

The Plaintiffs note that, with respect to prior liquor law violations, AmRest, LLC's corporate representative has provided a list of "the number of times AmRest violated, or understood that it had violated as of January 31, 2013, liquor laws during its operation of Applebee's restaurants from mid-2008 until the end of 2010."  Prior Conduct Response at 6.  The Plaintiffs note that this list "shows a total of 14 liquor law violations occurring at AmRest-operated Applebee's restaurants from July 31, 2008 through October 29, 2010."  Prior Conduct Response at 6.  "AmRest claims it bought and assumed operations of 103 Applebee's restaurants in July 2008"; these "restaurants were located in eight states."  Prior Conduct Response at 6.  The Plaintiffs assert that AmRest, LLC "sold all but a few of its Applebee's restaurants on October 10, 2012."  Prior Conduct Response at 6-7.  The Plaintiffs note a steady uptick of liquor law violations during AmRest, LLC's ownership: there was only one violation in 2008; there

were four in 2009; and there were nine in 2010 -- the year of the accident underlying this lawsuit -- five of which occurred in New Mexico.  See Prior Conduct Response at 7.  "Finally, the list shows that the only two violations involving the sale of liquor to an intoxicated person both occurred in New Mexico."  Prior Conduct Response at 7.

According to the Plaintiffs, Muldoon, AmRest, LLC's Applebee's Neighborhood Grill brand president, testified that: (i) "he was unaware of the facts regarding the liquor law violations"; (ii) "he and other members of management did not give any thought to why the number of liquor law violations doubled from 2009 to 2010"; (iii) management did not consider "that a disproportionately high number of the violations were in New Mexico"; and (iv) AmRest, LLC-run Applebee's Neighborhood Grill restaurants "operating in New Mexico had a higher percentage of bar sales compared to AmRest[-]run Applebee's generally."  Prior Conduct Response at 7.  The Plaintiffs also note that AmRest, LLC

> received a warning for sale to an intoxicated person . . . on July 8, 2009 in Roswell, New Mexico, and AmRest was cited for" selling "liquor to an intoxicated person . . . on March 6, 2010, one day after the event that is the basis of this lawsuit, at an Applebee's in Farmington, New Mexico.

Prior Conduct Response at 7.  The Plaintiffs state that area coach Gandhi and district coach Deborah Passmore, who oversaw the Santa Fe Applebee's Neighborhood Grill, also oversaw the Farmington Applebee's Neighborhood Grill.  See Prior Conduct Response at 7-8.  The Plaintiffs note that the Prior Conduct Motion does not discuss "that the July 8, 2009 incident also involved a warning for sale to an intoxicated person, just as [the Subsequent Conduct Motion omits] the March 6, 2010 Farmington Applebee's violation for sale to an intoxicated person."  Prior Conduct Response at 8.

The Plaintiffs assert that this evidence is relevant.  See Prior Conduct Response at 8.  They note that Muldoon intends to testify at trial, and that they anticipate he and other AmRest,

LLC representatives will tell the jury "that responsible service of alcohol was always in the forefront at AmRest," LLC, and that they "should be allowed to present the evidence that proves otherwise."  Prior Conduct Response at 8.  They note that the evidence at issue in the Prior Conduct Response

> shows another state of mind at work in Santa Fe, and shows that it was in fact the routine habit at AmRest to do absolutely nothing to address serious indications that servers, bartenders, and even managers at AmRest[-]run Applebee's in Santa Fe and in New Mexico were not taking responsible service of alcohol seriously.

Prior Conduct Response at 8.  After summarizing the evidence, see Prior Conduct Response at 9, the Plaintiffs argue that AmRest, LLC's liquor violations and acts demonstrate increased pressure to sell alcohol and diminished attention to safe alcohol service: the "pre-March 5, 2010 incidences and liquor law violations are relevant because the continuing violations make the fact of AmRest's liability for Plaintiffs' injuries more probable than it would be without the evidence of the subsequent violations."  Prior Conduct Response at 9.

The Plaintiffs contend that Muldoon and Gandhi's responses to these violations show "that it was AmRest's routine practice to not concern itself with its repeated liquor law violations"; in their view, the evidence shows "that AmRest deliberately turned a blind eye to the fact that it was not safely serving alcohol and that the over-service on March 5, 2010 was not simply an accident and mistake."  Prior Conduct Response at 10.  The Plaintiffs continue:

> The violations show that AmRest was primarily motived to increase its alcohol sales and not to safely serve its customers.  The prior incidences and liquor law violations will provide the jury with the basis for making these inferences and that will lead the jury to decide that AmRest is liable.  In addition, the evidence regarding AmRest's prior incidences and liquor law violations will help the jury determine AmRest's state of mind as it relates to punitive damages -- i.e. whether it possessed the requisite wantonness, willfulness, and recklessness that necessitates that it pay punitive damages, and guides the jury in determining the appropriate amount of punitive damages to be paid.  Finally, the evidence regarding the violations will help the jury decide appropriate damages under the Wrongful Death Act because AmRest's callous lack of concern regarding safe

service of alcohol is certainly an aggravating circumstance in this case.

Prior Conduct Response at 10.

The Plaintiffs assert that this evidence shows AmRest, LLC's "routine practice to hype alcohol sales figures and turn a blind eye to its problems regarding the safe service of alcohol." Prior Conduct Response at 11. The Plaintiffs contend that the evidence demonstrates management's dismissive and oblivious attitude towards complaints about alcohol service. See Prior Conduct Response at 11. They submit that "the continuing violations show that Amrest [sic] and its employees' conduct on March 5, 2010 was in conformity with its routine practices both before the events in this case and subsequent to them." Prior Conduct Response at 11 (citing Fed. R. Evid. 406). The Plaintiffs also contend that AmRest, LLC's acts are also relevant "to the lost evidence in this case."[4] Prior Conduct Response at 11. They explain:

> AmRest's routine practice was to not investigate serious responsible service of alcohol problems. The investigation of this incident was being directed by Jake Gandhi. The jury may conclude that the loss of critical evidence and the confusion of facts, including how many beers and drinks were served to Ruiz, Mendoza and Castro, was no accident, but rather a result of AmRest's routine habit of choosing to turn a blind eye to the truth about its irresponsible service of alcohol. Thus the facts will be relevant to the inferences the jury will be permitted to make concerning spoliated evidence.

Prior Conduct Response at 11.

The Plaintiffs also contend that this evidence is admissible under rule 404(b)(2). See Prior Conduct Response at 12. In their view, this evidence shows that AmRest, LLC knew of "substantial problems within the organization regarding safe service of alcohol to customers," because the liquor law violations are like the overservice of Ruiz and Mendoza. Prior Conduct

---

[4] The Plaintiffs allude to the concerns that they have raised regarding the location of certain receipts and forms related to the service at Ruiz' and Mendoza's table. See Plaintiffs' Motion for Sanctions Against Defendant AmRest, LLC, filed in state court March 4, 2013, filed in federal court September 10, 2013 (Doc. 36-6). The Court disposed of the motion for sanctions in its Sealed Memorandum Opinion and Order, filed April 12, 2014 (Doc. 330).

Response at 12.  They also note that these events -- "especially the violation in Roswell, New Mexico on July 8, 2009, the violation in Clovis[,] New Mexico on February 5, 2010, and the demotion from the bar of Andrea Beals" -- occurred very near March 5, 2010.  Prior Conduct Response at 12.  The Plaintiffs submit that the Prior Conduct Motion "is designed to prevent the jury from hearing the extent of AmRest's knowledge of deficiencies in its service of alcohol" and that, "from the very outset of its launch of 'Late Night' and other programs to increase bar sales, throughout 2010 and beyond, there were obvious signs that AmRest was putting the public at danger, yet AmRest chose not to heed those warnings."  Prior Conduct Response at 12.

The Plaintiffs also argue that AmRest, LLC's prior acts "show that the events at issue in this trial were not simply a mistake or accident."  Prior Conduct Response at 13.  The Plaintiffs further submit that the prior acts, taken together with its subsequent violations, "show AmRest's motive was to profit from alcohol sales at the expense of safe service of alcohol."  Prior Conduct Response at 13.

The Plaintiffs note that, if the Court allows the jury to consider whether to award punitive damages, "the jury will be asked to decide whether the conduct of AmRest and its employees was willful, reckless, or wanton."  Prior Conduct Response at 13.  The Plaintiffs contend that the prior violations "will allow the jury to infer that it was AmRest's routine practice to reward every increase in alcohol sales and to consistently diminish the importance of safe service."  Prior Conduct Response at 13.  In their view, this evidence also "will allow the jury to infer that AmRest was on notice that it had system-wide problems with safe service of alcohol, that AmRest's actions on March 5, 2010 were not simply an accident or mistake, [and] that AmRest purposely diminished safe service because its paramount motivation was more alcohol profits."  Prior Conduct Response at 14.  The Plaintiffs contend that "[t]hese inferences will aid the jury in

its determination about whether AmRest possessed the requisite culpable state of mind on March 5, 2010 to justify an award for punitive damages."  Prior Conduct Response at 14.  The Plaintiffs also contend that the same inferences will help the jury "consider the aggravating circumstances attending the wrongful acts that gave rise to Plaintiffs['] injuries" for purposes of liability under the Wrongful Death Act.  Prior Conduct Response at 14.

The Plaintiffs finally argue that the rule against hearsay does not bar this evidence:

> First, none of the evidence at issue may be said to be hearsay.  The guest contact reports were provided by a party opponent, namely Applebee's.  The reports themselves are not hearsay pursuant to Rule 801(d)(2), to the extent they will be offered against Applebee's.  They are also not hearsay to the extent they will be offered against AmRest, pursuant to Rule 801(d)(2) because Applebee's Services, Inc. collected these guest contacts as a service for Applebee's franchisees.  As such, they are (1) made by the party in an individual or representative capacity, (2) made by a person who the party authorized to make the statement on the subject, or (3) made by the party's co-conspirator during and in furtherance of the conspiracy.  See Federal Rule of Evidence 801(d)(2)(A), (C), and (E); see also U.S. v. El Mezain, 664 F.3d 467, 502 (5th Cir. 2011) "[C]onspiracy as an evidentiary rule differs from conspiracy as a crime.  Just as coconspirators are generally considered partners in crime and therefore agents of each other, joint venturers may be considered partners in the joint undertaking.").

Prior Conduct Response at 14-15.  The Plaintiffs also contend that, "even if the guest contacts themselves [were] hearsay as presented against AmRest, they fall within the exception to hearsay under Federal Rule of Evidence 803(6), because they are a record of a regularly conducted activity."  Prior Conduct Response at 15.

The Plaintiffs submit that AmRest, LLC's hearsay argument -- which it did not develop in the Prior Conduct Motion -- probably "relates to the statements made by guests contained within the guest contacts."  Prior Conduct Response at 15.  The Plaintiffs argue that the objection lacks a sound basis.  See Prior Conduct Response at 15.  As to the first and third complaints, the Plaintiffs would offer them to demonstrate that AmRest, LLC and Applebee's International did not investigate alcohol-service issues.  See Prior Conduct Response at 15.  They continue:

- 21 -

> It is obviously disturbing to hear that a bartender continued to serve a man who passed out at a bar, and the manager learned of that and allowed it to continue (first complaint).  Likewise, it is disturbing to hear that a bartender was demoted from the bar due to a complaint by the drunk and obnoxious regulars she cut off (second complaint).  But far more disturbing, and the reason this evidence is being offered, is that these issues were reported to Applebee's and AmRest, reduced to writing, and no record exists showing anything was done to investigate the incidences and address the underlying problems that may or may not have allowed them to happen.

Prior Conduct Response at 15.  As to the second complaint, in which a "guest states that the Santa Fe Applebee's is '. . . known for the happy hour crowd . . .' and '. . . known for their "regulars" at happy hour," the Plaintiffs concede that it is hearsay, but argue that it falls under the exception in rule 803(21) of the Federal Rules of Evidence[5] as reputation concerning its character.  Prior Conduct Response at 14 (ellipses in original)(quotations unattributed).  The Plaintiffs also submit that rule 807 of the Federal Rules of Evidence -- commonly called the residual exception -- renders the evidence admissible.  See Prior Conduct Response at 16.  They explain:

> As described above, the statement by the anonymous customer was confirmed in the depositions of Andrea Beals and Anthony Bonnefil.  It therefore has circumstantial guarantees of trustworthiness.  Further, though it is not being offered primarily to prove the truth of the matter asserted, the evidence does prove a dual purpose of evidencing a material fact, that Beals was demoted for cutting drunk customers off.  Thus, Rule 807 makes a limiting instruction both unnecessary and inappropriate.  In addition, the evidence is more probative than other evidence, namely the testimony of Beals, Bonnefil, Jenkins and Gandhi, because all four of those witnesses remain in the exclusive control of AmRest.  Beals, the bartender, and Jenkins, the general manager who demoted her, remain employed at the Santa Fe Applebee's.  These witnesses cannot be counted on to not attempt to reverse or equivocate their candid deposition testimony at trial.  Therefore, admitting this evidence will serve the purposes of these rules and the interests of justice.

Prior Conduct Response at 16.

---

[5] Rule 803(21) provides: "**(21) *Reputation Concerning Character*.** A reputation among a person's associates or in the community concerning the person's character."  Fed. R. Evid. 803(21).

The Plaintiffs also contend that the evidence, although prejudicial, "is only *duly* prejudicial." Prior Conduct Response at 17 (emphasis in original). They explain:

> Showing AmRest's state of mind -- craven for profit, indifferent to public endangerment -- is a permissible purpose for the jury to consider this evidence, and is not *unfair* prejudice. The evidence of prior incidences and liquor law violations is not offered to show that AmRest continued to act in conformity with its actions on March 5, 2010. Rather, the evidence of the subsequent violations is highly probative for all the permissible reasons listed above including routine practice and state of mind and should be admitted.

Prior Conduct Response at 17 (citations omitted).

AmRest, LLC did not file a reply.

### 3.     Subsequent Liquor Law Violations Motion.

AmRest, LLC moves the Court "to exclude evidence of any liquor law violations at any AmRest location occurring after March 5, 2010, the date of the accident." Motion at 1. After reviewing the case's facts, <u>see</u> Subsequent Liquor Law Violations Motion at 1-2, AmRest, LLC asserts that the number of beers that Ruiz and Mendoza consumed at the Applebee's Grill is disputed, and that, after Ruiz and Mendoza left, they went to Blue Corn, where they consumed at least six additional drinks each. <u>See</u> Subsequent Liquor Law Violations Motion at 2. "It was after Ruiz and Mendoza left Blue Corn Café and Brewery that they caused the accident. AmRest was never issued a citation for its service of Ruiz and Mendoza earlier that day." Subsequent Liquor Law Violations Motion at 2.

AmRest, LLC asserts that it was the franchisee of, among other Applebee's Neighborhood Grill restaurants, locations

> in Meridian Idaho; Roswell, New Mexico; Boulder, Colorado; Rio Rancho, New Mexico; Boise, Idaho; Lakewood, Colorado; and Greeley, Colorado. All seven of these locations were found to have committed violations of liquor laws *after* March 5, 2010. Six violations were for serving alcohol to a minor, and one violation was for failing to have copies of alcohol server cards on file or having expired cards on file. Despite the fact that these violations have nothing to do

> with the issues in this case, AmRest is concerned that Plaintiffs intend to offer
> evidence of them at any trial of this matter.  Such evidence is irrelevant,
> prejudicial, and inadmissible character evidence, and this Court should prohibit
> Plaintiffs from making any reference to it at trial.

Subsequent Liquor Law Violations Motion at 2-3 (citations omitted).  It first argues that the evidence is irrelevant under rule 401: that is, "[a]ny subsequent liquor law violations at the Santa Fe Applebee's or at any other AmRest location could not have caused Plaintiffs' injuries, and evidence of such violations has no tendency to make any material fact more or less probable." Subsequent Liquor Law Violations Motion at 3.   AmRest, LLC contends that the Plaintiffs do not allege that "AmRest served alcohol to a minor, failed to have copies of server cards on file, or had expired cards on file," and any evidence of those violations does not satisfy rule 401. Subsequent Liquor Law Violations Motion at 3.    "Accordingly," in its view, "evidence of any subsequent liquor violations at the Santa Fe AmRest location, much less any other AmRest location, is not relevant and should not be admitted for any purpose at trial."  Subsequent Liquor Law Violations Motion at 3.

AmRest, LLC also asserts that the Court should exclude the evidence under rule 403, because the evidence "would tend to mislead the jury into concluding that the restaurant AmRest operated in Santa Fe received, or should have received, a citation or violation for its service of Ruiz and Mendoza earlier in the day on March 5, 2010."  Subsequent Liquor Law Violations Motion at 5.  It points out that it did not receive such a citation and that "all of the violations that were issued after March 5, 2010 were issued *at other AmRest locations*."  Subsequent Liquor Law Violations Motion at 5 (emphasis in original).  Moreover, it argues that this evidence would confuse the issues and unduly prejudice AmRest, LLC, "because the company would be forced to defend against those claims at the trial of this matter," which "would essentially create a trial within a trial by presenting the jury with violations having nothing to do with Plaintiffs' claims."

Subsequent Liquor Law Violations Motion at 5.  In AmRest, LLC's view, "[a]ny one of these dangers, and certainly all of them combined, far outweigh any negligible probative value of evidence regarding subsequent violations at other AmRest locations."  Subsequent Liquor Law Violations Motion at 5.

In the Plaintiffs' Response to AmRest, LLC's Motion *in Limine* to Exclude Evidence of Subsequent Liquor Law Violations at Any AmRest Locations, filed March 17, 2014 (Doc. 226)("Subsequent Liquor Law Violations Response"), the Plaintiffs contend that

> [l]iquor law violations at the AmRest-operated Applebee's that were committed after March 5, 2010 -- the date of the event that is the basis of this lawsuit -- are relevant in this lawsuit for several reasons. The violations, along with other evidence, show the motive, intent, preparation, plan, knowledge, absence of mistake -- i.e., the state of mind -- as well as the routine practices of Defendant AmRest on the subject of responsible service of alcohol.  These issues and the inferences that the jury draws from them will be critical to many questions that must be determined by the jury including AmRest's overall liability, whether AmRest acted with the requisite willfulness and recklessness to assess punitive damages, and the amount of damages under the Wrongful Death Act.

Subsequent Liquor Law Violations Response at 1.  The Plaintiffs lay out more specifically the information they want to admit: a list of liquor law violations in AmRest, LLC's Applebee's Neighborhood Grill restaurants from mid-2008 until the end of 2010, which AmRest, LLC provided in response to a document request that the Plaintiffs made before the deposition of AmRest, LLC's rule 30(b)(6) corporate representative, Muldoon.  See Subsequent Liquor Law Violations Response at 2.  They continue:

> This list of violations shows a total of 14 liquor law violations occurring at AmRest-operated Applebee's restaurants from July 31, 2008 through October 29, 2010. [See Liquor Violations, no date provided, filed February 26, 2014 (Doc. 144-1)].  AmRest bought and assumed operations of 103 Applebee's restaurants in July 2008.  Deposition of Michael Muldoon (Feb. 21, 2014) at 104:17-18, 115:12-13, attached as Exhibit B [(Doc. 226-2)].  AmRest's 103 Applebee's restaurants were located in eight states. Deposition of Michael Muldoon (Feb. 21, 2014) at 104:18, attached as Exhibit B.  AmRest sold all but a few of its Applebee's restaurants on October 10, 2012. See Deposition of Jake Gandhi at

6:7-11, attached as Exhibit C [Doc. 226-4].

Subsequent Liquor Law Violations Response at 2.  The Plaintiffs notes that, during 2008, when AmRest, LLC took over the restaurant, there was only one violation, and that the number increased to four in 2009 and nine in 2010, the year of the accident underlying this case.  See Subsequent Liquor Law Violations Response at 2.  The Plaintiffs note that five of the fourteen listed violations occurred within New Mexico, and "that the only two violations involving the sale of liquor to an intoxicated person both occurred in New Mexico."  Subsequent Liquor Law Violations Response at 2-3.  Muldoon testified that he did not know about the facts of the individual liquor law violations; "that he and other members of management did not give any thought to why the number of liquor law violations doubled from 2009 to 2010"; "that management did not give any consideration to the fact that a disproportionately high number of the violations were in New Mexico"; and "that AmRest run Applebee's operating in New Mexico had a higher percentage of bar sales compared to AmRest run Applebee's generally." Subsequent Liquor Law Violations Response at 3.

The Plaintiffs also point out that AmRest, LLC created a "Late Night" program to increase alcohol sales by "doubl[ing] the happy hours at AmRest-operated Applebee's restaurants from 3 to 6 hours everyday . . . that was intended to 'put the "bar" back into Applebee's Neighborhood Grill & Bar.'"  Subsequent Liquor Law Violations Response at 3 (quoting Late Night Rollout Guide).  The Plaintiffs note that the Late Night campaign increased AmRest, LLC's bar sales in 2010 -- particularly in New Mexico, "where bar sales percentages at AmRest-operated Applebee's were already higher than the AmRest national average." Subsequent Liquor Law Violations Response at 3-4.  The Plaintiffs also note that AmRest, LLC sold liquor to an intoxicated person, thereby violating relevant liquor regulations, "on March 6,

- 26 -

2010, one day after the event that is the basis of this lawsuit, at an Applebee's in Farmington, New Mexico." Subsequent Liquor Law Violations Response at 4. The Plaintiffs state that area coach Gandhi and district coach Passmore -- who oversaw the Santa Fe Applebee's Neighborhood Grill -- also oversaw the Farmington restaurant. See Subsequent Liquor Law Violations Response at 4. The Plaintiffs note that AmRest, LLC does not mention that event, or that another "liquor law citation [was] issued to AmRest, LLC arising out of sales to an intoxicated person by Santa Fe, [sic] Applebee's bartender Brooke Mitchell," which occurred shortly after "Mitchell signed the AmRest Meal and Alcohol Policy (a policy Plaintiffs' [sic] will show was counter productive to responsible service of alcohol training, and that was in use March 5, 2010)." Subsequent Liquor Law Violations Response at 4.

The Plaintiffs note that subsequent violations "are relevant because the existence of those continuing violations make the fact of AmRest's liability for Plaintiffs' injury more probable than it would be without the evidence of the subsequent violations." Subsequent Liquor Law Violations Response at 4. The Plaintiffs argue:

> The evidence of subsequent violations, and particularly Michael Muldoon and other upper management's lack of consideration of those violations, shows that is was AmRest's routine practice to not concern itself with its repeated liquor law violations. The subsequent violations show that AmRest deliberately turned a blind eye to the fact that it was not safely serving alcohol and that the over-service on March 5, 2010 was not simply an accident and mistake. The violations show that AmRest was primarily motived to increase its alcohol sales and not to safely serve its customers. The subsequent liquor law violations will provide the jury with the basis for making these inferences and that will lead the jury to decide that AmRest is liable. In addition, the evidence regarding AmRest's subsequent liquor law violations will help the jury determine AmRest's state of mind as it relates to punitive damages -- i.e. whether it possessed the requisite wantonness, willfulness, and recklessness that necessitates that it pay punitive damages, and guides the jury in determining the appropriate amount of punitive damages to be paid. Finally, the evidence regarding the violations will help the jury decide appropriate damages under the Wrongful Death Act because AmRest's callous lack of concern regarding safe service of alcohol is certainly an aggravating circumstance in this case.

- 27 -

Subsequent Liquor Law Violations Response at 5-6.

With respect to the "routine practice" argument, the Plaintiffs contend that the "subsequent liquor law violations show that it was this defendant's routine practice to hype alcohol sales figures and turn a blind eye to its problems regarding the safe service of alcohol," and "show that Amrest's [sic] and its employees' conduct on Ma[r]ch 5, 2010 was in conformity with its routine practices both before the events in this case and subsequent to them." Subsequent Liquor Law Violations Response at 6 (citing Fed. R. Evid. 406). The Plaintiffs assert that it was AmRest, LLC's routine practice to serve alcohol without management oversight, and that it "made a habit of celebrating increases in liquor sales and praising the managers of every restaurant that achieved certain sales levels." Subsequent Liquor Law Violations Response at 6. The Plaintiffs contend that AmRest, LLC "also made a habit of consistently diminishing the importance of safe service of alcohol through its lack of training, lack of management oversight, and even disciplining employees that attempted to safely serve alcohol at the expense of AmRest's bottom line." Subsequent Liquor Law Violations Response at 6. Accordingly, they argue that "[e]vidence that these habits and routine practices continued after the events in this case will help the jury infer that AmRest acted in accordance with its routine on March 5, 2010 and that inference will assist the jury in ultimately deciding AmRest's liability." Subsequent Liquor Law Violations Response at 6-7.

The Plaintiffs also contend that the evidence is admissible under rule 404(b)(2). See Subsequent Liquor Law Violations Response at 7. The Plaintiffs argue that the violations demonstrate that AmRest, LLC knew "of substantial problems within the organization regarding safe service of alcohol to customers." Subsequent Liquor Law Violations Response at 7. The Plaintiffs state that the subsequent violations "are similar to the event at issue in this case

because they all occurred under the campaign to increase Applebee's alcohol sales."  Subsequent

Liquor Law Violations Response at 7.  The Plaintiffs argue that these acts -- particularly the

Farmington violation -- "are very close in time to the events of March 5, 2010."  Subsequent

Liquor Law Violations Response at 7.  The Plaintiffs assert that the Subsequent Liquor Law

Violations Motion's purpose is to keep the jury from understanding that AmRest, LCL knew of

flaws in its alcohol service practices, and from hearing that, as soon as it launched the Late Night

program and other programs to increase its bar revenue, "throughout 2010 and beyond, there

were obvious signs that AmRest was putting the public at danger, yet AmRest chose not to heed

those warnings."  Subsequent Liquor Law Violations Response at 7-8.

The Plaintiffs also contend that the violations show that AmRest, LLC's overservice was

not a mistake or an accident: "that AmRest continued to fail to properly train employees

regarding safe service and continued to fail to discipline employees for violations, [sic] shows

that the events of this case were not an aberration."  Subsequent Liquor Law Violations

Response at 8.  The Plaintiffs also contend that the violations "show AmRest's motive was to

profit from alcohol sales at the expense of safe service of alcohol."  Subsequent Liquor Law

Violations Response at 8.  The Plaintiffs contend that these events demonstrate AmRest, LLC's

"state of mind by putting dollars before people both in perpetrating the events of this case and in

continuing to violate safe liquor service procedures."  Subsequent Liquor Law Violations

Response at 8 (citing United States v. Courtney, No. CR 11-2860 JB, 2013 WL 4782148

(D.N.M. Sept. 3, 2013)(Browning, J.)).  The Plaintiffs also argue that this evidence demonstrates

that AmRest, LLC's conduct was willful, reckless, or wanton for purposes of punitive damages,

and that its acts are relevant "aggravating circumstances attending the wrongful acts that gave

rise to Plaintiffs['] injuries."  Subsequent Liquor Law Violations Response at 9.

Using language identical to that from the close of their Prior Conduct Response, the Plaintiffs also argue that this evidence, although prejudicial, "is only *duly* prejudicial," and that rule 403 does not, therefore, bar its admission.  Subsequent Liquor Law Violations Response at 9-10 (emphasis in original).

AmRest, LLC did not file a reply.

### 4.      Post-Accident Conduct Motion.

AmRest, LLC moves the Court "to exclude evidence of AmRest's post-accident conduct," because it "is irrelevant and unduly prejudicial, and its introduction would constitute improper use of evidence of remedial measures."  Post-Accident Conduct Motion at 1.  AmRest, LLC asserts that the Court should not allow the Plaintiffs to bring in "evidence of AmRest's post-accident actions regarding reprimands, counseling, 'coaching' of any of its employees, or any lack of discipline."  Post-Accident Conduct Motion at 1.  After reviewing the facts of the underlying accident, <u>see</u> Post-Accident Conduct Motion at 1-2, AmRest, LLC asserts that its former employee, David Kirby, served Ruiz and Mendoza.  <u>See</u> Post-Accident Conduct Motion at 2.  AmRest, LLC notes that Kirby's manager "discussed the incident with him but did not formally reprimand him"; moreover, "AmRest's management used the accident as a means to further reinforce company policies through additional training."  Post-Accident Conduct Motion at 2.  AmRest, LLC argues that the Court should exclude this evidence.  <u>See</u> Post-Accident Conduct Motion at 2.

After reviewing the familiar standards for relevance, <u>see</u> Post-Accident Conduct Motion at 2-3, AmRest, LLC argues that evidence about its post-accident investigation is irrelevant, because reprimand or lack thereof, or any decision to reinforce its policies, "does not make it any more or less probable that AmRest negligently over served [sic] Ruiz and Mendoza," Post-

Accident Conduct Motion at 3.   AmRest, LLC also argues that rule 403 bars the evidence's admission.   See Post-Accident Conduct Motion at 3.   AmRest, LLC asserts that "[i]t appears Plaintiffs intend to offer such evidence in order to paint AmRest as negligent or a bad company and confuse the issues before the jury."   Post-Accident Conduct Motion at 3.   In its view, the Court should exclude evidence regarding the reprimand or the failure to reprimand Kirby, "because the limited probative value of such evidence is outweighed by the unfair prejudice it creates."   Post-Accident Conduct Motion at 3.   According to AmRest, LLC, this evidence would confuse the issues, "because AmRest would be compelled to put forth evidence of all the steps the company took after the accident."   Post-Accident Conduct Motion at 4.   Accordingly, in its view, rule 403 requires the Court to exclude the evidence.   See Post-Accident Conduct Motion at 4.

AmRest, LLC states that the "Plaintiffs intend to introduce evidence that Mr. Kirby was not disciplined for failing to comply with [its] three-drink notification policy," which "is the subject of" Defendant AmRest, LLC's Motion in Limine to Exclude Evidence Relating to its Three-Drink Notification Policy, filed March 13, 2014 (Doc. 211).   Post-Accident Conduct Motion at 4.   It states that this house policy requires servers "to notify their manager once a patron orders or is served their third drink to enable the manager to observe the patron to check for signs of intoxication."   Post-Accident Conduct Motion at 4.   It asserts that, as it explains more thoroughly in its other motion, the Court should exclude this evidence, because it is irrelevant, and "because it is uncontested that the policy exceeds industry standards for the responsible service of alcohol and therefore cannot be evidence of AmRest's adherence or alleged failure to adhere to the relevant standard of care."   Post-Accident Conduct Motion at 4.   AmRest, LLC argues that Kirby's policy violation did not affect the events in the case, because

"no witness has testified that Ruiz displayed any signs of intoxication."  Post-Accident Conduct Motion at 4.  AmRest, LLC submits that the Court should also exclude this evidence because it would "mislead the jury into concluding that Mr. Kirby's violation of the three-drink notification policy amounts to a violation of the standard of care for responsible service of alcohol, contrary to the law and the opinions of all experts in this case."  Post-Accident Conduct Motion at 4.  It maintains that this conclusion is impermissible, and that rule 403 would bar its admission.  See Post-Accident Conduct Motion at 4.  It notes that its other motion asks the Court to exclude the policy under rule 403 and contends that, if the Court grants that motion, it should also exclude the evidence at issue in this motion.  See Post-Accident Conduct Motion at 5.  AmRest, LLC states that allowing the Plaintiffs to introduce this evidence would admit through a back door evidence of the policy, which would unduly prejudice AmRest, LLC.  See Post-Accident Conduct Motion at 5.

AmRest, LLC also argues that the Court should exclude the evidence under rule 407, asserting that "the post-accident actions of an employer, including the reprimand of an employee, constitute inadmissible evidence of remedial measures."  Post-Accident Conduct Motion at 5.  It points to Wanke v. Lynn's Transportation Co., 836 F. Supp. 587 (N.D. Ind. 1993), in which the Honorable Robert L. Miller, Jr., United States District Judge for the Northern District of Indiana, excluded evidence that the defendant company fired a truck driver whom had been involved in a car accident, holding that "Rule 407 encompassed such post-event discipline."  Post-Accident Conduct Motion at 5-6.  AmRest, LLC argues that its actions, like those of the company in Wanke v. Lynn's Transportation Co., "are considered remedial measures and cannot be admitted to try and prove negligence on" its part.  Post-Accident Conduct Motion at 6.  Moreover, in its view, its "use of the accident at issue in training is further evidence of a remedial measure and

cannot be used to prove negligence on" its part.   Post-Accident Conduct Motion at 7. Accordingly, "[b]ecause Plaintiffs can show no reason to submit such evidence to the jury other than to attempt to find such negligence," AmRest, LLC asks the Court to exclude the evidence. Post-Accident Conduct Motion at 7.

In the Plaintiffs' Response to AmRest, LLC's Motion in Limine to Exclude Evidence of its Post-Accident Conduct, filed March 31, 2014 (Doc. 284)("Post-Accident Conduct Response"), the Plaintiffs ask the Court to deny the Post-Accident Conduct Motion.   Post-Accident Conduct Response at 1.   As the Plaintiffs frame the issue, AmRest, LLC asks the Court "to exclude evidence that an AmRest manager discussed the incident with Kirby but did not reprimand or terminate him for unsafely serving alcohol or for violating" the house policy.   See Post-Accident Conduct Response at 1.   They also assert that AmRest, LLC asks the Court "to exclude evidence that it did not train staff regarding this incident aside from one AmRest manager's practice -- whenever AmRest staff state that this incident is a reason to safely serve alcohol -- of agreeing that this incident is exactly why staff should follow the Three Drink Notification Policy."   Post-Accident Conduct Response at 1 & n.1 (citing Deposition of Anthony Bonnefil at 41:15-20, taken April 14, 2011, filed March 10, 2014 (Doc. 196-1)).

The Plaintiffs assert that this evidence is relevant, because AmRest, LLC's "indifference to the March 5, 2010 incident makes the fact of AmRest's liability for Plaintiffs' injuries more probable than it would be without the evidence of these subsequent actions."   Post-Accident Conduct Response at 2.   In their view, AmRest, LLC's reaction demonstrates its "lack of concern regarding safe service of alcohol on March 5, 2010."   Post-Accident Conduct Response at 2. They underscore that this evidence "shows that it was AmRest's routine practice not to concern itself with safe service of alcohol," but that it instead "deliberately turned a blind eye to the fact

that it was not safely serving alcohol and that the over-service on March 5, 2010 was not simply an accident and mistake." Post-Accident Conduct Response at 2. They contend that the failure to discipline Kirby and to better train other staff demonstrates "that AmRest was primarily motivated to increase its alcohol sales and not to safely serve its customers." Post-Accident Conduct Response at 2. Moreover, they state that this evidence "will provide the jury with the basis for making these inferences and that will lead the jury to decide that AmRest is liable." Post-Accident Conduct Response at 2. They also contend that the evidence will help the jury decide the appropriate compensatory damages under the Wrongful Death Act and AmRest, LLC's state of mind with respect to punitive damages. See Post-Accident Conduct Response at 3.

> The Plaintiffs concede that they
>
> intend to present evidence of AmRest's post-incident state of mind and motive because that will allow the jury to make inferences regarding AmRest's state of mind and motive during this incident. Thus, the evidence will be offered to show AmRest's negligence and its status as a "bad company" to the extent AmRest means wantonness, willfulness, recklessness, or any of the other factors that compel punitive damages. However, this evidence will not confuse the issues for the jury.

Post-Accident Conduct Response at 3-4.

The Plaintiffs suggest that this evidence will not "serve as a back-door to purportedly inadmissible evidence regarding the Three-Drink Notification Policy," first, because AmRest, LLC failed to reprimand Kirby not only for violating that policy, but also because he overserved Ruiz and Mendoza; "[t]hus, evidence regarding the failure to reprimand Kirby can be submitted exclusive of the Three-Drink Notification Policy." Post-Accident Conduct Response at 4. The Plaintiffs also argue, echoing the Plaintiffs' Response to AmRest LLC's Motion *in Limine* to Exclude Evidence Relating to its Three-Drink Notification Policy, filed March 27, 2014

(Doc. 277), that evidence regarding the policy is admissible, because the number of drinks served to a patron is circumstantial evidence that may be sufficient to establish whether it was reasonably apparent or in fact known that the patron was intoxicated.   See Post-Accident Conduct Response at 4-5 (citing Estate of Gutierrez ex rel. Jaramillo v. Meteor Monument, L.L.C., 2012-NMSC-004, 247 P.3d 94).   They note that the Defendants' "experts agree that liquor sellers can violate the standard of care based purely on the number of drinks without observing clinical or physical signs of intoxication."   Post-Accident Conduct Response at 5. Moreover, they assert that

> every single training material that has been produced in this case, and indeed the State's Responsible Service of Alcohol program itself, require drinks to be counted and a patron's blood-alcohol level to be assessed based on the number of drinks served, the patron's estimated weight, and the time in which those drinks were served.

Post-Accident Conduct Response at 5.   Accordingly, in their view, drink-counting is relevant to the standard of care, and evidence regarding the policy and AmRest, LLC's failure to reprimand Kirby for departing from it will not confuse the jury.   See Post-Accident Conduct Response at 5. They also observe that AmRest, LLC's contention that it would need to provide evidence of the steps it took after the accident to rebut the evidence at issue lacks authority and that, accordingly, "[i]t is difficult to respond to this unsubstantiated argument without knowing what steps AmRest is referring to."   Post-Accident Conduct Response at 5-6.   In their view, "if Plaintiffs submit evidence of AmRest's state of mind via its failure to reprimand Kirby and failure to train regarding the incident, AmRest's counter-evidence seems unlikely to confuse the jury."   Post-Accident Conduct Response at 6.

The Plaintiffs also contend that "[i]t is bold of AmRest to describe the post-incident discussion that a manager had with David Kirby as a 'subsequent remedial measure,'" and that

"it is specious to describe as 'training' Anthony Bonnefil's habit of responding to staff that spoke about the Peshlakai girls with 'That's exactly why [we count drinks].'" Post-Accident Conduct Response at 6. They assert that Bonnefil's testimony "that he did not acknowledge the girls during training unless a staff member spoke about them first" underscores this speciousness. Post-Accident Conduct Response at 6. They note that rule 407 excludes evidence if it would "have made an earlier injury or harm less likely to occur," Fed. R. Evid. 407, and argue that AmRest, LLC "has not explained how the post-incident conduct that it seeks to exclude . . . would have made Plaintiffs' injuries less likely." Post-Accident Conduct Response at 6. They assert "that AmRest's indifferent reaction to the incident in this case is evidence of the very motive and state of mind that helped cause Plaintiffs' injuries in the first place." Post-Accident Conduct Response at 6. The Plaintiffs point out that the authority that AmRest, LLC cites "is inapposite because, unlike in this case, those rulings were regarding evidence that an employee was actually dismissed or reprimanded," and "there is no such evidence here." Post-Accident Conduct Response at 6-7.

The Plaintiffs maintain that these matters are more appropriately described as subsequent bad acts, which is admissible under rule 404(b)(2):

> For instance AmRest's post-incident conduct shows that the events of March 5, 2010 were not simply a mistake or accident. The fact that AmRest continued to fail to properly train employees and continued to fail to discipline employees for unsafe service of alcohol shows that this case was not an aberration. Similarly, the post-incident conduct shows that AmRest's motive was profit from alcohol sales at the expense of safe service of alcohol. Subsequent bad acts are probative of motive, intent, and knowledge when the subsequent acts are similar to the acts at issue and this similarity may be shown through . . . the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses. Here, AmRest demonstrated the same state of mind by putting dollars before people both in perpetrating the events of this case and in failing to reprimand or dismiss Kirby.

Post-Accident Conduct Response at 7 (internal quotation marks and citations omitted). The

- 36 -

Plaintiffs, therefore, ask the Court to deny the Post-Accident Conduct Motion.  See Post-Accident Conduct Response at 8.

       5.      **Cumulative Conduct Motion.**

      AmRest, LLC moves the Court "to exclude from trial evidence of alleged wrongful acts which did not cause, and are not similar to conduct that caused, Plaintiffs' injuries."  Cumulative Conduct Motion at 1.  It "anticipates that the Plaintiffs will seek to introduce at trial evidence of alleged negligent conduct by AmRest which is entirely unrelated to Plaintiffs' injuries."  Cumulative Conduct Motion at 1.  It notes that, in various briefing, the Plaintiffs have indicated "that they will attempt to adduce [sic] evidence that AmRest's Santa Fe location was 'understaffed,' that it maintained 'a high turnover rate,' that it ignored 'its own testing standards,' and that it 'failed to discipline [s]erver David Kirby' *after* the automobile accident that caused Plaintiffs' injuries."   Cumulative Conduct Motion at 1 (quoting Response to Defendant AmRest's Motion for Partial Summary Judgment on Punitive Damages at 3, filed April 8, 2013 (Doc. 41-5)).  AmRest, LLC acknowledges that the Plaintiffs may have other evidence that it "fell below a standard of care or otherwise acted wrongfully."  Cumulative Conduct Motion at 1-2.  It asserts that the Court should not allow the Plaintiffs "to present evidence of allegedly wrongful acts by AmRest that did not cause Plaintiffs' injuries and are dissimilar to any such causal acts.  Allowing evidence of this sort to be presented to the jury would introduce constitutional error into any determination of punitive damages arising from direct negligence."  Cumulative Conduct Motion at 2.

      AmRest, LLC notes that the Supreme Court of the United States has limited plaintiffs' use "of a defendant's general, allegedly wrongful conduct in support of a claim for punitive damages."  Cumulative Conduct Motion at 2.  It contends that, in State Farm Mutual Automobile

Insurance Co. v. Campbell, the Supreme Court extended its decision holding in BMW of North

America, Inc. v. Gore, 517 U.S. 559 (1996), "clarif[ying] that the wrongful acts upon which

punitive damages are predicated must bear some relation to a plaintiff's harm.  'A defendant's

dissimilar acts, independent from the acts upon which liability was premised, may not serve as

the basis for punitive damages.'"  Cumulative Conduct Motion at 2 (quoting in State Farm Mut.

Auto. Ins. Co. v. Campbell, 538 U.S. at 422-23).   It explains that, in State Farm Mutual

Automobile Insurance Co. v. Campbell, the plaintiffs convinced the trial court to allow an

exceedingly broad range of evidence in an effort "'to rebuke [the defendant] for its nationwide

activities.'"  Cumulative Conduct Motion at 2 (quoting State Farm Mutual Automobile Insurance

Co. v. Campbell, 538 U.S. at 420-21).  AmRest, LLC explains that

> [t]he Supreme Court reined in that approach, holding that "[t]he reprehensibility
> guidepost does not permit courts to expand the scope of the case so that a
> defendant may be punished for any malfeasance."  The trial court erred because
> "evidence pertaining to claims that had nothing to do with [the lawsuit] was
> introduced at length."  As a result, the lower court "awarded punitive damages to
> punish and deter conduct that bore no relation to the [plaintiffs'] harm."  The
> sweeping evidence presented by the plaintiffs could not be used to support the
> punitive award, because "[a] defendant should be punished for the conduct that
> harmed the plaintiff, not for being an unsavory individual or business."  When a
> plaintiff seeks to introduce evidence of repeated wrongs to enhance punitive
> damages, "courts must ensure that the conduct in question replicates the prior
> transactions."

Cumulative Conduct Motion at 3.  In their view, if the Court allows the Plaintiffs to introduce

"evidence of other alleged wrongdoing by AmRest that neither caused Plaintiffs' injuries nor is

substantially similar to any such causative conduct, any punitive damages awarded by the juries

will rest on a constitutionally infirm basis."  Cumulative Conduct Motion at 3 (citing Stogsdill v.

Healthmark Partners, L.L.C., 377 F.3d 827 (8th Cir. 2004)).

AmRest, LLC asserts that the "Plaintiffs' attorneys already have indicated that they

intend to argue that evidence of alleged general AmRest wrongdoing in support of punitive

damages is admissible under a 'cumulative conduct' theory, on the basis of" <u>Clay v. Ferrellgas,</u> <u>Inc.</u>, 1994-NMSC-080, 118 N.M. 266, 881 P.2d 11, and <u>Grassie v. Roswell Hospital Corp.</u>, 2011-NMCA-024, 150 N.M. 283, 258 P.3d 1075.  Cumulative Conduct Motion at 4.  AmRest, LLC notes that those cases could not "make admissible under state law evidence that [<u>State Farm</u> <u>Automobile Insurance Co. v.</u>] Campbell holds is barred from consideration by the Constitution." Cumulative Conduct Motion at 4.  Moreover, AmRest, LLC contends that neither case would admit this evidence: "Under New Mexico as well as federal law, cumulative conduct that may be considered for punitive damages purposes is limited to conduct that caused the harm in question or is closely similar to such conduct."  Cumulative Conduct Motion at 4.  In AmRest, LLC's telling, in <u>Clay v. Ferrellgas</u>,

> one of the defendant corporation's employees partially converted a vehicle to run on propane by installing a propane tank and leak-testing the tank with fuel, but the employee did not install a vapor barrier or external vent to complete the job. Another employee released the unfinished vehicle to its owner without checking for residual fuel in the tank or warning that the conversion work was incomplete. The vehicle exploded as a result of the leaking residual propane.  Viewing the conduct cumulatively, the Supreme Court [of New Mexico] held that "[t]he culpable mental state of the corporation . . . may be inferred from the very fact that one employee could be ignorant of the acts or omissions of other employees with potentially disastrous consequences."
>
> The Court also held that evidence that the corporation had failed to file reports with the state for this and numerous other conversion jobs was admissible cumulative conduct.  Filing the reports would have resulted in the state inspecting the work and, in the case before the Court, "probably would have prevented the harm."  The plaintiffs did not present a liability theory to the jury based on the corporation's failure to file the reports, however, so evidence of that failure could not constitute "evidence . . . of a contention of negligence and proximate cause." It could, however, provide proof of "a mental state that was not an essential element of the underlying cause of action."

Cumulative Conduct Motion at 4-5 (citations omitted).  In AmRest, LLC's view, the Supreme Court of New Mexico in <u>Clay v. Ferrellgas</u> allowed plaintiffs to introduce evidence that the defendant had failed to file a particular report, "which played a direct causative role in the

plaintiff's injuries, and evidence of similar failures on other work from which the jury could infer that the corporation's 'policy (or lack thereof)' reflected a culpable mental state." Cumulative Conduct Motion at 5 (quoting Clay v. Ferrellgas, 881 P.2d at 16). It argues that, "[i]n later decisions, the Supreme Court [of New Mexico] has applied Clay[ v. Ferrellgas] only to evidence of cumulative conduct that is causally connected to the injury in question or is indistinguishable from that conduct." Cumulative Conduct Motion at 5 n.1.

AmRest, LLC also points to Grassie v. Roswell Hospital Corp., in which "a hospital patient's death was attributed to an emergency physician's negligence and to a general failure of communication between the physician and nurses in the emergency room who had knowledge of the patient's 'scary high' blood pressure readings." Cumulative Conduct Motion at 5 (quoting Grassie v. Roswell Hosp. Corp., 2011-NMCA-024, ¶¶ 6-27). The New Mexico Court of Appeals, applying Clay v. Ferrrellgas, "held that the negligence of the nurses," which the jury had found did not proximately cause a patient's death, "could be cumulated with the physician's negligence to establish a culpable mental state." Cumulative Conduct Motion at 5-6. In AmRest, LLC's view, the nurses' conduct was both similar to the physician's conduct, and both failures "contributed to the emergency room dysfunctions that was broad enough in its sources to support finding a capable mental state on the part of the hospital." Cumulative Conduct Motion at 6 (internal quotation marks and alterations omitted).

AmRest, LLC asserts that, unlike in those cases, certain evidence the Plaintiffs seek to admit lacks causal or temporal connection to, or similarity with, "the alleged overservice that caused [their] injuries." Cumulative Conduct Motion at 6. It asserts that the Plaintiffs believe the following conduct supports a punitive damages award:

- Upselling the Brewtus beer.

- Generating 69% of the sales at the Santa Fe Applebee's from bar sales during happy hour.

- Multiple unrelated, anonymous customer complaints regarding RSOA (responsible service of alcohol) issues at the Santa Fe Applebee's.

- The alleged suspension of a bartender for cutting off (refusing alcohol service to) Applebee's patrons.

- Giving 100% scores to two servers who answered questions on a RSOA test differently.

- A high employee turnover rate and the alleged understaffing of managers.

- Having a Manager on Duty who was considered unapproachable.

- Not disciplining server David Kirby for violating the three-drink notification rule.

- Not changing ORSO policies after the accident that injured Plaintiffs.

- AmRest's alleged failure to produce documents in discovery in this litigation.

Cumulative Conduct Motion at 6-7 (internal quotation marks and citations omitted).

In AmRest, LLC's view, this conduct is not similar "to the alleged overservice of alcohol that caused Plaintiffs' injuries and would form the basis for liability, and none could be deemed causally related to the operative conduct."  Cumulative Conduct Motion at 7.  In AmRest, LLC's view, "[t]here is no evidence that anyone upsold the Brewtus beer to Ruiz, not that there is anything wrong with such conduct to begin with.  Similarly, making money from bar sales is not wrongful conduct and cannot be causally linked to Plaintiffs' injuries."  Cumulative Conduct Motion at 7.  With respect to the customer complaints, AmRest, LLC cites the Court's decision in Pedroza v. Lomas Auto Mall, Inc.,  No. CIV 07-0591 JB/RHS, 2009 WL 1300944, at *5 (D.N.M. Apr. 2, 2009), in which the Court excluded evidence of other lawsuits as evidence of punitive damages; in AmRest, LLC's view, "[t]he anonymous complaints here are, likewise, no

- 41 -

more than a set of allegations and have even less probative value than a complaint filed in court." Cumulative Conduct Motion at 7.

With respect to the alleged staffing issues, AmRest, LLC asserts that the Plaintiffs have not shown that those issues caused their injuries.  See Cumulative Conduct Motion at 7. Moreover, in their view, the Plaintiffs have not shown that the inconsistencies in the test results or that "the alleged suspension of a different bartender contributed to the alleged overservice of Ruiz."  Cumulative Conduct Motion at 7.  "And conduct that occurred *after* the alleged overservice, including the supposed failure to discipline Kirby, by definition could not have played any role in causing the incident."  Cumulative Conduct Motion at 7 (emphasis in original).  They note that, in Pedroza v. Independent Auto Dealers Service Corp., the Court held that "recidivist behavior may properly be considered when determining reprehensibility [for purposes of punitive damages], but later conduct is not evidence that earlier conduct is recidivist. Later conduct does not amount to prior transactions."    Cumulative Conduct Motion at 7 (quoting Pedroza v. Lomas Auto Mall, Inc., 2009 WL 1300944, at *5 (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 423)).

AmRest, LLC also argues that, under the law of the United States Court of Appeals for the Tenth Circuit and New Mexico, its "alleged, after-the-fact misconduct in discovery is not admissible on the issue of punitive damages."  Cumulative Conduct Motion at 8 (citing Farm Bureau Life Ins. Co. v. Am. Nat'l Prop. & Cas. Co., 408 F. App'x 162 (10th Cir. 2011); Chavarria v. Fleetwood Retail Corp. of N.M., 2005-NMCA-082, 137 N.M. 783, 115 P.3d 799, overruled on other grounds by 2006-NMSC-046, 140 N.M. 478, 143 P.3d 717).  In its view,

> [n]either Clay nor Grassie authorizes the indiscriminate aggregation of corporate misconduct bearing no relation to the cause of the claimant's injury.  Allowing Plaintiffs to present evidence of non-causal and dissimilar acts of alleged misconduct by AmRest would be akin to allowing evidence in Clay of automobile

> accidents involving the defendant corporation's employees or in <u>Grassie</u> of Slip -
> and-fall incidents in the defendant hospital's hallways, all to support arguments
> that those defendants operated with an overall disregard for safety.  Those cases
> involve no such thing, and the tactic should not be permitted here.

Cumulative Conduct Motion at 8.  AmRest, LLC argues that there is no basis for punitive

damages against it, but that a punitive damages award based on the evidence to which it

addresses the Cumulative Conduct Motion would be "doubly" erroneous.  Cumulative Conduct

Motion at 8.  It argues that the Court should, therefore, exclude evidence of AmRest, LLC's

actions and inactions that did not directly injure the plaintiffs and acts that were not similar to

those that injured them; in its view, "[e]vidence of cumulative allegedly wrongful conduct is

constitutionally inadmissible unless the conduct caused Plaintiff's injury or bears a substantial

similarity to any such causal acts."  Cumulative Conduct Motion at 8-9.

In the Plaintiffs' Response to AmRest, LLC's Motion *in Limine* to Exclude "Cumulative

Conduct" Evidence of Alleged Wrongful Acts by AmRest That Did Not Cause, and Are Not

Similar to Conduct That Caused, Plaintiffs' Injuries, filed March 24, 2014

(Doc. 256))("Cumulative Conduct Response"), the Plaintiffs ask the Court to deny the

Cumulative Conduct Motion.  Cumulative Conduct Response at 1.  They argue that the evidence

that the Cumulative Conduct Motion would exclude is relevant, even separate from the

cumulative conduct theory for punitive damages.  <u>See</u> Cumulative Conduct Response at 1-2.

The Plaintiffs state that AmRest, LLC's "argument is based on AmRest's myopic view that the

prior and subsequent bad acts listed above are unrelated to Plaintiff's injuries.  This is simply

incorrect."  Cumulative Conduct Response at 2.[6]   The Plaintiffs reiterate their arguments from

---

[6] The Plaintiffs also incorporate by reference their arguments from the Guest Report
Response, the Prior Conduct Response, the Subsequent Conduct Response, and their responses
to three other motions: (i) Plaintiffs' Response to AmRest, LLC's Motion in Limine to Exclude
References to and Evidence Regarding AmRest's Alcohol Sales Figures, field March 20, 2014

the responses discussed above: all of the events at issue are relevant under rule 404(b)(2), under rule 406, for purposes of a spoliation charge, and for compensatory and punitive damages, separate from the cumulative-conduct theory.  See Cumulative Conduct Response at 3-4.

With respect to AmRest, LLC's argument under State Farm Mutual Automobile Insurance Co. v. Campbell, the Plaintiffs submit that "the prior and subsequent bad acts are precisely the type of evidence that courts have allowed juries to consider when determining 'if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.'"  Cumulative Conduct Response at 4 (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 419). In their view, these acts "are limited regarding time and location and are similar to AmRest's acts on March 5, 2010."  Cumulative Conduct Response at 4-5.  They argue that, unlike in State Farm Mutual Automobile Insurance Co. v. Campbell, the evidence that they would submit does not expose to criticism AmRest, LLC's operations throughout the United States: "[E]ach of the prior and subsequent acts that AmRest seeks to exclude occurred at the very Santa Fe Applebee's restaurant where the events in this case took place."  Cumulative Conduct Response at 5. Moreover, they point out that these acts occurred within two years before and after March 5, 2010 -- and not, as in State Farm Mutual Auto Insurance Co. v. Campbell, a twenty-year period. See Cumulative Conduct Response at 5.  They also assert, without elaboration, that these acts

---

(Doc. 239); (ii) the Plaintiffs' Response to AmRest, LLC's Motion in Limine to Exclude Any and All Suggestions, Implications, Intimations and/or Arguments that James Ruiz and Gilbert Mendoza Were Given Complimentary Alcoholic Drinks at Applebee's in March of 2010, filed March 20, 2014 (Doc. 241); (iii) the Plaintiffs' Response to Applebee's Motion in Limine to Exclude Any and All References to "Upselling["] and "Suggestive Selling" practices, filed March 21, 2014 (Doc. 247).  The Court has determined that the arguments that the Plaintiffs expressly state in the Cumulative Conduct Response are sufficient to dispose of the Cumulative Conduct Motion, and will not, therefore, rehearse the arguments from the four additional responses in this Memorandum Opinion and Order.  It may, at a later date, enter a Memorandum Opinion and Order disposing of the motions to which the Plaintiffs address their responses.

"are very similar to the acts that gave rise to Plaintiffs' injuries." Cumulative Conduct Response at 5.

Against this backdrop, the Plaintiffs assert that this evidence "is admissible to show the cumulative conduct of AmRest's employees," because "all of the prior and subsequent bad acts at issue in this motion show AmRest's state of mind." Cumulative Conduct Response at 5 (citing Clay v. Ferrellgas, Inc.). Further, in their view,

> [i]t is not dispositive that some of the prior and subsequent acts that AmRest seeks to exclude may have been lawful. For instance, AmRest argues that there is nothing wrong with upselling Brewtus beers. Putting aside -- for the sake of argument -- that there is evidence that David Kirby upsold Brewtus Beers to Defendants James Mendoza and David Ruiz, and thus the upselling of Brewtus Beers is relevant causal evidence, this purportedly lawful conduct can be considered in the aggregate with other employee conduct in determining punitive damages. "The circumstances define the conduct; a cavalier attitude toward the lawful management of a dangerous product may raise the wrongdoer's level of conduct to recklessness, whereas a cavalier attitude toward the lawful management of a nondangerous product may be mere negligence." Clay[ v. Ferrellgas, Inc.], 881 P.2d at 14.

Cumulative Conduct Response at 6. The Plaintiffs also respond to AmRest, LLC's argument that its "purportedly lawful conduct of generating 69% of its sales at the Santa Fe Applebee's from bar sales during happy hour is too dissimilar from the events of this case to be relevant" is misplaced, because it is relevant background evidence: "When the bar sales evidence is considered in combination with all of the acts that AmRest seeks to exclude it shows that AmRest's state of mind was craven for profit and indifferent to public endangerment and that punitive damages are appropriate." Cumulative Conduct Response at 6-7.

The Plaintiffs continue:

> AmRest argues that evidence regarding its spoliation of evidence is not admissible to show that AmRest is liable for punitive damages. This is a shockingly incorrect statement of the law. In the first case cited by AmRest for its argument, the Tenth Circuit specifically stated that a defendant's dishonest testimony during trial could be the basis for the amount of punitive damages.

- 45 -

> <u>Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.</u>, 408 F. App'x 162, 170 (10th Cir.
> 2011)("A defendant's conduct at trial may be considered in assessing the amount
> of a punitive damages award under Utah law.").   The court ruled, however, that
> conduct at trial could not be the sole reason for awarding punitive damages in the
> first place "absent some showing that the defendant's conduct at trial is probative
> of his state of mind at the time that the previous tortious act was committed."
> <u>Farm Bureau Life Ins. Co.[ v. Am. Nat. Ins. Co.]</u>, 408 F. App'x at 170.   In this
> case, AmRest's loss of the evidence is just another example of its careless and
> indifferent state of mind regarding this accident and safe service of alcohol in
> general.   But even if it were not part of the larger picture here, the spoliation
> would be admissible regarding the amount of punitive damages because "a
> defendant's actions at trial may call for a high punitive damages award in order to
> deter future misconduct."  <u>Id.</u>

Cumulative Conduct Response at 7.

The Plaintiffs also argue that <u>Chavarria v. Fleetwood Retail Corp. of New Mexico</u>, 115

P.3d 799, <u>aff'd in part, rev'd in part sub nom.</u> 143 P.3d 717, does not support AmRest's

argument.   <u>See</u> Cumulative Conduct Response at 7.   In their view, that case stands for the

proposition "that a corporation's decision to defend a lawsuit is not evidence that it ratified the

bad conduct of its employees and thus could not be used to prove up punitive damages," and that

it does not speak to "spoliation of evidence or other bad acts during discovery."   Cumulative

Conduct Response at 7-8.

In AmRest, LLC's Reply in Support of AmRest, LLC's Motion in Limine to Exclude

"Cumulaive [sic] Conduct" Evidence of Alleged Wrongful Acts by AmRest That Did Not Cause,

and Are Not Similar To Conduct that Caused, Plaintiffs' Injuries, filed March 31, 2014

(Doc. 282)("Cumulative Conduct Reply"), AmRest, LLC substantially reiterates the arguments

from its Cumulative Conduct Motion.   <u>See</u> Cumulative Conduct Reply at 1.   In its view, the

Plaintiffs' arguments that they may present this evidence to show AmRest, LLC's state of mind

to enhance its culpability puts the evidence "squarely within the scope of [<u>State Farm Mutual</u>

<u>Automobile Insurance Co. v.] Campbell</u>."   Cumulative Conduct Reply at 2.   AmRest, LLC

contends that the evidence is not admissible to show aggravating or mitigating circumstances under the Wrongful Death Act, "because when used in the compensatory damages context 'aggravating circumstances' refer[s] to circumstances that might affect the amount of damages needed to compensate for the decedent's injury and death, not to circumstances relating to the wrongful conduct itself." Cumulative Conduct Reply at 2-3 (citing Beller v. United States, 296 F. Supp. 2d 1277 (D.N.M. 2003)(Johnson, J.)). Moreover, it argues that the Plaintiffs have not satisfied their burden under State Farm Mutual Automobile Insurance Co. v. Campbell to show that the evidence of these acts is similar to the acts that harmed the Plaintiffs. See Cumulative Conduct Reply at 4. AmRest, LLC also contends that neither Clay v. Ferrellgas, Inc. nor Grassie v. Roswell Hospital Corp. "supports the admission of evidence of dissimilar acts under the rubric of cumulative conduct," and points out that neither case addresses the constitutional concerns. Cumulative Conduct Reply at 4. It also notes that, under New Mexico law, the Plaintiffs' spoliation allegation cannot support punitive damages, because "[l]itigation misconduct occurring subsequent to the acts giving rise to the plaintiff's injury, even if proved, is not a basis for punitive damages." Cumulative Conduct Reply at 4. Accordingly, it argues, State Farm Automobile Insurance Co. v. Campbell "bars evidence of dissimilar acts offered to prove the culpable mental state of the defendant for the purpose of assessing punitive damages," and the Court should, therefore, grant the Cumulative Conduct Motion. Cumulative Conduct Reply at 4-5.

      **6.**      **Hearing on the Motions.**

      The Court held hearings on April 1, 2014 and April 2, 2014. See Transcript of Hearing, taken April 1, 2014 ("Apr. 1 Tr."). The Court first gave its inclination with respect to the Subsequent Liquor Law Violations Motion: in its view, the evidence implicated neither a rule

401 nor a rule 403 problem.  See Apr. 1 Tr. at 173:7-10 (Court).  The Court stated rule 404(b)

might present a problem, and that no permissible purpose came to mind:

> [T]his is a dram shop case.  So the motive -- I mean, there is a profit motive; we're going to talk about that.  But you don't have a motive to violate the law. Intent, preparation, plan, knowledge; I guess absence of mistake might be lack of accident, something like that.  But I think in that case, if you're going to get to that, you're going to have to really be specific as to overservice rather than other things.
>
> So, to me, I think it's a 404(b) question.  And if it's actually being used, as I think the plaintiffs argued, to some degree for punitive damages, I think Campbell is going to keep it restricted to overservice; not underage, or things like that.
>
> So I guess those are my thoughts coming in.  It looked to me like a 404(b) problem; not a 401, not a 403.  And if it does come in for punitives, it seems to me it's got to come in just the overservice.

Apr. 1 Tr. at 173:21-174:14 (Court).

AmRest, LLC reiterated its argument that State Farm Mutual Automobile Insurance Co.

v. Campbell precludes this evidence and that, if any of this evidence should come in for punitive

damages purposes, it should be evidence of overselling, because that activity directly harmed the

Plaintiffs.  See Apr. 1 Tr. at 175:15-176:5 (Ray).  AmRest, LLC submitted that the other

matters -- for example, whether server cards were valid or whether it checked a minor's

identification -- were the sort of cumulative information that State Farm Mutual Automobile

Insurance Co. v. Campbell prohibits the Court from admitting.  See Apr. 1 Tr. at 176:6-13 (Ray).

AmRest, LLC argued that State Farm Mutual Automobile Insurance Co. v. Campbell also

prohibits the use of subsequent conduct.  See Apr. 1 Tr. at 176:14-177:3 (Ray).  The Court asked

AmRest, LLC if courts have understood that sentence to refer to conduct that occurs before the

event at issue, or, rather, to conduct that occurs before trial; AmRest, LLC asserted that it has

identified no case that would allow the Court to admit evidence of acts occurring after the act

- 48 -

that harmed the Plaintiff.  See Apr. 1 Tr. at 177:4-24 (Court, Ray).  In its view, the only evidence

that should come in to evidence is evidence of overservice.  See Apr. 1 Tr. at 177:25-178:2

(Court, Ray).  AmRest, LLC argued that State Farm Mutual Automobile Insurance Co. v.

Campbell limits the evidence in another way:

> You cannot go out to, let's say Utah, or in this case, Colorado -- there is a listing
> that the plaintiffs want to attempt to put into evidence -- anything that is outside
> of the AmRest locations within the State of New Mexico, is my reading of State
> Farm versus Campbell. And in that case, the Supreme Court noted that anything
> outside of that; in other words, a nationwide practice or a company-wide practice,
> when it doesn't involve that state, is certainly something that has to be limited by
> courts under due process and the 14th Amendment.
>
> So with your clarification, Judge, as well as limiting it within the State of
> New Mexico.  So, when we narrow it down to that, those are the issues regarding
> overservice citations and warnings related to overservice.

Apr. 1 Tr. at 178:8-24 (Ray).  The Court indicated that it would deal with other objections

regarding the guest complaints separately.  See Apr. 1 Tr. at 178:25-179:9 (Court).  AmRest,

LLC summarized its view that the Court should limit evidence to overservice within the state of

New Mexico. See Apr. 1 Tr. at 179:10-16 (Ray).

The Court continued argument on this motion on April 2, 2014.  See Transcript of

Hearing, taken April 2, 2014 (Apr. 2 Tr.").  AmRest, LLC argued that State Farm Mutual

Automobile Insurance Co. v. Campbell, Pedroza v. Lomas Auto Mall, Inc., and Behrens v.

Gateway Court, LLC, 2013-NMCA-097, 311 P.3d 822, together hold that conduct's

reprehensibility should be based upon recidivism -- "[i]n other words, a repetition of prior

conduct."  Apr. 2 Tr. at 182:15-183:10 (Ray).  AmRest, LLC argued that no case in this

jurisdiction "addresses recidivist conduct as being after the direct harm to the Plaintiff" and that,

"to have reprehensibility of specific conduct based on recidivist nature, it is obviously before the

harm to plaintiff occurs."  Apr. 2 Tr. at 183:11-17 (Ray).

The Plaintiffs reframed the issue: noting that AmRest, LLC "trains its employees in responsible service of alcohol," and that what is at issue is AmRest, LLC's enforcement of that training, evidence of service of minors and evidence of overservice are both relevant to this issue. Apr. 2 Tr. at 185:7-185:21 (Lyons). The Plaintiffs contended that the "divide and conquer strategy" was obscuring the broader picture of "similar conduct, which is the failure to enforce polices on responsible service of alcohol, which would include service to minors and service to intoxicated people, and failing to count drinks." Apr. 2 Tr. at 185:22-185:11 (Lyons). The Plaintiffs pointed out that AmRest, LLC's operations manual covers a number of responsible service of alcohol topics. See Apr. 2 Tr. at 185:12-186:4 (Lyons). The Plaintiffs argued that, of the fourteen violations that AmRest, LLC produced, five had occurred in New Mexico; two before the incident, and three beginning the day after the incident. See Apr. 2 Tr. at 186: Tr. at 186:5-15 (Lyons). They underscored that, "in a company that ran 103 restaurants in eight different states across the country, out of their 14 liquor law violations, five of them were in New Mexico." Apr. 2 Tr. at 186:16-19 (Lyons). They also noted that AmRest, LLC's corporate offices had intended to roll out the Late Night program and to reinforce responsible service of alcohol, which did not happen in New Mexico. See Apr. 2 Tr. at 186:20-24 (Lyons). The Plaintiffs argued that they had addressed the liquor law violation on March 6, 2014, in another motion; in that motion, they ask that Teilani Telford, the bartender who overserved on March 6, 2014, be allowed "to testify that they didn't have any reinforcement of responsible service of alcohol training before that rollout." Apr. 2 Tr. at 186:25-187:7 (Lyons). Moreover, they assert that Telford will testify that, whenever bartenders informed the managers that an individual had had too much to drink, "the managers there would say, 'Well, give them one more,' which shows that something endemic was happening here in New Mexico." Apr. 2 Tr. at 187:7-11 (Lyons).

The Plaintiffs argued that "those restaurants, the Farmington restaurant and the Santa Fe restaurant were under the supervision of Jake Ghandi." Apr. 2 Tr. at 187:11-14 (Lyons).

> The Plaintiffs contended that
>
> this evidence is relevant, that at these particular places: Farmington, which involved the sale to an intoxicated person; and the other two subsequent, Roswell and Rio Rancho, New Mexico, are relevant to show these patterns. The patterns, they jump off the page. When you think of eight different states, if there was an equal spread of liquor law violations, there would be one or two in a particular state, and, you know, then it would be spread equally around. Instead, we have five in New Mexico. And what is also interesting is Colorado has the second highest number here, which was in the same region, and also happens to be a mountain high altitude state.

Apr. 2 Tr. at 187:5-188:3 (Lyons). The Plaintiffs also noted that Muldoon testified that he did not know that two of the fourteen overservice violations occurred in New Mexico and that five of the fourteen violations occurred in New Mexico. See Apr. 2 Tr. at 188:4-17 (Lyons). The Plaintiffs stated that multiple lawsuits have arisen out of the restaurant in Taos, New Mexico, and stated that another overservice violation occurred at the Santa Fe restaurant in 2011:

> That's not covered in these 14 violations, because that only went up to 2010. But the Santa Fe restaurant had a 2011 violation that is also a subsequent violation here in this motion, where a bartender in Santa Fe sold to an obviously intoxicated person. The person was observed being intoxicated; left the bar and drove, and was found to have a high BAC. They came back and cited the bartender and she was fired.

Apr. 2 Tr. at 188:18-189:8 (Lyons). In sum, the Plaintiffs believe that the conduct that relates to failure to enforce the responsible service of alcohol is sufficiently similar to be admitted. See Apr. 2 Tr. at 189:9-19 (Lyons).

After reviewing the familiar standards under rule 404(b) and rule 403, see Apr. 2 Tr. at 189:25-190:13 (Lyons), the Plaintiffs stated that Kirby's failure to count drinks and his overservice of Ruiz contradicted his state training, and argued that AmRest, LLC encouraged its waiters to sell alcohol without training them properly. See Apr. 2 Tr. at 190:14-191:6 (Lyons).

The Plaintiffs asserted that they were unaware of cases that disallow evidence of subsequent bad acts and argued that cases speak of prior bad acts because rule 404(b) uses similar language; in their view, it is illogical to say that the Court may not, therefore, admit evidence of subsequent acts. See Apr. 2 Tr. at 191:7-19 (Lyons).

The Plaintiffs argued that the evidence is relevant, that it is admissible under rule 403, and that it is admissible under rule 404, because it "provide[s] the insight into the motive and the intent and the absence of mistake and the absence or the lack of an accident. It shows that this is actually a pattern . . . [that] continued. That's recidivism . . . in a nutshell." Apr. 2 Tr. at 191:25-192:8 (Lyons). The Plaintiffs noted that Ghandi had been the "area coach" -- a manager -- for three of the five New Mexico restaurants. Apr. 2 Tr. at 192:9-25 (Court, Lyons). The Plaintiffs asserted that, in addition to the issues in Taos and Santa Fe, the Gallup restaurant violated unspecified food cleanliness rules, and stated that "there are certainly mentions of . . . personnel issues . . . in Gallup that Jake Ghandi was failing to get on top of properly that may be relevant." Apr. 2 Tr. at 193:1-18 (Lyons). In short, the Plaintiffs stated, "the general theme is that this was a poorly directed area of AmRest's business. And that never, never became so crystalized until we learned that there was this plan to roll out the Late Night, with responsible service of alcohol in mind, and it never got executed here." Apr. 2 Tr. at 193:19-24 (Lyons).

AmRest, LLC argued that the plaintiffs' lawyers in State Farm Mutual Auto Insurance Co. v. Campbell used the same arguments and that the Supreme Court had excluded them; moreover, they stated that the Plaintiffs were "trying to get this in for punitive damages to show just bad acts or bad character or somebody is not doing their job properly." Apr. 2 Tr. at 194:6-19 (Ray). In its view, this case is about whether AmRest, LLC overserved Ruiz; AmRest, LLC contended that service to a minor is not relevant. See Apr. 2 Tr. at 194:20-195:1 (Ray).

AmRest, LLC argued:

> Mr. Lyons wants to turn it into an indictment against AmRest, which State Farm says, You can't do that.  The Supreme Court of the United States says, You can't do that.  Lawyers have tried this by saying, Well, you know, it's the failure to enforce the responsible service of alcohol, so let's just loop everything in under that category.
>
> Judge, that's exactly like taking a product liability case, and saying, Well, you need to be a responsible manufacturer of automobiles, so every model, everything that you've done, whether it be General Motors or Toyota, whoever, everything that you've done is going to come into Court.
>
> And that's just not the law.  It never has been.  And it continues not to be the law; not only in the State of New Mexico but in the federal courts as well, and with the Supreme Court of the United States.

Apr. 2 Tr. at 195:2-19 (Ray).

AmRest, LLC suggested that, if the Plaintiffs had evidence about Kirby's training, that evidence would call for a different analysis, but State Farm Automobile Insurance Co. v. Campbell bars evidence of broad issues about service of alcohol.  See Apr. 2 Tr. at 195:24-196:16 (Ray).   AmRest, LLC contended that such evidence must address specific prior transgressions, and that it must address "the existence and frequency of similar past conduct." Apr. 2 Tr. at 196:15-18 (Ray).   AmRest, LLC argued that "[p]rior transgressions of these Applebee's stores within the State of New Mexico, and under the coaching of Ghandi . . . would be relevant."  Apr. 2 Tr. at 195:8-10 (Ray).  AmRest, LLC stated that there is no such thing as "post-accident recidivist activity" and that,

> essentially, that's what he's trying to do is bootstrap everything again.  State Farm says: You can't do it.  Many cases that talk about in the instance of automobile accidents or product liability cases say: You can't do it. It has to be similar conduct.  It has to be related directly to the harm of the plaintiff.  It doesn't have to be exact, but it's got to be similar.

Apr. 2 Tr. at 197:15-22 (Ray).

The Court stated that the following as the tentative ruling:

[i]n under 404(b). It still strikes me as prohibited evidence, rather than evidence that goes to motive. I'm having a hard time linking it up to a permissible purpose.

So I'm not inclined to go that route. As I indicated yesterday, I don't think it's a 401 issue. I think it's relevant. That's one of the problems here: It's probably too relevant. I don't think it's 403 issue. If it should come in, it should come in.

I don't think it's any more unfairly prejudicial than a lot of the other evidence that's in this case. So, to me, it seems to me it's a punitive damages issue.

I'm inclined to think Campbell does restrict me, and that I cannot allow anything other than the violations of overservice that -- I don't think it's going to sweep in things such as service to minors and that type of activity. So I think I'll exclude that.

I'm going to have to study this issue of before and after. Arguments of Mr. Ray concern me, but my understanding from other cases, and when I've looked at this in the past, is that subsequent acts can come in. So I'm inclined to allow that.

Apr. 2 Tr. at 198:7-199:7 (Court). The Court stated that it was inclined to allow the Plaintiffs to

admit evidence of AmRest, LLC's subsequent overservice violations within Ghandi's area. See

Apr. 2 Tr. at 198:8-17 (Court). The Court stated that the Plaintiffs could say that there were

seven violations against AmRest, LLC for overservice and that five happened within Ghandi's

area. See Apr. 2 Tr. at 199:20-23 (Court). The Plaintiffs said that there were only two violations

for overservice and that

they're both in Mr. Ghandi's area, if I'm not mistaken. They might actually be both in New Mexico: One in Mr. Ghandi's area and one in another area of New Mexico. But those would both be under Debbie Passmore's jurisdiction, who is higher up than Ghandi, but one step down from Mr. Muldoon.

THE COURT: Okay.

MR. LYONS: So it's also relevant.

Apr. 2 Tr. at 199:24-200:11 (Lyons, Court). The Plaintiffs asked how they could communicate

to the jury that New Mexico had a particular problem in this area; the Court stated that it would

allow the Plaintiffs

> to ask the appropriate witness, whoever it's going to be: AmRest has had violations before; correct?  And they will say yes.
>
> And only two of them have been for overservice of alcohol; correct?  They'll say yes.
>
> And both of those were in Passmore's district?  Yes.
>
> And then I don't know what else you want to do with those, but I think that's where you are.  That allows you to set up, then, the comparison within AmRest.

Apr. 2 Tr. at 200:19-201:3 (Lyons, Court).  The Plaintiffs reiterated their arguments that the responsible service of alcohol evidence that they would seek to admit is limited enough that State Farm Mutual Auto Insurance Co. v. Campbell does not prohibit it; they asked the Court to reconsider its inclinations.  See Apr. 2 Tr. at 201:5-202:10 (Lyons).  The Court stated that it would look at that case again.  See Apr. 2 Tr. at 202:12-15 (Court).

AmRest, LLC asked the Court to review Behrens v. Gateway Court, LLC, , in which the Court of Appeals of New Mexico stated:  "The Plaintiff's compensatory damages claim is based solely on defendant's liability of causing the fire, which destroyed plaintiff's home and worldly possessions. . . .  The compensatory damages element, therefore, cannot support a punitive damages award for any type of post fire conduct"   Apr. 2 Tr. at 202:21-203:9 (Ray).  The Court stated that, although AmRest, LLC might be correct, the proposition that subsequent evidence is irrelevant struck it as wrong.  See Apr. 2 Tr. at 203:16-23 (Court).  The Court stated that it understood the policies behind, for example, the bar against evidence of remedial efforts, but asserted that,

> if somebody is going to continue to violate the law, I'm not sure why that should be something we keep from the jury.  You may be right, that's what the law requires.  But it strikes me as odd.  In the past I'm not sure I've drawn that line, but I'd be glad to take a look at it.

Apr. 2 Tr. at 204:3-11 (Court).

The Court offered the following thoughts on the Guest Report Motion:

I think some of this, again, is sort of a 404(b) issue. There was one -- let's see, the first complaint involved this overservice. But I thought that that probably was out of time, given AmRest didn't own the restaurant at the time. So I was inclined to exclude that.

The second complaint about the loudness, I didn't think that was appropriate.

The third complaint, this one about the bartender was suspended for refusing to serve drinks. And it seemed to me that there was enough in the depositions following the complaint -- I'm not sure the complaint is terribly relevant. I don't know how you get the complaints in. It seems to me that the hearsay rule is going to keep these complaints out. I don't think just because you get a letter or a complaint as a corporation, it goes in a file, that that then allows you to introduce for the truth of the matter the statements in the letter. Now, it may give you notice of something, but I'm not sure how notice is particularly relevant here.

Now, if somebody can explain that, we give a limiting instruction saying you received notice. But that's not what this case is really about. So I guess I'm not sure that it serves a non hearsay purpose in this case. I think what the plaintiffs want to use it for is for hearsay purpose: That these are examples of people being served, or being suspended for not being served. So it would seem to me the complaints themselves may have trouble coming in under the hearsay rule. They might also have 404(b) problems.

But as far as the third one, this bartender being suspended for refusing to serve drinks to two intoxicated patrons. If I recall, from reading the deposition testimony, you were able to identify the bartender. She was the one that I think there was a dispute about whether she was rude or whether she got suspended here. I assume, if you want to get into that dispute as to why she was suspended, whether it was for being rude or for refusing service, I think that's fair game. But I don't think it comes in through an anonymous person's complaint.

The fourth complaint about people being really loud, and they kept serving drinks. I know it's after the automobile accident, but I didn't think that was the reason to exclude it. But there just didn't seem to be any factual development here.

So we had an anonymous complaint, hearsay problems; I couldn't think of a non hearsay purpose for this. So I was inclined to keep that out.

> So far as the complaints themselves, the four guest contacts, as far as just introducing those documents, I was inclined to grant the motion.  But I think later on it comes up, this story about the rude bartender.  I don't know if she was rude or not. That incident, I thought, could be the subject of a live witness testifying.

Apr. 2 Tr. at 269:20-272:3 (Court).

AmRest, LLC agreed that evidence about the rude bartender "is fair game" and that the Plaintiffs could ask a witness about that event directly.   Apr. 2 Tr. at 272:4-8 (Mowery). AmRest, LLC stated that the reports are inadmissible for the reasons that the Court had explained and that it did not object to any aspect of the Court's inclination.  See Apr. 2 Tr.; at 272:9-15 (Mowery).

The Plaintiffs began by recognizing that "it's hard to avoid the idea that we want to introduce these things for the truth of the matter."  Apr. 2 Tr. at 272:18-20 (Lyons).  The Plaintiffs began their argument focusing on the third complaint:

> We've established the truth of the matter through talking with Anthony Bonnefil, and through talking about Andrea Beals, the bartender who was fired just a month before this incident, cutting the two gentlemen off.  They didn't identify by name. The two gentlemen that were cut off called Jake Ghandi; he claims to not know who called him.

Apr. 2 Tr. at 272:20-273:2 (Lyons).  The Plaintiffs contend that these complaints are admissible to prove that AmRest, LLC was on notice, was expected to respond to them, and that they had done nothing except for the last one: "Ms. Passmore has some e-mails where she asked Barry Jenkins, 'Are we serving alcohol safely down there?' And he says, 'Yes, ma'am.'"  Apr. 2 Tr. at 273:3-17 (Lyons)(source of quotation not identified).

With respect to the first complaint, the Plaintiffs argued that they

> know it's on a date that AmRest claims it was not involved with this franchise, but this says "AmRest" on it.  And now, in an interrogatory response AmRest told us that they didn't take over this restaurant until 2009.  We later learned that they were admitting they started taking over the restaurant in July of 2008.  This

- 57 -

document shows that the franchise is AmRest, LLC, in April of 2008.

> And what's happening here is scary sounding.  And the point isn't to tell the jury this, in fact, happened -- although I'm with you, Your Honor, maybe a cautionary instruction is needed, and that's what Rule 404(b) requires -- but the routine habit here is they do nothing.  And this proves they do nothing.  They get a dangerous sounding complaint; they don't verify it.  We can't prove it's true.  But they did nothing to prove or disprove that this was actually happening.  And it's a man, passing out at the bar, being served nonetheless.

> So the fact that it's a scary piece of hearsay is one issue.  And so that can be dealt with by a cautionary instruction saying "You're not to accept the truth of the matter."  But this is incredibly relevant evidence on the issue of what AmRest's-run restaurant did or did not do, when being faced with notice that they were having dangerous service from what we now know to be a rogue element of their enterprise.

Apr. 2 Tr. at 273:18-274:21 (Lyons).

With respect to the second complaint, the Plaintiffs contended that this evidence is reputation evidence, an exception to the hearsay rule, and stated that they  want to admit it to show that the place is known for its happy-hour crowd, as contextual evidence about the loud environment at the restaurant.  See Apr. 2 Tr. at 275:8-276 (Lyons).

With respect to the third complaint, the Plaintiffs argued:

> The third, of course is, probably the most important, and we've talked about it a little bit.  And this is the one that involves Ms. Andrea Beals.  I guess I put my cards on the table.  I fully anticipate we'll subpoena Ms. Beals to testify live, and I can ask my questions of her however I need to.  But in the deposition I began the questioning by reading this statement to her because she never heard it before.

> And what I'm concerned about -- and this is more a comment of my own ability as a lawyer to take a proper deposition -- is she answers the question referring to the statement, and I don't want that testimony to be not understandable by the jury, just because I started off with a statement that you'll be ruling may or may not be --

> THE COURT:  Well, I read her testimony.   I think she's going to remember the incident.  And she's going to -- she looked pretty engaged.

> MR. LYONS:  What I would like to do also, and what I think is very

- 58 -

relevant, is that she was pulled from the bar.  And, obviously, Jake Ghandi says in his deposition -- and pardon my language, it's his language -- She's pissing people off, nothin' doing, she's out of here, okay.  So that's obviously the reason he fired her.  He probably gets a call from the Catanach brothers: She makes them mad, he fires her. We now know the Catanach brothers have been cut off several times because they get drunk at the bar and they got Jake's number.

So, you know, that Andrea was never told someone has actually stuck up for you, someone said you are part of this, that Ms. Passmore -- nobody higher up in AmRest -- ever intervened in any way.  They just said: Do what you want down there. I think that's relevant, and that makes this complaint's existence relevant.  We can read it, but there is some reference to it -- I think that since it's absolutely been corroborated and the danger of it being hearsay, even though it's anonymous, has been mitigated.  That's why we ask for its admissibility.

Apr. 2 Tr. at 276:7-277:23 (Lyons, Court).

With respect to the fourth, anonymous complaint, the Plaintiffs explained:

Yes. So this is the one, Your Honor, where there is an e-mail chain afterwards. Ms. Passmore says, Are things -- "Are you serving  alcohol safely down there?" And Mr. Jenkins says, "Yes," which is the reference to the actual complaint. Obviously, I'd like to show the complaint to the jury.  It's not anonymous.  And the reference to the complaint will be necessary to discuss, you know, is that the extent of Ms. Passmore's concern, when she hears these kinds of complaints that she just sends an e-mail; takes it at face value when they say, Oh, yeah, we're being safe.  Given everything that she's been learning about what's been going down in New Mexico up to that point, which is this incident, the Farmington incident, what's going on in Taos, that all she's doing is a phone call saying, You guys being safe down there?  And he answers, "Yes."  That's generally going to be the use of this complaint, and the reason we think it's relevant and admissible.

Apr. 2 Tr. at 278:6-25 (Lyons).  The Court asked for what non-hearsay purpose the Plaintiffs could introduce this evidence; the Plaintiffs suggested it was a routine habit, and the Court said that there were not enough incidents to go to habit, and asked the Plaintiffs for another basis. See Apr. 2 Tr. at 279:1-13 (Court, Lyons).  The Plaintiffs complained that they were victim of a divide-and-conquer strategy; the Court reiterated its request that the parties provide, not a permissible purpose under rule 404(b), but a permissible non-hearsay purpose that would be relevant to the jury.  See Apr. 2 Tr. at 279:14-280:18 (Lyons, Court).  The Plaintiffs stated that

they would offer it to show AmRest, LLC's reckless state of mind; the Plaintiffs argued that this purpose does not assume the complaints' truth, but shows that AmRest, LLC did not investigate the complaints.  See Apr. 2 Tr. at 280:19-281:2 (Lyons, Court).

The Court continued:

> THE COURT: But I don't think you can make anything of that with the first two -- for the first one, do you?  You don't know what they did after that first one, do you?
>
> MR. LYONS: Well, they have absolutely no record that they did anything at all.
>
> THE COURT: Well, but what would you do as a manager, if you got that complaint?  What would you do with it?
>
> MR. LYONS: Honestly, open a file and find out what happened.  I would talk to the managers about it.  I would want to know who was the person being overserved.  Who is the bartender on duty.  What was the time this happened?  Let's identify whose shift that occurred on.
>
> THE COURT: And from that failure to do that, then tell me what you're going to tell the jury about that.
>
> MR. LYONS: They didn't do any of those things. They didn't investigate.
>
> THE COURT: And then, what's the consequences for this trial of them not doing anything?
>
> MR. LYONS: That they have lip service to the responsible service of alcohol; that their state of mind -- which is a culpable state of mind on punitive damages testimony -- and first of all, they're going to be saying: We put responsible service of alcohol first.
>
> Punitive damages asks the jury to make a determination about what was the state of mind of the defendant, which is AmRest, that contributed to this incident.  And David Kirby, who was otherwise a well-trained person who knew better, by his own testimony, overserved in this incident.  And why would he do that?  Because they're encouraging him to increase sales.  They've got him busy at a time -- and they don't have the place properly staffed with managers.  And why are they not taking seriously all the responsible service of alcohol things that they know should be done?  Because they just have a habit of not doing it.  They talk about it.  They check off tests that say 100 percent.  But they don't actually do anything, in fact.  Even when they hear terrifying incidents about serving

someone who is passing out at the bar, or firing a bartender because she cut two people off, and rightly should have, and other incidents that are similar; that when those incidents come up, they do nothing about it.

And that would, one, show that their protests that they take responsible service of alcohol seriously is not true, which goes to the state of mind for the culpable mentality needed for the determination of punitive damages.

It's relevant, so therefore, it's admissible under 406. And it's also admissible under -- as hearsay under Exception 803(7).

* * * *

MR. LYONS: Honestly, I can't imagine what would be more relevant. If the jury is being asked to determine state of mind of AmRest, to restrict the evidence that goes to the jury as to what David Kirby did on this one incident, it doesn't make any sense. What the jury needs to know is what AmRest did about responsible service of alcohol.

And here it shows terrifying incidences where they did absolutely nothing. In fact, I don't think there is any other piece of evidence that is more salient on just what AmRest did, so that the jury can make a proper determination on what AmRest's state of mind that contributed to this incident.

Apr. 2 Tr. at 281:3-284:1 (Court, Lyons).  Moreover, in the Plaintiffs' view, they should use this evidence to lay the predicate for evidence under rule 803(7) of the absence of a record that AmRest, LLC responded to these complaints.  See Apr. 2 Tr. at 284:4-14 (Lyons).

The Court stated that it was leaning towards admitting the first, third, and fourth complaints, with a limiting instruction stating that AmRest, LLC was on notice of these complaints and did not respond.  See Apr. 2 Tr. at 284:17-285 (Court).  AmRest, LLC returned the Court's attention to the first complaint -- specifically to its argument that it did not own the restaurant at the time; the Court stated that it was inclined to allow the parties to fight out the ownership issue in front of the jury.  See Apr. 2 Tr. at 285:10-16 (Mowery, Court).  AmRest, LLC continued:

MR. MOWERY: Mr. Lyons brought your attention to one portion of this. On that same page, as you go to the bottom, the e-mail exchange starts with a

- 61 -

different company.  It's addressed to a Ms. Sherhorn of Apple Grove.  If you go, then, to the very next page at the top, it identifies the franchise as Restaurant Concepts.

In our motion we attached the deposition testimony of Patrick Muldoon, the president of the company.  The relevant portion was: "Were you involved at the ground floor of the negotiations for AmRest to take over Apple Grove's Applebee's restaurant?

"No, sir.

"How did you get the news that that was going to happen?

"From Charlie Snyder.

"When did you learn that that was going to happen?

"In approximately April of 2008.

"And then the official transition occurred July of 2008?

"Correct."

That fact is not disputed by the plaintiffs. If you look at their response, they don't challenge this.

THE COURT: So you're saying the incident occurred before the transition, but some of the e-mail chain was after AmRest took over?

MR. MOWERY: Yes. And I can't explain why they decided to include AmRest at the very end of the chain.  But as a new franchisee that's coming in, I suspect that they were trying to keep them in the loop on some of these complaints. That doesn't establish that we had any ownership interest.  That is an argument that Mr. Lyons has just now come up with, based upon what he saw was a reference to the franchise of AmRest.  But the record before the Court is undisputed, that we did not own or operate.

Now, unless somebody from Applebee's is going to come forward and explain these documents -- remember, these are not AmRest documents.  We have hearsay within hearsay.  But the undisputed record before the Court is that we were not the owner.  This first report should not come in for any purpose, if we were not the operator of the restaurant. And that's what the undisputed facts are before the Court.

Apr. 2 Tr. at 285:17- 287:14 (Mowery, Court).

The Court clarified that it did not see the second complaint coming into evidence.  See Apr. 2 Tr. at 287:18 (Court).  The Court stated that it was inclined to allow the third and fourth complaints into evidence to show that AmRest, LLC was on notice of overservice.  See Apr. 2 Tr. at 287:18-21 (Court).  AmRest, LLC asserted that the anonymous report lacks foundation, that there was no evidence of their motivations, and that there is no opportunity to cross-examine or confront the anonymous complainant regarding potential biases against AmRest, LLC or against Applebee's International.  See Apr. 2 Tr. at 287:22-288:4 (Mowery).  AmRest, LLC asserted that the evidence has not been corroborated; it stated that it had not clearly established to whom Beals had denied service, and, moreover, that those individuals had not been deposed and would not testify at trial.  See Apr. 2 Tr. at 288:5-10 (Mowery).  Accordingly, it stated that "to represent baldly that we know all these facts are true and have been corroborated, is just not the case.  You would have seen exhibits to that effect attached to the Plaintiffs' response."  Apr. 2 Tr. at 288:11-14 (Mowery).  AmRest, LLC continued:

> Ms. Beals has denied that she was ever suspended or disciplined for cutting anyone off.  She does note that she was removed from the bar and went back to being a server.  She, in her deposition, talked about she had an attitude.  There is at least conflicting testimony, and they're entitled to their inferences from the testimony as given.  But that doesn't make this report admissible under any of the exceptions that Mr. Lyons was citing.

Apr. 2 Tr. at 288:15-23 (Mowery).

AmRest, LLC turned to the hearsay exceptions that the Plaintiffs had cited -- the business-record exception, the absence-of-a-record exception under rule 803(7), and the exception for reputation under rule 803(21):

> I have to remind Your Honor that these are not AmRest records.  These were all created by what is now a nonparty to this litigation.
>
> And I don't know of any witness that the plaintiffs intend to call to explain any of these reports.  You'll see that none of these were actually generated by

AmRest. They're just in the e-mail chain. There is nobody from AmRest that's commenting on any of these complaints. So it's -- with all the additional problems we had with trying to find a reason to bring these complaints to the attention of the jury, plaintiffs don't know what kind of response was actually made. They haven't identified anybody who received these e-mails, taken their deposition, to find what response, if any, was made. If it's an anonymous complaint, there is nothing you can do about it. That's been testimony, too, by a couple of the managers with regard to this third report. How do we investigate an anonymous phone call? If they won't leave their name, any contact information, how do we verify that something is true, as represented in the report?

Same thing for the fourth report. If it's an anonymous report, how do you investigate something like that?

So it's an improper suggestion that, well, we need this to show that there is a lack of follow-up. You can ask about -- I think it's fair game for them to talk to AmRest employees directly on the stand, ask them: Are you aware of any customer complaints? Did you follow-up on this? What investigation, if any, did you do? But you can't use these reports as evidence to support those suggestions and the speculation and this story that the plaintiffs want to tell.

THE COURT: All right. Thank you, Mr. Mowery.

MR. MOWERY: Thank you, Your Honor. Let me just ask one clarification. It doesn't sound like you're even considering admitting any of these reports on the notion that this proves a routine or habit?

THE COURT: No.

MR. MOWERY: All right. Then, I won't address that.

Apr. 2 Tr. at 289:2-290:22 (Mowery, Court).

The Court stated that the evidence would not come in for its truth or under rule 406, but only for the non-hearsay purpose that AmRest, LLC was on notice and for the resulting argument that it did nothing about it. See Apr. 2 Tr. at 290:23-291:5 (Court). The Court acknowledged that this argument puts AmRest, LLC in a difficult position with respect to the anonymous complaint, but stated that it did not think that it could solve the prejudice to AmRest, LLC. See Apr. 2 Tr. at 291:6-16 (Court). The Court stated that it would admit the first complaint, "because AmRest is in the chain, but also they came in an ownership position so quickly thereafter that

arguably they should have still been investigating." Apr. 2 Tr. at 291:18-21 (Court). The Court

stated that it would admit the third complaint -- noting that the parties would discuss that issue

before the jury -- and the fourth complaint for the limited purpose of notice, assuming that it

would "stay with the guidelines that [it had laid out] allowing complaints and incidents and those

sort of things after the date of March 5," 2010. Apr. 2 Tr. at 291:23-292:5 (Court). AmRest,

LLC stated for the record that allowing the fourth complaint, in particular, was gravely

prejudicial:

> It's outrageous conduct. Whoever is behind the bar is serving somebody who is
> supposedly passed out. And we didn't have anything to do with that incident, yet
> it is evidence that's now going to be used against AmRest to indict its practices. I
> respectfully submit that it can't be admitted for any purpose, but the danger of
> unfair prejudice to AmRest by allowing such inflammatory evidence to come in is
> great, and can only be cured by excluding it.
>
> THE COURT: All right.
>
> MR. LYONS: In an effort to protect the Court's record on that, your
> honor, I just wanted to make the point that the evidence is that Jake Ghandi was
> the area coach for the predecessor restaurant, Concepts Incorporated, Apple
> Grove; and that Barry Jenkins was the general manager at this restaurant at the
> time. In other words, the two people supervising this restaurant remained the
> same throughout that transition. And that AmRest continued to operate under the
> -- Barry Jenkins testified that AmRest continued to operate under Restaurant
> Concepts' license up until 2010.
>
> So whenever -- AmRest and Restaurant Concepts shared responsibility at
> some level throughout this transition continued from some point -- obviously, we
> can see from this record, before April 2008, through 2010.
>
> THE COURT: Anything else, Mr. Mowery?
>
> MR. MOWERY: No, Your Honor.
>
> THE COURT: All right. Well, I think the transition occurred in July. It
> was a close enough incident. If I'm taking over a business and I get that, there
> might need to be some follow-up to find out what is going on in a business that
> I'm taking over. So I'll let you make the point. But I will give a limiting
> instruction when that evidence comes in.

Apr. 2 Tr. at 292:13-294:2 (Mowery, Court, Lyons).

The parties agreed that the Court's discussion of other motions also disposed of the Prior Conduct Motion.  See Apr. 2 Tr. at 294:2-17 (Court, Edwards, Lyons).

With respect to the Post-Accident Motion, AmRest, LLC substantially reiterated its arguments from its briefs: that AmRest, LLC's house policy is not a legal requirement, but an internal policy -- one that the Plaintiffs' expert has described as meaningless and that is, therefore, irrelevant.  See Apr. 2 Tr. at 461:22-462:23 (Mowery).  AmRest, LLC also reiterated its argument under rule 407.  See Apr. 2 Tr. at 462:24-463:6 (Mowery).  The Court stated that it did not think that rule 407 prohibited inaction; AmRest, LLC stated that the Plaintiffs criticize its discipline of Kirby, because it was not severe enough, and argued that the issue became a problem under rule 403, because it would mislead the jury and confuse the issues.  See Apr. 2. Tr. at 463:7-24 (Court, Mowery).  In their view, the Plaintiffs' response was telling:

> They argue that AmRest -- this is evidence of AmRest's callous lack of concern that will help the jury decide compensatory damages under The Wrongful Death Act. We made these arguments yesterday, and analyzed the applicable case law that, while aggravating circumstances can be considered for an award of compensatory damages, the jury's inquiry has to be on the nature of the damages, what happened to the plaintiff.  It's not -- the decedent rather.  It's not based upon the conduct of the defendant.  That's something that has to be based upon -- that's for assessment of punitive damages.

Apr. 2 Tr. at 463:25-464:12 (Mowery).  AmRest, LLC underscored its argument that the conduct must be similar to overservice, and that the failure to notify a manager "can't be used to assess compensatory damages.  It's not admissible under punitive damages.  So for all of those reasons, this should be excluded."  Apr. 2 Tr. at 464:13-21 (Mowery).

The Plaintiffs asserted that they had discussed this issue with respect to other motions and stated that this action "can be best described as acquiescence or ratification after the fact, which is proof of state of mind for the organization."   Apr. 2 Tr. at 464:25-465:4 (Lyons).   The

Plaintiffs contended that he violated the three-drink notification policy both when he failed to notify the manager when he served Ruiz a third Brewtus and a fourth Brewtus, and submitted that this evidence demonstrated that AmRest, LLC was not, therefore, enforcing the drink-counting policy.  See Apr. 2 Tr. at 465:7-22 (Lyons).  The Plaintiffs submitted that AmRest, LLC's defense to the Plaintiffs' argument from another document showing that Ruiz' and Mendoza's seats had each been served four Brewtus beers would be that people shift seats while being served.  See Apr. 2 Tr. at 465:23-466:2 (Lyons).  They argued that this other document called into question Kirby's statement that he served three Brewtus beers each to Ruiz and Mendoza.  See Apr. 2 Tr. at 466:2-6 (Lyons).  They contended that the fact that he was not "paying any attention whatsoever to the three drink notification policy goes to the credibility of his statement on that."  Apr. 2 Tr. at 466:6-9 (Lyons).  The Plaintiffs stated that the fact that Kirby did not comply with the notification policy, and that AmRest, LLC did not take his failure to do so seriously by counseling him and putting into his file the document, reinforced this conclusion.  See Apr. 2 Tr. at 466:14 (Lyons).  They asserted that Kirby's personnel file lacked any record of discipline regarding the March 5, 2010, incident, and argued that this attitude towards the notification policy will help the jury "understand the liability question of facts, what actually happened in our case, and it will help them understand the state of mind of AmRest when it comes to determining punitive damages."  Apr. 2 Tr. at 466:22-467:4 (Lyons).

AmRest, LLC first underscored its view that the records regarding how many beers it served Ruiz conflict, saying: "It's not undisputed that he was served four beers"; it noted that the seating-chart document to which the Plaintiffs referred does not have names associated with the seats.  Apr. 2 Tr. at 467:8-15 (Mowery).  AmRest, LLC asserted that the Plaintiffs have offered this evidence as character evidence and argued that "they cannot rely upon something that's

disparate from the actual overservice."   Apr. 2 Tr. at 467:16-22 (Mowery).   According to AmRest, LLC's "failure to notify a manager does not inform the decision as to whether or not it's more likely than not that these gentlemen were served while they were intoxicated."   Apr. 2 Tr. at 467:23-468:1 (Mowery).   It emphasized that "[a]ll of the individuals who were at that table, who have been identified and deposed . . . , have confirmed showing no signs of intoxication."   Apr. 2 Tr. at 468:1-4 (Mowery).   According to AmRest, LLC, the policy's purpose

> is to have the manager come over and interact and look at these customers.  By all accounts, if a manager had come by, he would have seen no signs of intoxication. So what would have been served?  Why would you be punishing Mr. Kirby at that point for something that was not going to be apparent -- wasn't apparent to anyone else they table who spent an hour and a half interacting with these people?
>
> That's the prejudice to AmRest, if you allow evidence of this three drink notification policy, and the failure to take drastic actions against Mr. Kirby.  It's suggesting that that is an appropriate basis for the jury to determine or assess liability against AmRest.  Thank you.

Apr. 2 Tr. at 468:6-19 (Mowery).

The Court stated that it did not think this evidence presents a rule 403 issue and that it doubted that rule 407 would bar the evidence; in its view, that AmRest, LLC did not reprimand Kirby was "a fair game area."   Apr. 2 Tr. at 469:22-469:9 (Court).   It noted some hesitation about its opinion in <u>Pedroza v. Lomas Auto Mall, Inc.</u>, but stated that this evidence is relevant evidence about how AmRest, LLC responds to violations.   <u>See</u> Apr. 2 Tr. at 469:10-18 (Court). The Court stated that the evidence is closely related enough to overservice, and that it is relevant to the Plaintiffs' argument that AmRest, LLC did not enforce or document violations of its policies.   <u>See</u> Apr. 2 Tr. at 469:19-470:5 (Court).   The Court stated that it might look at rule 407, but that it was not inclined to exclude the evidence under rules 401 or 403.   <u>See</u> Apr. 2 Tr. at 470:6-11 (Court).   AmRest, LLC asserted that, under rule 407, the Court should consider

counseling a subsequent remedial measure, and submitted that, if the Court admits this evidence, the jury would hear about AmRest, LLC's subsequent remedial measures within rule 407's meaning.  See Apr. 2 Tr. at 470:14-21 (Mowery).  The Court asked whether AmRest, LLC had a case other than Wanke v. Lynn's Transportation Co.; AmRest, LLC said it did not have another case.  See Apr. 2 Tr. at 470:22-24 (Court, Mowery).  The Court stated that it thought that this area was fair game, alluding to admission of similar evidence in employment discrimination cases, but stated that it would give the issue thought.  See Apr. 2 Tr. at 470:25-7 (Court).

The Court then turned to the Cumulative Conduct Motion and asked AmRest, LLC if any matters remained.  See Apr. 2 Tr. at 471:9-18 (Court).  AmRest, LLC stated that the Court had covered everything and that it had "specifically talked about the one area, about the understaffing issue, that you were going to allow in, but beyond that, nothing else."  Apr. 2 Tr. at 471:19-23 (Ray).  AmRest, LLC underscored its argument under State Farm Mutual Automobile Insurance Co. v. Campbell and stated that the Court had addressed the issue in ruling on other motions. See Apr. 2 Tr. at 472:5-22 (Ray).  The Plaintiffs asserted that, of the categories that it had laid out in its Cumulative Conduct Response, the Court had not yet given the Plaintiffs guidance with respect to the high employee turnover rate; they stated that they would not comment that, because AmRest, LLC had a high turnover rate, the manager was "a bad boss."  Apr. 2 Tr. at 473:18:-474:21 (Lyons, Court, Ray).  The Plaintiffs clarified that the high turnover rate is not, in itself, a "bad act" fact, but a neutral fact; it might, however, be relevant to training.  Apr. 2 Tr. at 474:18-475:9 (Lyons).

The Plaintiffs also stated that "[t]he fact that there were no changes in responsible service of alcohol policies after the accident" is "just a fact" and that, although, in their view, the policies were "counterproductive," the evidence is relevant.  Apr. 2 Tr. at 475:12-17 (Lyons).  The Court

pointed out that AmRest, LLC would argue that the policies were good, so they did not need to change.  See Apr. 2 Tr. at 475:18-476:3 (Court).  The Plaintiffs stated that, under the Court's disposition of an earlier motion, an expert could testify that the policies are counterproductive and that AmRest, LLC kept this policy in place was relevant.  See Apr. 2 Tr. at 476:4-10 (Lyons).

With respect to discovery disputes, the Plaintiffs stated that they would discuss the spoliation issues that they have raised, but not general discovery disputes.  See Apr. 2 Tr. at 476:12-24 (Lyons, Court).  The Court continued:

> THE COURT: The areas that I know about are the stuff that was subject to the search warrant.  Anything else?
>
> MR. LYONS: I don't know where we are with the Late Night stuff.
>
> THE COURT: Late Night, okay.
>
> MR. LYONS: There is a list of things, Your Honor.
>
> THE COURT: On the Late Night, I think that we've got it -- at least I'm comfortable that there is not any more material out there.  So there is not a spoliation; it's just they don't exist.
>
> MR. LYONS: I'm happy to provide, Your Honor, a list of what we think was spoliated, things that should have been produced, that weren't.  Now, I asked in the deposition of Michael Muldoon, that was recently taken, you know: You've got an e-mail that says that Brewtus -- that any expenditure should be reported by the end of the month; we should have the invoices sent to us; and it should be recorded in our profits and loss statements.  And here you are telling us that the Brewtuses -- that a new case of Brewtus glasses was ordered, so that it was brought down from the 23-ounce glass to the 20-ounce glass before our incident.  And we've asked for any proof of that.  Is there any reason you haven't provided to us the profit and loss statements or the invoices that would reflect the ordering of that case of new glasses?  He says, I don't know why we wouldn't have given you that.  And we still don't have any document like that.  We've asked them for everything that supports that they switched out the Brewtus glasses before our incident, in 2009, is what they say.  And we don't have the invoice or the profits and loss statements.  So that is something we'll be saying, for whatever reason, they've lost.

- 70 -

>So the items that were seized, which would include the checks; David
>Kirby's server checkout statement; credit card slips -- and those are the things
>having to do with the seizure of evidence by the Santa Fe Police Department.
>There is a couple other things, Your Honor, as we went through this that are
>obviously not -- did you say -- the inventory of bottled beers.  We've asked them
>for the inventory of bottled beers from that night.  For whatever reason, they
>haven't produced that either.

Apr. 2 Tr. at 476:25-478:20 (Court, Lyons).  The Plaintiffs asserted that they would not argue

that AmRest, LLC had been obstructive in discovery, but only wished to preserve their spoliation

argument.  See Apr. 2 T. at 478:22-479:2 (Lyons).  The Court asked what, in light of the volume

produced in this case, the Plaintiffs would do if Bonnefil stated that he did not know if a

particular piece of paper had been produced.  See Apr. 2 Tr. at 476:3-11 (Court, Lyons)  The

Plaintiffs responded that Bonnefil might be "a perfect example," because he produced many

documents to the Santa Fe Police Department, "which didn't include the check from David

Kirby, even though he testified that David Kirby told him he was the one who served those folks

that night.  The reason we've got thousands of pages of documents is because we're not getting

the thing we asked for."  Apr. 2 Tr. at 476:12-20 (Lyons).  The Court stated that the Plaintiffs

must be careful not to draw discovery fights in front of the jury; the Plaintiffs agreed.  See Apr. 2

Tr. at 479:21-480:3 (Court, Lyons).

The Court stated that none of the categories listed troubled the Court, but invited

AmRest, LLC to explain its position.  See Apr. 2 Tr. at 480:14-17 (Court).  AmRest, LLC

substantially reiterated its argument under State Farm Mutual Auto Insurance Co. v. Campbell.

See Apr. 2 Tr. at 480:18-41:9 (Ray).  AmRest, LLC stated that, before the Plaintiffs speak about

spoliation charges in their opening statement, they should approach the evidence.  See Apr. 2 Tr.

at 481:16-22 (Lyons).  The Court asked the Plaintiffs if they intended to discuss missing

documents in their opening statement; the Plaintiffs stated that they intended to discuss the

materials subject to the search warrant, as well as the beer inventory and proof that "the glasses were switched out."  Apr. 2 Tr. at 481:23-482:9 (Court, Lyons).  The Plaintiffs asserted that a similar issue arose in connection the Plaintiffs' Motion for Sanctions Against Defendant AmRest, LLC (Doc. 36-6), and asserted that AmRest, LLC had not provided the affidavits that the Court had requested during the hearing on that motion,[7] see Apr. 2 Tr. at 482:9-14 (Lyons). The Plaintiffs clarified that AmRest, LLC had provided Bonnefil's affidavit.  See Apr. 2 Tr. at 482:14-15 (Lyons).  The Plaintiffs argued that the spoliation issue was a matter for the jury to infer and stated that they wanted to discuss that issue in their opening statement.  See Apr. 2 Tr. at 482:16-22 (Lyons).

AmRest, LLC stated that the parties had not briefed the spoliation issue and argued that a party must prove up elements for a spoliation charge, and that "it's not a matter to argue in opening statement."  Apr. 2 Tr. at 482:24-6 (Mowery).  In its view, if the plaintiffs do not lay the proper foundation, they do not get the benefit of the spoliation charge.  See Apr. 2 Tr. at 483:6-8 (Mowery).  It continued:

> And the evidence on this is from the witnesses who had control of the documents.
>
> I gave the police everything they asked for.  The police inventory is not specific enough to show exactly what was given.  But they had asked in their search warrant for these receipts.  The manager who was there at the time said, "I gave them the receipts."  We then got all the documents back much later -- a year-and-a-half, two years, I can't remember -- from the police department.  We made a copy of everything that we obtained from the police. I still have all of those documents in my office. Plaintiffs' counsel have been welcome to come over and look at them at any time, including a video surveillance tape.  They are now going to review that this Friday.  But there is no basis for allowing the plaintiffs to even suggest that there was documents  that AmRest intentionally destroyed or lost. They're going to have to make that case and prove it and establish the necessary elements for such a charge, and they cannot do it during opening.

---

[7] The Court disposed of this motion in its Sealed Memorandum Opinion and Order, filed April 12, 2014 (Doc. 330).

Apr. 2 Tr. at 483:11-484:4 (Mowery).

The Plaintiffs asserted that they had been clear that they intended to seek the inference

charge and not pursue a claim for spoliation of evidence.  See Apr. 2 Tr. at 484:5-5 (Lyons).

They stated that they would not argue the issue in opening, but stated that "there are facts

pertaining to this that we would like to discuss in opening statement."  Apr. 2 Tr. at 484:16-20

(Lyons).

AmRest, LLC stated that there is no spoliation claim in the case and argued that "there is

an abundance of case law that establishes when you're entitled to" the spoliation instruction.

Apr. 2 Tr. at 484:22-485:6 (Mowery, Court).  AmRest, LLC asserted that for the Plaintiffs "to

even suggest during opening that the elements of a spoliation claim allegation have been

established already in this case is improper."  Apr. 2 Tr. at 485:6-9 (Mowery).  The Court

clarified that the Plaintiffs would only speak about facts that the jury would hear and not speak to

instructions that the Court would give or use the word spoliation.  See Apr. 2 Tr. at 485:10-23

(Court).  The Plaintiffs confirmed that they would not talk about instructions and elaborated:

> There are some things that you won't see. And we might tell them it was once in
> the possession of AmRest; then it was seized by the police; and then -- or it was
> asked for by the police, supposedly seized.  When we got those records back, it
> wasn't in there.  And AmRest's position and explanation is that the police must
> have lost it.  You're going to hear from witnesses who will say, No, we're the
> police.  We didn't lose it.  I mean, those are facts. That's an opening statement
> preview that would deal with that. That's the way we would intend to talk about
> it.

Apr. 2 Tr. at 485:24-486:10 (Lyons).

The Court provided the following summary:

> I'm not seeing on these 10 items[8] anything I should exclude pretrial.  The one
> on the evidence -- the failure to produce documents we're going to have to be

---

[8] The Court was referring to the ten-item list in the Cumulative Conduct Motion.  See
Cumulative Conduct Motion at 6-7.

careful about that.  I may have to coach you when we're in trial as to how --
whether we're going to have to put witnesses on the stand and start asking what
has been produced, in a case where 30,000 documents have been produced.

So I may avoid discovery fights in front of the jury.  I may have to see
how that goes.  If you can figure out a way to avoid it, so I don't have to deal with
it, that's great.  If it comes up, then I'll try to deal with it, so we're not
having discovery fights in front of the jury.  But the documents exist, the
documents don't exist.  I don't think I can start saying pretrial that the plaintiff
shouldn't mention those, either in opening or in their case-in-chief.

Apr. 2 Tr. at 486:21-487:5 (Court).

### 7.    **Supplemental Memorandum.**

In AmRest, LLC's Supplemental Memorandum Regarding Evidence of Post-Accident

Liquor Law Violations and Customer Comment, filed April 7, 2014 (Doc. 304)("Supplemental

Memo."), AmRest, LLC urges the Court not to admit "an anonymous customer comment relating

to an alleged instance of overservice occurring at the Santa Fe franchise on May 29, 2010," and

"evidence relating to events that occurred after the date of the accident."  Supplemental Memo.

1.  In its view, this evidence is hearsay, and it does not fall within an exception to rule 404(b).

See Supplemental Memo. at 1.  It argues that this evidence's sole purpose is to advance the

Plaintiffs' punitive damages claim, "[b]ut to do so it must be probative of AmRest's mental state

at the time AmRest allegedly overserved Ruiz," and that this evidence "reflects, if anything,

AmRest's mental state at a later time."  Supplemental Memo. at 2.  It contends that "the evidence

is irrelevant and its admission would confuse the jury and unfairly prejudice AmRest."

Supplemental Memo. at 2.

AmRest, LLC underscores its arguments under State Farm Mutual Automobile Insurance

Co. v. Campbell and Pedroza v. Lomas Auto Mall, Inc. that "[t]he evidentiary focus must be on

similar past conduct."  Supplemental Memo. at 2.  AmRest, LLC asserts that, under Tenth

Circuit law, "evidence of a defendant's conduct after an injury-causing event, if it is to have any

bearing on punitive damages, 'must be probative of the defendant's state of mind at the time of the transaction.'"   Supplemental Memo. at 2 (quoting O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1449 (10th Cir. 1987)(internal quotation marks and citations omitted)).   It contends that the post-accident liquor law violations would not "show that AmRest's alleged conduct of the accident was recidivist.   Only evidence of AmRest's conduct prior to the accident could establish that contention."   Supplemental Memo. at 2-3.   AmRest, LLC argues that later evidence could show "that AmRest's conduct at the time of the later violation was more reprehensible because it was a repetition of a previous transgression," which "would matter if a claim were to arise out of the subsequent violation, but it is irrelevant to the question that is material here: AmRest's state of mind in serving James Ruiz."   Supplemental Memo. at 3.   AmRest, LLC contends that, "[t]o state the proposition another way, if a defendant commits a wrong, and, before a claim based on that wrong goes to trial, the defendant commits a second, similar wrong, the second wrong is more reprehensible, but it does not make the first wrong more reprehensible."   Supplemental Memo. at 3.

AmRest, LLC also contends that this evidence is not only irrelevant, but also highly prejudicial: "Evidence that at a later time a defendant had a more culpable mental state is likely to confuse the jury and lead it to punish the defendant for its later and more culpable conduct, not for the conduct that injured the plaintiff.   That is impermissible."   Supplemental Memo. at 3. AmRest, LLC suggests that allowing the jury to consider this evidence would make possible multiple punitive damages awards for the same conduct, because it would allow the Plaintiffs to recover "punitive damages that a subsequent plaintiff also could recover."   Supplemental Memo. at 3.   Accordingly, AmRest, LLC argues that the Court should exclude this evidence under rules 401 and 403.   See Supplemental Memo. at 4.

With respect to the customer comment, AmRest, LLC asserts that "evidence that AmRest received and did not sufficiently respond to one comment after the accident could prove its mental state only at that time."   Supplemental Memo. at 4.   It contends that, "[a]s with other allegations of recidivist conduct, the jury could find that AmRest's state of mind was more culpable when it failed to respond to a later report of potential service than it was in failing to respond to earlier ones."  Supplemental Memo. at 4.  AmRest, LLC argues that this evidence is inadmissible, because it does not prove AmRest, LLC's state of mind on March 5, 2010, and because it is likely to confuse the jury, "lead[ing] it to assess punitive damages for a level of culpability that existed only at a later date."  Supplemental Memo. at 4.  Moreover, it argues, that the customer comment refers to the accident underlying this case heightens its prejudicial effect. See Supplemental Memo. at 4.  It also argues that "[t]he anonymous nature of the comment undermines its reliability."  Supplemental Memo. at 4.  Accordingly, AmRest, LLC argues, the Court should exclude this evidence under rules 401 and 403.  See Supplemental Memo.at 4.

In the Plaintiffs' Response to AmRest, LLC's Supplemental Memorandum Regarding Evidence of Post-Accident Liquor Law Violations and Customer Complaint, filed April 11, 2014 (Doc. 324)("Supplemental Response"), the Plaintiffs argue that the evidence is admissible for punitive damages purposes.  Supplemental Response at 1.[9]  The Plaintiffs contend that the evidence of the post-accident citation for overservice and of the post-accident anonymous complaint "is admissible for reasons unconnected to recidivism: to show that AmRest's state of mind regarding safe service of alcohol on March 5, 2010 was wanton, willful, and reckless and to show the cumulative conduct of AmRest's employees as that aggregate picture shows

---

[9] The Plaintiffs also argue, by reference to other briefing, that the Court should admit this evidence for liability and compensatory damages, because it "show[s] AmRest's routine practices and [its] motive, intent, preparation, plan, knowledge, absence of mistake, lack of accident, and state of mind."  Supplemental Response at 1 n.1.

AmRest's state of mind."  Supplemental Response at 2-3 (footnote omitted).  The Plaintiffs note

that the law does not require them to demonstrate that AmRest, LLC is a recidivist; they point to

the following factors that State Farm Mutual Automobile Insurance Co. v. Campbell states are

relevant to reprehensibility:

> the harm caused was physical as opposed to economic; the tortious conduct
> evinced an indifference to or a reckless disregard of the health or safety of others;
> the target of the conduct had financial vulnerability; the conduct involved
> repeated actions or was an isolated incident; and the harm was the result of
> intentional malice, trickery, or deceit, or mere accident.

Supplemental Response at 2-3 (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at

419).  They argue that, of these factors, they

> intend to prove AmRest's reprehensibility by showing the following: (1) Plaintiffs
> suffered extreme physical harm, (2) AmRest was indifferent to and recklessly
> disregarded the health and safety of Plaintiffs and others, and (3) AmRest's
> conduct was repeated and recidivist.  Plaintiffs intend to rely on the evidence of
> post-accident over-service to show only the second factor: AmRest's state of
> mind.  Plaintiffs intend to rely on AmRest's prior liquor law violations to show
> the third factor: AmRest's recidivism.

Supplemental Response at 3.

The Plaintiffs contend that State Farm Mutual Automobile Ins. Co. v. Campbell does not

speak to subsequent acts; in their view, nothing in the Supreme Court's opinion in State Farm

Mutual Automobile Ins. Co. v. Campbell or in the lower courts' opinions demonstrates that the

jury considered the defendant's subsequent acts.   See Supplemental Response at 3-4.   The

Plaintiffs contend that the evidence is admissible, "because AmRest's subsequent conduct has a

close 'nexus to the specific harm suffered by the plaintiff[s].'"   Supplemental Response at 4

(quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 422).  The Plaintiffs argue that

it shows that AmRest, LLC acted deliberately and culpably.  See Supplemental Response at 4.

The Plaintiffs turned to the Court's decision in Pedroza v. Lomas Auto Mall, Inc., and

noted that the "Court did not 'decide whether all allegations of misconduct that occurred after the conduct at issue in a case, rather than evidence of past conduct, also runs afoul of the due-process limitations on punitive damages.'"  Supplemental Response at 4 (quoting Pedroza v. Lomas Auto Mall, Inc., 2009 WL 1300944, at *4).  They argue that "[t]he evidence at issue here is not, for instance, regarding misconduct in another state," unlike evidence in Pedroza v. Lomas Auto Mall, Inc.  Supplemental Response at 3-4.  They point out that "the subsequent customer complaint is regarding over-service at the very same AmRest restaurant as the one in this case."  Supplemental Response at 5.  Moreover, they argue that this report is more credible than the unverified petition at issue in Pedroza v. Lomas Auto Mall, Inc. "given the probable cause standard to write a citation and the higher beyond a reasonable doubt standard for a fine to attach."  Supplemental Response at 5.

The Plaintiffs contend that "[t]here is no unconditional rule against using subsequent conduct to show the need for -- or the proper measure of -- punitive damages."  Supplemental Response at 5.  Citing numerous cases both within and outside the Tenth Circuit, the "Plaintiffs respectfully disagree with the Court's statement in Pedroza that the decisions discussing punitive damages invariably refer to prior acts."  Supplemental Response at 5-6.

The Plaintiffs also clarify that they "will not ask or imply that the jury should punish AmRest for the subsequent instances of over-service," but will, instead, ask the jury to consider that those instances "are evidence of AmRest's mental state on March 5, 2010 and it is that deeply troubling mental state that should be punished and deterred."  Supplemental Response at 6.  They point to the following provision from the following Uniform Jury Instruction that incorporates the Supreme Court's decision in Phillip Morris USA v. Williams, 549 U.S. 346 (2007):

> Plaintiff has introduced evidence of risk of harm to others as a result of Defendant's conduct.  You may consider this evidence in determining the nature and enormity of Defendant's wrongful conduct toward Plaintiff.  You may not, however, include in your award of punitive damages any amount that punishes Defendant for harm to others not before this court.

Supplemental Response at 5-6 (quoting NMRA Civ. UJI 13-1827A).  The Plaintiffs contend that this instruction's purpose "is to instruct the jury 'that it can consider evidence of injury or harm to others in determining the reprehensibility of the conduct that injured the plaintiff, but that it may not punish the defendant for causing harm to others who are not parties to the litigation.'"  Supplemental Response at 7 (quoting NMRA CIV. UJI 13-1327A, Committee Commentary).

## LAW REGARDING THE RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion of irrelevant and potentially prejudicial evidence."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).  "Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3 (D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: **(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and **(b)** the fact is of consequence in determining the action.")).  "Rule 401 contains a low threshold for relevance, because '[a]ny more stringent requirement is unworkable and unrealistic.'"  United States v. Goxcon-Chagal, 885 F. Supp. 2d 1118, 1162 (D.N.M. 2012)(Browning, J.)(quoting Fed. R. Evid. 401 advisory committee's note).  Irrelevant evidence, or that evidence which does not make a fact of consequence more or less probable, however, is inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).   "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991))(internal quotation marks omitted).   "In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."   Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1274 (10th Cir. 2000).    The "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980).  As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .  This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(citation omitted).

Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury, or if the evidence otherwise tends to adversely affect the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). "Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case." United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(quoting United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003)).  Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note)(emphasis in original).

## LAW REGARDING RULE 404(b)

Under rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith.  See Fed. R. Evid. 404(b).  Rule 404(b) provides:

(b)     **Crimes, Wrongs, or Other Acts.**

(1)     **Prohibited Uses.**  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2)     **Permitted Uses; Notice in a Criminal Case.**  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  On request by a defendant in a criminal case, the prosecutor must:

(A)     provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

> (B)    do so before trial -- or during trial if the court, for good
> cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b).  "In other words, one cannot present evidence the relevance of which is based on the forbidden inference: the person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too."  Wilson v. Jara, No. 10-0797, 2011 WL 6739166, at *5 (D.N.M. Nov. 1, 2011)(Browning, J.).  "The rule, however, has a number of 'exceptions' -- purposes for which such evidence will be admissible."  Wilson v. Jara, 2011 WL 6739166, at *5.   Those purposes include proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  See Fed. R. Evid. 404(b).  The Supreme Court of the United States has enunciated a four-part process to determine whether evidence is admissible under rule 404(b).  See Huddleston v. United States, 485 U.S. 681, 691-92 (1988).  The Tenth Circuit has consistently applied that test:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test . . . : (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(citing United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999)).   See United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir. 2002); United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).

Rule 404(b)'s prohibition finds its source in the common-law protection of the criminal defendant from risking conviction on the basis of evidence of his character.  See Wynne v. Renico, 357 F.3d 599, 611 (6th Cir. 2004)(Boggs, J.)(citing United States v. Dudek, 560 F.2d 1288 (6th Cir. 1977)) ; 22 C. Wright & K. Graham, Federal Practice and Procedure: Evidence

§ 5239, at 428, 436-37, 439 (1991).  In United States v. Phillips, 599 F.2d 134 (6th Cir. 1979), the United States Court of Appeals for the Sixth Circuit noted, in addressing rule 404(b)'s limitations and requirements, that the rule addresses two main policy concerns: (i) that the jury may convict a "bad man" who deserves to be punished, not because he is guilty of the crime charged, but because of his prior or subsequent misdeeds; and (ii) that the jury will infer that, because the accused committed other crimes, he probably committed the crime charged.  United States v. Phillips, 599 F.2d at 136.

When bad act evidence is both relevant and admissible for a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the bad act." United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(alterations omitted).  The Tenth Circuit has also stated that district courts must "identify specifically the permissible purpose for which such evidence is offered and the inferences to be drawn therefrom."  United States v. Youts, 229 F.3d 1312, 1317 (10th Cir. 2000)(citing United States v. Kendall, 766 F.2d 1426, 1436 (10th Cir. 1985)).  "[A] broad statement merely invoking or restating Rule 404(b) will not suffice."  United States v. Youts, 229 F.3d at 1317.  Rules 401-403 and the conditional relevancy rules in rule 104(b) govern the applicable burden the government must meet to successfully offer evidence under rule 404(b).  See Huddleston v. United States, 485 U.S. at 686-691.

The Tenth Circuit has recognized the probative value of uncharged, unrelated acts to show motive, intent and knowledge, whether the acts involved previous conduct or conduct subsequent to the charged offense if the uncharged acts are similar to the charged crime and sufficiently close in time.  See United States v. Olivo, 80 F.3d 1466, 1468-69 (10th Cir. 1996)(finding the district court did not abuse its discretion when it admitted evidence about an

event over one year after a defendant's arrest); United States v. Bonnett, 877 F.2d 1450, 1461 (10th Cir. 1989)(holding that evidence about events over a year after the charged conduct was not "too remote in time and unrelated to the transactions with which he was charged").  This similarity may be shown through "physical similarity of the acts or through the 'defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses.'"  United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997)(quoting United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978).  See United States v. Bonnett, 877 F.2d at 1461 ("The closeness in time and the similarity in conduct [are] matters left to the trial court, and [its] decision will not be reversed absent a showing of abuse of discretion.").  The more similar the act or state of mind, the more relevant the evidence becomes.  See United States v. Queen, 132 F.3d at 996.  Moreover, when establishing identity, although the uncharged crime must be similar to the charged offense if it is unrelated to the charged offense, it need not be identical. See United States v. Gutierrez, 696 F.2d 753, 755 (10th Cir. 1982).

## LAW REGARDING RULE 406 EVIDENCE

Under rule 406, a party may present evidence of a person's "habit" for the purpose of proving that the person or organization acted in conformity with that habit.  See Fed. R. Evid. 406.  While evidence of past wrongs or acts is inadmissible to establish a trait of character and "show action in conformity therewith," Fed. R. Evid. 404(b), but that same evidence may be admissible pursuant to rule 406 if it tends to establish a "habit" and is used "to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice," Fed. R. Evid. 406.  This distinction is not, however, merely terminological.  "Habit 'describes one's regular response to a repeated specific situation.' "Guidance Endodontics,   LLC   v.   Dentsply   Int'l,   Inc.,   705   F.   Supp.   2d   1265,   1269

(D.N.M.2010)(Browning, J.)(quoting E. Cleary, <u>McCormick on Evidence</u> § 162, at 340 (6th ed.)).  Examples of habits include "going down a particular stairway two stairs at a time, or ... giving the hand-signal for a left turn, or ... alighting from railway cars while they are moving." E. Cleary, <u>McCormick on Evidence</u> § 162, at 340. "The doing of the habitual acts may become semi-automatic."  <u>Guidance Endodontics, LLC v. Dentsply Int'l, Inc.</u>, 705 F. Supp. 2d at 1269. <u>See</u> <u>Perrin v. Anderson</u>, 784 F.2d 1040, 1046 (10th Cir. 1986)(defining habit as "a regular practice of meeting a particular kind of situation with a certain type of conduct, or a reflex behavior in a specific set of circumstances.")(citing <u>Frase v. Henry</u>, 444 F.2d 1228, 1232 (10th Cir.1971)).

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  <u>Skyline Potato Co., Inc. v. Hi-Land Potato Co., Inc.</u>, No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *13 (D.N.M. Jan. 18, 2013)(Browning, J.)(citing Fed. R. Evid. 802).  Under rule 801(c) of the Federal Rules of Evidence, "'[h]earsay' means a statement that: **(1)** the declarant does not make while testifying at the current trial or hearing; and **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination."  <u>United States v. Cunningham</u>, 194 F.3d 1186, 1199 (11th Cir. 1999).  A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including to impeach a witness.  <u>See</u> <u>United States v. Caraway</u>, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay.  If admitted for impeachment purposes, however,

it is not hearsay.").

## LAW REGARDING PUNITIVE DAMAGES

A chronology of the Supreme Court's and the United States Court of Appeals for the Tenth Circuit's caselaw on the constitutional limitations on punitive damages reveals an increasingly restrictive view of punitive damages awards that greatly exceed compensatory damages.  The Court cannot, as a district court that must faithfully follow controlling constitutional cases, say that the Supreme Court has replaced the guideposts in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), for constitutional analysis with the bright-line test in Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008), which is now used in maritime cases, but even the Supreme Court's opinion in State Farm Mutual Automobile Insurance Co. v. Campbell states that "[w]hen compensatory damages are substantial, then a lesser ratio [of punitive to compensatory], perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  538 U.S. at 425 (emphasis added).  Coupled with the analysis of Exxon Shipping Co. v. Baker, which remains instructive, even if not controlling in constitutional cases, it may be difficult to justify under the Due Process Clause more than a one to one ratio in cases involving substantial compensatory, purely economic damages.

1.	**The Case Law from the Supreme Court and the Tenth Circuit Concerning Punitive Damages.**

In Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 262 (1989), the Supreme Court held that the Excessive Fines Clause of the Eighth Amendment to the Constitution of the United States of America does not apply to a punitive damages award in a civil case between private parties.  See 492 U.S. at 262 (noting that "our cases long have understood [the Eighth Amendment] to apply primarily, and perhaps exclusively, to criminal prosecutions and punishments.").  The Supreme Court held that,

- 86 -

> even if we were prepared to extend the scope of the Excessive Fines Clause beyond the context where the Framers clearly intended it to apply, we would not be persuaded to do so with respect to cases of punitive damages awards in private civil cases, because they are too far afield from the concerns that animate the Eighth Amendment.

492 U.S. at 275. Although it ultimately declined to review the punitive damages award in Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc. under the Due Process Clause of the Fourteenth Amendment because the petitioners had not previously raised that argument before the District Court or the Court of Appeals, and had made no mention of the argument in their petition for certiorari, the Supreme Court nonetheless noted: "There is some authority in our opinions for the view that the Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory scheme." Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. at 277. Although only five justices joined in all parts of the majority opinion in Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., all nine justices concurred that the Due Process Clause might be used in future cases to limit punitive damages awards. See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. at 280-282 (Brennan, J., concurring in part, joined by Marshall, J.)("I join the Court's opinion on the understanding that it leaves the door open for a holding that the Due Process Clause constrains the imposition of punitive damages in civil cases brought by private parties."); Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. at 282-283 (O'Connor, J., concurring in part, joined by Stevens, J.)("[N]othing in the Court's opinion forecloses a due process challenge to awards of punitive damages or the method by which they are imposed . . . .").

In Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1 (1991), the Supreme Court confronted the questions whether and to what extent the Due Process Clause might limit punitive

damages awards in civil cases between private litigants.  See 499 U.S. at 15.  The Supreme Court

held:

> One must concede that unlimited jury discretion -- or unlimited judicial discretion
> for that matter -- in the fixing of punitive damages may invite extreme results that
> jar one's constitutional sensibilities.  We need not, and indeed we cannot, draw a
> mathematical bright line between the constitutionally acceptable and the
> constitutionally unacceptable that would fit every case.  We can say, however,
> that general concerns of reasonableness and adequate guidance from the court
> when the case is tried to a jury properly enter into the constitutional calculus.
> With these concerns in mind, we review the constitutionality of the punitive
> damages awarded in this case.

499 U.S. at 18-19 (internal citations omitted).  The underlying facts of Pacific Mut. Ins. Co. v.

Haslip involved a life insurance agent for Pacific Mutual Insurance Company who sold life

insurance to a number of employees of an Alabama municipality.  See 499 U.S. at 4.  Although

the insureds' employer paid the insureds' premiums to the insurance agent, he misappropriated

most of the funds and failed to forward notices of lapsed coverage to the insureds.  See Pacific

Mut. Ins. Co. v. Haslip, 499 U.S. at 5.  The insureds sued both the insurance agent and Pacific

Mutual Insurance Company, and the jury awarded $1,040,000.00 in total damages to plaintiff

Cleopatra Haslip, including $4,000.00 in out-of-pocket expenditures and compensatory damages

of $200,000.00.  See id. at 6 n.2.  Recognizing that the district court had adequately instructed

the jury and that the appellate courts had properly analyzed the verdict for excessiveness, the

Supreme Court ultimately held that the punitive damages award was constitutional.  See Pacific

Mut. Ins. Co. v. Haslip, 499 U.S. at 19-23.  Specifically, the Supreme Court found:

> We are aware that the punitive damages award in this case is more than 4 times
> the amount of compensatory damages, is more than 200 times the out-of-pocket
> expenses of respondent Haslip, and, of course, is much in excess of the fine that
> could be imposed for insurance fraud under Ala. Code §§ 13A-5-11 and 13A-5-
> 12(a) (1982), and Ala. Code §§ 27-1-12, 27-12-17, and 27-12-23 (1986).
> Imprisonment, however, could also be required of an individual in the criminal
> context.  While the monetary comparisons are wide and, indeed, may be close to
> the line, the award here did not lack objective criteria.  We conclude, after careful

consideration, that in this case it does not cross the line into the area of constitutional impropriety.  Accordingly, Pacific Mutual's due process challenge must be, and is, rejected.

499 U.S. at 23-24.

The Supreme Court affirmed a punitive damage award of ten million dollars in its next punitive damages case.  See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 446 (1993). The jury in TXO Production Corp. v. Alliance Resources Corp. awarded compensatory damages of only $19,000.00.  See TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 446.  In the plurality opinion, Justice Stevens, joined by Chief Justice Rehnquist and Justice Blackmun, emphasized that the potential harm from the defendant's conduct went beyond the damage that actually occurred: "It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to the other victims that might have resulted if similar future behavior were not deterred."  TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 460-61 (emphasis original).  The defendant, TXO Production Corp., was a large oil and gas company conducting business in twenty-five states, whereas the plaintiff, Alliance Resource Corp., was a smaller company that owned mineral rights in a tract of land that TXO Production considered potentially profitable.  See 509 U.S. at 447.  TXO Production made a deal with Alliance Resource to acquire its interest, subject to a provision that Alliance Resource would return the consideration TXO Production paid if TXO Production's attorneys found that Alliance Resource's title had failed.  See 509 U.S. at 447-48.  Knowing that Alliance Resource's title was valid, TXO Production attempted to induce a third party to sign an affidavit stating otherwise, according to the Alliance Resources, so that TXO Production would not have to pay royalties on the oil-and-gas revenues generated on the property, pursuant to the parties' agreement.  See 509

U.S. at 449.  The jury was ultimately persuaded to agree with Alliance Resource, given its award.

Acknowledging "the shocking disparity between the punitive damage award and the compensatory award," Justice Stevens wrote:

> [T]he shock dissipates when one considers the potential loss to [Alliance Resources], in terms of reduced or eliminated royalties payments, had [TXO Production] succeeded in its illicit scheme.  Thus, even if the actual value of the "potential harm" to [Alliance Resource] is not between $5 million and $8.3 million, but is closer to $4 million, or $2 million, or even $1 million, the disparity between the punitive award and the potential harm does not, in our view, "jar one's constitutional sensibilities."

509 U.S. at 462 (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. at 18).  Noting Justice O'Connor's dissenting opinion, in which Justice White and Justice Souter joined, wherein she asserted the "plausible argument" that the sizeable punitive damage award "is explained by the jury's raw, redistributionist impulses stemming from  antipathy to a wealthy, out-of-state, corporate defendant," TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 468 (Kennedy, J., concurring), Justice Kennedy wrote:

> There is, however, another explanation for the jury verdict, one supported by the record and relied upon by the state courts, that persuades me that I cannot say with sufficient confidence that the award was unjustified or improper on this record: TXO acted with malice.  This was not a case of negligence, strict liability, or *respondeat superior*.  TXO was found to have committed, through its senior officers, the intentional tort of slander of title.  The evidence at trial demonstrated that it acted, in the West Virginia Supreme Court's words, through a "pattern and practice of fraud, trickery and deceit" and employed "unsavory and malicious practices" in the course of its business dealings with respondent.  "The record shows that this was not an isolated incident on TXO's part -- a mere excess of zeal by poorly supervised, low level employees -- but rather part of a pattern and practice by TXO to defraud and coerce those in positions of unequal bargaining power."

TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. at 468-69 (Kennedy, J., concurring).

### a.    *BMW of North America, Inc. v. Gore.*

In BMW of North America, Inc. v. Gore, the Supreme Court found for the first time that a punitive damages award was unconstitutionally excessive and in violation of the Due Process Clause's substantive component.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 585-86. Noting that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose," the Supreme Court set forth three guideposts for lower courts to consider when determining the constitutionality of a punitive damages award.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 574-75.  The BMW of North America, Inc. v. Gore guideposts are: (i) the reprehensibility of the defendant's conduct; (ii) "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award;" and (iii) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases."  517 U.S. at 575.

The plaintiff in BMW of North America, Inc. v. Gore purchased a BMW automobile and later learned that the vehicle had been repainted after it was damaged before its delivery to the plaintiff.  See 517 U.S. at 562.  The manufacturer admitted it was company policy not to disclose such damage to new cars when the cost of repair was less than three percent of the car's suggested retail price.  See 517 U.S. at 562.  In addition to compensatory damages in the amount of four-thousand dollars, the jury awarded punitive damages in the amount of four-million dollars.  See 517 U.S. at 565.  On appeal, the Supreme Court of Alabama remitted the punitive damages award to two-million dollars.  See 517 U.S. at 567.

With regard to the first guidepost, the reprehensibility of the defendant's conduct, the Supreme Court held that "BMW's conduct was not sufficiently reprehensible to warrant imposition of a $2 million exemplary damages award."  517 U.S. at 580.  Noting that "[t]he $2

million punitive damages awarded to Dr. Gore by the Alabama Supreme Court is 500 times the amount of his actual harm as determined by the jury," 517 U.S. at 582, the Supreme Court found the relationship between punitive and compensatory damages to be "breathtaking" and held that it "must surely 'raise a suspicious judicial eyebrow,'" 517 U.S. at 583.  With regard to the third guidepost, the Supreme Court held that "the $2 million economic sanction imposed on BMW is substantially greater than the statutory fines available in Alabama and elsewhere for similar malfeasance."  517 U.S. at 584.  Thus, the Supreme Court reversed and remanded the Supreme Court of Alabama's remitted amount.  See 517 U.S. at 586.

In the first punitive damages case the Tenth Circuit considered after BMW of North America, Inc. v. Gore, the Tenth Circuit remitted a punitive damages award to an amount "approximately six times the actual and potential damages plaintiffs suffered."  Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d 634, 643 (10th Cir. 1996)(reversing district court's denial of remittitur and reducing punitive damages award of $30 million to $6 million).  A number of punitive damages decisions thereafter used the six to one ratio.  See United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1231 (10th Cir. 2000)(affirming as constitutional a punitive damages award of $653,217.00 where compensatory damages were $67,694.00, after noting that adding the plaintiff's lost profits to the compensatory damages would "bring[] the punitive to harm ratio down to less than 6:1"); Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d 854, 862 (10th Cir. 1997)("[W]e reverse the $1,200,000.00 punitive damage award entered by the district court, and order a remittitur to $264,000.00, an amount representing six times the actual damages suffered by the Hamiltons.").

On the other hand, also after BMW of North America, Inc. v. Gore, case law from the Tenth Circuit suggested that it would allow punitive to compensatory damages ratios of greater

than ten to one.  See United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1230 (10th Cir. 2000)(noting that "the 10:1 ratio is not a sacred line in the sand, across which no punitive award may venture without feeling the wrath of an appellate court's constitutional sword").  Indeed, in some cases, the Tenth Circuit permitted punitive to compensatory ratios greater than ten to one.  See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1272-73 (10th Cir. 2000)(holding that punitive damages award of $295,000.00 was not constitutionally excessive despite compensatory damages of only $5,000.00, because "both the Supreme Court and this court acknowledge that low awards of compensatory damages may support a higher ratio if a particularly egregious act has resulted in a small amount of economic damages"); Bielicki v. Terminix Int'l Co., 225 F.3d 1159, 1165 (10th Cir. 2000)(affirming as constitutional the district court's award of punitive damages where "[t]he ratio between the punitive damages and compensatory damages awarded by the jury is 12 to 1").

### b.  *State Farm Mutual Automobile Insurance Co. v. Campbell*.

The Supreme Court returned to the question of the constitutional limits on punitive damages in State Farm Mutual Automobile Insurance Co. v. Campbell, where the Supreme Court considered a bad-faith failure to settle claim brought by an insured against its insurer.  The jury at the district-court level awarded one million dollars in compensatory damages and $145 million in punitive damages.  See 538 U.S. at 412.  The Supreme Court found the question whether punitive damages were excessive to be "neither close nor difficult."  538 U.S. at 418.  Although it found that "State Farm's handling of the claims against the Campbells merits no praise,"  538 U.S. at 419, the Supreme Court found that the punitive damages award -- or at least the analysis of the first guidepost, reprehensibility -- was based more on State Farm's "nationwide policies than for the conduct directed toward the Campbells," 538 U.S. at 420.  The Supreme Court

declined to impose any bright-line ratio of punitive to compensatory damages under the second guidepost, but held that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  538 U.S. at 425. With regard to the third guidepost, the Supreme Court found: "The most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, an amount dwarfed by the $145 million punitive damages award."  538 U.S. at 428 (internal citation omitted).  The Supreme Court noted that, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  538 U.S. at 425.  All in all, the Supreme Court held in State Farm Mutual Automobile Insurance Co. v. Campbell:

> An application of the Gore guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages.   The punitive award of $145 million, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant.

538 U.S. at 429.

After the Supreme Court's holding in State Farm Mutual Automobile Insurance Co. v. Campbell, the Tenth Circuit affirmed an award with a ratio of twenty to one.  See Haberman v. The Hartford Ins. Group, 443 F.3d 1257, 1263 (10th Cir. 2006)(considering a $100,000.00 punitive damage award with actual damages of $5,000.00).   Noting the Supreme Court's admonition in State Farm Mutual Automobile Insurance Co. v. Campbell that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," the Tenth Circuit nonetheless affirmed the twenty to one ratio. Haberman v. The Hartford Ins. Group, 443 F.3d at 1272.  The Tenth Circuit found it persuasive, with the reprehensibility of the defendant's conduct, that the compensatory damages were

relatively low.   See 443 F.3d at 1272 ("We are not convinced that the low award of compensatory damages in this case cannot support the more than single digit ratio.").

<strong>c.    <em>Exxon Shipping Co. v. Baker</em>, 554 U.S. 471 (2008).</strong>

Although the binding precedential value of the Supreme Court's most recent punitive damages decision in Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008), is limited to maritime cases, see Exxon Shipping Co. v. Baker, 554 U.S. at 513, some commentators view the decision as signaling an intention to adopt a bright-line punitive to compensatory damages ratio of one to one in all cases, see, e.g., Joni Hersch & W. Kip Viscusi, Punitive Damages by Numbers: *Exxon Shipping Co. v. Baker*, 18 Sup. Ct. Econ. Rev. 259, 260 (2010)(stating that, "[g]iven the earlier statements by the Court in State Farm v. Campbell," and "the Court's reliance in Exxon Shipping Co. v. Baker on statistical analyses of punitive damages that are not specific to maritime cases, there is considerable likelihood that the 1:1 ceiling ultimately will have ramifications beyond maritime cases."); Michael L. Brooks, Uncharted Waters: The Supreme Court Plots the Course to a Constitutional Bright-Line Restriction on Punitive Awards in *Exxon Shipping Co. v. Baker*, 62 Okla. L. Rev. 497, 517-18 (Spring 2010)("[A]lthough the precise holding in Exxon may be narrow, the case is likely to have a substantial impact on the constitutional dimension of punitive damages.").  But see Erwin Chemerinsky, A Narrow Ruling on Punitive Damages, Trial, Sept. 2008, at 62, 63 ("[T]he Court was clear that it was dealing only with punitive damages in maritime cases.  At most, its reasoning can be applied to other areas of federal common law where punitive damages are allowed.").

Exxon Shipping Co. v. Baker was a lawsuit that commercial fishermen and native Alaskans brought for economic damages arising from the grounding of the supertanker *Exxon Valdez* on a reef off the Alaskan coast, which caused millions of gallons of crude oil to spill into

Prince William Sound.  See 554 U.S. at 476.  After the United States Court of Appeals for the Ninth Circuit remitted the matter twice, the punitive damages award on appeal to the Supreme Court was $2.5 billion.  See Exxon Shipping Co. v. Baker, 554 U.S. at 481.  Total compensatory damages in the case were $507.5 million.  See 554 U.S. at 515.  The Supreme Court held that punitive damages in maritime cases should be limited to a one to one ratio.  See 554 U.S. at 513.  Although it did not decide Exxon Shipping Co. v. Baker on constitutional grounds, but rather pursuant to maritime law, the Supreme Court held: "In *State Farm*, we said that a single-digit maximum is appropriate in all but the most exceptional of cases, and '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'"  Exxon Shipping Co. v. Baker, 554 U.S. at 514-15.

Justice Ginsburg appears to be among those who view Exxon Shipping Co. v. Baker as a sign of things to come in the Supreme Court's due-process jurisprudence.  In her dissent, she wrote:

> In the end, is the Court holding only that 1:1 is the maritime-law ceiling, or is it also signaling that any ratio higher than 1:1 will be held to exceed "the constitutional outer limit"?  On next opportunity, will the Court rule, definitively, that 1:1 is the ceiling due process requires in all of the States, and for all federal claims?

554 U.S. at 524 (Ginsburg, J., dissenting).

As constitutional scholar Erwin Chemerinsky has noted, the Supreme Court's "reasoning was less about maritime law and more about the need for predictable and consistent rules for punitive damages awards."  Chemerinsky, supra at 62.  Along these lines, the Supreme Court expressly rejected the "verbal" approach to judicial review of punitive damages -- the approach taken in the Supreme Court's prior punitive damages jurisprudence -- in Exxon Shipping Co. v.

Baker.  Exxon Shipping Co. v. Baker, 554 U.S. at 503-504.  After reviewing examples of state-law jury instructions on punitive damages, the Supreme Court noted:

> These examples leave us skeptical that verbal formulations, superimposed on general jury instructions, are the best insurance against unpredictable outliers. Instructions can go just so far in promoting systemic consistency when awards are not tied to specifically proven items of damage (the cost of medical treatment, say), and although judges in the States that take this approach may well produce just results by dint of valiant effort, our experience with attempts to produce consistency in the analogous business of criminal sentencing leaves us doubtful that anything but a quantified approach will work.

554 U.S. at 504.  The Supreme Court found that, rather than imposing caps on punitive damages, "the more promising alternative is to leave the effects of inflation to the jury or judge who assesses the value of actual loss, by pegging punitive to compensatory damages using a ratio or maximum multiple."  554 U.S. at 506.  The Tenth Circuit has not expounded upon Exxon Shipping Co. v. Baker.

**2.    Determining the Constitutional Limits on Punitive Damages Awards.**

Even in the context of a constitutional due-process analysis, the Supreme Court has recognized the value of "pegging punitive to compensatory damages using a ratio."  Exxon Shipping Co. v. Baker, 554 U.S. at 506.  See Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. at 23 (holding that, while "the punitive damages award in this case is more than 4 times the amount of compensatory damages" and "may be close to the line," the award "does not cross the line into the area of constitutional impropriety"); BMW of N. Am., Inc. v. Gore, 517 U.S. at 580-81 (adopting as a "guidepost" the requirement that "exemplary damages must bear a 'reasonable relationship' to compensatory damages").  Indeed, the Supreme Court has held: "Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538

U.S. at 425.   "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425.   Because the Supreme Court's reasoning in Exxon Shipping Co. v. Baker applies in cases outside the realm of maritime law, the Court will consider the reasoning, along with the guideposts identified in BMW of N. Am., Inc. v. Gore, mindful that the BMW of N. Am., Inc. v. Gore constitutional analysis controls the Court's analysis in non-maritime cases.   Cf. Agostini v. Felton, 521 U.S. 203, 237 (1997)("[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."   (citation omitted)).

### a.      The First *BMW of N. Am., Inc. v. Gore* Guidepost: "Some Wrongs Are More Blameworthy Than Others."

The reprehensibility of the Defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award."   BMW of N. Am., Inc. v. Gore, 517 U.S. at 575.   The Supreme Court has set forth five characteristics of conduct that may be relevant to the reprehensibility guidepost: (i) whether the harm was physical versus economic; (ii) whether the conduct evidences "an indifference to or reckless disregard of the health and safety of others"; (iii) the financial vulnerability of the target of the conduct; (iv) whether the conduct involved repeated action versus an isolated incident; and (v) whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident."   State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 419.

Under these factors, more reprehensible conduct, such as violence or the threat of violence, and "trickery and deceit," is considered more deserving of substantial punitive damage

awards.  BMW of N. Am., Inc. v. Gore, 517 U.S. at 575.  Where a plaintiff experiences purely economic harm, on the other hand, a substantial punitive damage award is less justified.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 575.  The Supreme Court has also noted, however, that "the infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty."  BMW of N. Am., Inc. v. Gore, 517 U.S. at 577.  See Exxon Shipping Co. v. Baker, 554 U.S. at 494 (internal citations and quotations omitted)(recognizing that "[a]ction taken or omitted in order to augment profit represents an enhanced degree of punishable culpability").  Likewise, "heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with it), or when the value of the injury and the corresponding compensatory award are small (providing low incentives to sue)."  Exxon Shipping Co. v. Baker, 554 U.S. at 494.

> **b.**      **The Second *BMW of N. Am., Inc. v. Gore* Guidepost: Punitive Damages Must Bear a Reasonable Relationship to Compensatory Damages.**

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff."  BMW of N. Am., Inc. v. Gore, 517 U.S. at 580.  In the constitutional context -- as opposed to the maritime context -- the Supreme Court has eschewed a mathematical formula.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 582 ("Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula").  A punitive damages award of more than 500 times the compensatory damages, however, may be too great to pass constitutional muster.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 583 ("In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this

basis.  When the ratio is a breathtaking 500 to 1, however, the award must surely 'raise a suspicious judicial eyebrow.'"  (internal citation omitted)).  Even before Exxon Shipping Co. v. Baker, absent exceptional circumstances, a ratio of greater than ten to one was likely to be deemed constitutionally excessive.  See BMW of N. Am., Inc. v. Gore, 517 U.S. at 581 (noting that the difference between punitive and actual damages in TXO Prod. Corp v. Alliance Res. Corp. "suggested that the relevant ratio was not more than 10 to 1").  Indeed, in most cases, the maximum ratio of punitive to compensatory damages permitted by the Due Process Clause appears to be nine to one.  See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").  At the same time as it appeared to uphold a nine to one ratio of punitive to compensatory damages generally, the Supreme Court in State Farm Mutual Automobile Insurance Co. v. Campbell also noted that: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 425.  Previously, the Supreme Court had affirmed a punitive damages award of "more than 4 times the amount of compensatory damages," although it noted that this award "may be close to the line."  Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. at 23-24.

The Supreme Court noted several studies of punitive damage awards in Exxon Shipping Co. v. Baker, expressing its concern with "the stark unpredictability of punitive awards":

> Courts of law are concerned with fairness as consistency, and evidence that the median ratio of punitive to compensatory awards falls within a reasonable zone, or that punitive awards are infrequent, fails to tell us whether the spread between high and low individual awards is acceptable.  The available data suggest it is not. A recent comprehensive study of punitive damages awarded by juries in state civil trials found a median ratio of punitive to compensatory awards of just 0.62:1, but

a mean ratio of 2.90:1 and a standard deviation of 13.81.  Even to those of us unsophisticated in statistics, the thrust of these figures is clear: the spread is great, and the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories.  The distribution of awards is narrower, but still remarkable, among punitive damages assessed by judges: the median ratio is 0.66:1, the mean ratio is 1.60:1, and the standard deviation is 4.54.  Other studies of some of the same data show that fully 14% of punitive awards in 2001 were greater than four times the compensatory damages, with 18% of punitives in the 1990s more than trebling the compensatory damages.  And a study of "financial injury" cases using a different data set found that 34% of the punitive awards were greater than three times the corresponding compensatory damages.

554 U.S. at 499-500 (citations omitted).  Relying on empirical studies of punitive damages awards, the Supreme Court determined that the median ratio for all types of cases -- ranging from those with the least blameworthy conduct triggering punitive damages to those featuring malice -- is less than one to one.  See 554 U.S at 512 ("These studies cover cases of the most as well as the least blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions.  The data put the median ratio for the entire gamut of circumstances at less than 1:1 . . . .").

    c.    **The Third *BMW of N. Am., Inc. v. Gore* Guidepost: Civil or Criminal Penalties in Comparable Cases Can Provide Notice of Potentially Significant Punitive Damages.**

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness."  BMW of N. Am., Inc. v. Gore, 517 U.S. at 583.  While "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action," the Supreme Court has cautioned that "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award."  Nonetheless, courts should "accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue."  Browning-Ferris Indus. of Vt., Inc. v. Kelco

Disposal, Inc., 492 U.S. 257, 301 (1989)(O'Connor, J., concurring in part and dissenting in part).

### d. All Three *BMW of N. Am., Inc.* Guideposts Need Not Be In Agreement.

Tenth Circuit decisions suggest that all three BMW of North America, Inc. v. Gore guideposts need not be in agreement to support a finding that a punitive damages award is constitutionally excessive. For example, in both Continental Trend Resources, Inc. v. OXY USA, Inc., 101 F.3d at 641 and United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1231, the Tenth Circuit found that, while the reprehensibility and ratio guideposts both supported their ultimate decision, the facts in those cases "d[id] not lend themselves to comparison with statutory penalties." Cont'l Trend Res., Inc. v. OXY USA Inc., 101 F.3d at 641. See United Phosphorous, Ltd. v. Midland Fumigant, Inc., 205 F.3d at 1231 ("A finding of common law fraud does not lend itself to comparison with statutory penalties.").

### e. The Defendant's Wealth is Relevant to the Determination of Punitive Damages.

Beyond the BMW of North America, Inc. v. Gore factors, the Tenth Circuit also permits consideration of the defendant's wealth when determining whether the punitive damages awarded comport with the Due Process Clause. See Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d at 641. On the one hand, the Tenth Circuit acknowledged that "the Supreme Court in BMW downplayed the defendant's wealth as a justification for increasing punitive damages." 101 F.3d at 641. On the other hand, however, the Tenth Circuit found that the Supreme Court "places in the constitutional calculus the question of the minimum level of penalty necessary to achieve the state's goal of deterrence." Cont'l Trend Res., Inc. v. OXY USA, Inc., 101 F.3d at 641.[10]

---

[10] Thus, the Court in Continental Trend Resources, Inc. v. OXY USA, Inc. quoted BMW

In Federal Deposit Insurance Corp. v. Hamilton, 122 F.3d 854 (10th Cir. 1997), the Tenth Circuit found that the wealth of the defendant in that case, NationsBank, "cut[] the other way," contrasted with the BMW of North America, Inc. v. Gore guideposts. 122 F.3d at 862. The defendant's conduct was not significantly reprehensible given that the injury was economic and that "it arises out of a contractual relationship where the parties can and should contractually protect themselves by providing for explicit remedies in the event of breach." Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862 (noting that, under these circumstances, "the permissible ratio of punitive damages to actual damages should be relatively modest"). Also, the Tenth Circuit found that there were not "any civil or criminal penalties applicable to the conduct engaged in by NationsBank," suggesting that "NationsBank was not on notice that its conduct could give rise to substantial non-compensatory liability." Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862. Still, a punitive to compensatory ratio of six to one was permitted after remittitur, based, in part, on the Tenth Circuit's consideration of the defendant's wealth:

> Although we have been cautioned that the size of the defendant should not ordinarily be a very significant factor, we have also concluded that it is not irrelevant either. OXY, 101 F.3d at 641. NationsBank is undeniably a large financial institution, and the $44,000 in fraud damages cannot be expected to serve as much of a deterrent to any future misconduct. Hence , constitutionally, a higher ratio of punitive to actual damages is warranted here than would be the case if the base level of compensatory damages were a significantly higher figure relative to the size of the defendant.

---

of North America, Inc. v. Gore:

> The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal. The fact that multimillion dollar penalty prompted a change in policy sheds no light on the question whether a lesser deterrent would have adequately protected the interests of Alabama consumers.

517 U.S. at 584-85.

Fed. Deposit Ins. Corp. v. Hamilton, 122 F.3d at 862. In Deters v. Equifax Credit Info. Servs., Inc., the Tenth Circuit stated:

> In assessing the reasonableness of the punitive damages award in the instant case, we must consider the purposes of such a remedy, namely to punish and deter.  In this respect, the wealth and size of the defendant are relevant considerations.  We agree with the district court that Equifax's gross operating revenue of $1.8 billion in 1996 could be considered in levying a substantial punitive damages award.

202 F.3d at 1233.

> **f.**      **Litigation Costs, Including Attorney's Fees, Are Appropriately Considered When Evaluating Constitutionality of Punitive Damages Awards.**

The Tenth Circuit has also noted that "the costs of litigation in order to vindicate rights is an appropriate element to consider in justifying a punitive damages award."  Cont'l Trend Res., Inc. v. v. OXY USA Inc., 101 F.3d at 642 (citing O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1447 (10th Cir. 1987), cert. denied, 486 U.S. 1032 (1988)). Thus, because there was evidence in Continental Trend Resources, Inc. v. OXY USA Inc. that "OXY thought it could impose its corporate will on plaintiffs," and because the plaintiffs had to endure a three-week trial, a lengthy appellate process, and significant post-trial litigation, the Tenth Circuit felt it was appropriate to consider the likely legal costs in addition to the compensatory damages when evaluating whether the punitive damages award was excessive. 101 F.3d at 642 ("Nothing in BMW would appear to prohibit consideration of the cost of those legal proceedings in determining the constitutionally permissible limits on the punitive damages award.").

## ANALYSIS

The Court will grant the Guest Report Motion and the Prior Conduct Motion in part and deny them in part.  With the exception of the second customer complaint, the evidence is relevant, and AmRest, LLC has not presented a sound basis for which to exclude the evidence.

The Court will deny the Post-Accident Conduct Motion and the Subsequent Conduct Motion, because the evidence is relevant, and because AmRest, LLC has not presented a sound basis for which to exclude the evidence.  The Court will grant in part and deny the part the Cumulative Conduct Motion, because although some of the evidence is too dissimilar to the conduct that harmed the Plaintiffs, the evidence of overservice is sufficiently similar to the conduct that harmed the Plaintiffs, and the Court will, therefore, admit it.

I.   **THE COURT WILL GRANT THE GUEST REPORT MOTION AND THE PRIOR CONDUCT MOTION IN PART AND DENY THEM IN PART.**

The Court will grant the Guest Report Motion and the Prior Conduct Motion in part and deny them in part.  The Court will exclude evidence of the second customer complaint, because it is irrelevant and because it is hearsay.  The Court will admit evidence of the first, third, and fourth complaints; but only for the limited purpose of showing that AmRest, LLC knew of the complaints and took no action on them.  With respect to evidence of the other prior incidents and liquor law violations, the Court concludes that it is relevant, and that AmRest, LLC has not set forth a sound basis for the Court to exclude it.

A.   **THE COURT WILL GRANT THE GUEST REPORT MOTION IN PART AND DENY IT IN PART.**

The Court will grant the Guest Report Motion in part and deny it in part.  The Court concludes that the second customer complaint is irrelevant and that is hearsay; accordingly, the Court will exclude evidence of it.  As to the first, third, and fourth complaints, the Court concludes that the evidence is relevant, and that no sound basis exists to exclude it.

The second complaint is irrelevant.  Although relevance under the Federal Rules of Evidence is a low bar -- the evidence must only tend to show that a fact of consequence is any more or less likely than the fact would be in its absence, see Fed. R. Evid. 401 -- the Court

concludes that evidence that, on some other occasion, the bar had been loud and that the Santa Fe Applebee's Neighborhood Grill was known for its bar is not relevant to any material issue. Moreover, to the extent that the statement about the Santa Fe Applebee's Grill being known for its bar depends on its truth for its value, the evidence is hearsay not within any exception.   See Fed. R. Evid. 801.   Accordingly, the Court will grant the Guest Report Motion as to this complaint.

Evidence of the other three complaints is relevant.  Evidence need only make a fact of consequence any more or less likely than the fact would be in its absence to be admissible.  See Fed. R. Evid. 401.  All three complaints satisfy this standard.  As to the first complaint, the Court recognizes that AmRest, LLC did not own the Santa Fe Applebee's Grill at that point.  AmRest, LLC took over the restaurant soon thereafter, however, and  it failed to follow up on a complaint about overservice is relevant, because it tends to make more likely AmRest, LLC's culpable mental state on March 5, 2010.  In other words, the evidence tends to show that overservice was not seen as a problem worthy of a response.  As to the third and fourth complaints, AmRest, LLC suspended a bartender for refusing to serve drinks to two intoxicated patrons, and that it overserved patrons but two months after the accident tends to make more likely its culpable mental state on March 5, 2010.

The Court also concludes that rule 404(b) does not exclude this evidence.  The Tenth Circuit has consistently applied the following test:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test . . . : (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

The Plaintiffs do not seek to admit the other three complaints for the conduct-in-conformity inference that rule 404(b) prohibits.  While much evidence has the potential for a conduct-in-conformity inference, with respect to the first, third, and fourth complaints, which preceded March 5, 2010, the evidence tends to show that AmRest, LLC was on notice that it had a problem with overservice, and that it did not act to address that problem -- which is relevant to show AmRest, LLC's culpable mental state.  The evidence is, as the Court has explained, relevant, and, as the Court will explain below, the risk of unfair prejudice does not substantially outweigh the complaints' probative value.  The Court will, upon request, issue an appropriate limiting instruction.  Accordingly, the Court concludes that rule 404(b) does not require the Court to exclude this evidence.

The Court concludes that rule 403 does not require the Court to exclude the evidence of the guest reports.  Although allowing evidence of the guest reports presents certain risks, the Court believes that it can control those risks using limiting instructions.  Moreover, the Court concludes that those risks do not substantially outweigh the guest reports' probative value regarding whether AmRest, LLC had notice of these events and did not act on that knowledge.

The Court concludes that the rule against hearsay does not require the Court to exclude this evidence.  Although the evidence would be hearsay if the Court allowed the jury to consider the evidence for its truth, see Fed. R. Evid. 801, the Court concludes that it may allow the jury to consider the evidence for the purpose of notice only and not for its truth.  The Court will, upon request, issue a limiting instruction to that effect.

AmRest, LLC presented its argument under State Farm Mutual Automobile Insurance v. Campbell only briefly in its Guest Report Reply, and more fully developed it in its Cumulative Conduct Motion.  The Court will, therefore, dispose of this argument in its discussion of the

*Cumulative Conduct Motion.*[11]

> **B.     THE COURT WILL GRANT IN PART AND DENY IN PART THE PRIOR CONDUCT MOTION.**

The Court will grant in part and deny in part the Prior Conduct Motion.  With the exception of the second complaint, as detailed above, the Court concludes that the evidence is relevant.  Moreover, the Court concludes that AmRest, LLC has not presented a sound basis for the Court to exclude it.

The evidence of this prior conduct -- with the exception of the second complaint, as detailed above -- is relevant.  As the Court has explained, evidence regarding most of the guest complaints is relevant.  With respect to prior incidents of overservice of alcohol and other incidents, the evidence is relevant to show that AmRest, LLC was on notice of a problem with liquor service and failed to act.[12]   Accordingly, rule 402 does not require the Court to exclude

---

[11]The Court does not agree with the Plaintiffs that this evidence is properly considered habit evidence under rule 406.  Under the rules, a habit is "a regular practice of meeting a particular kind of situation with a certain type of conduct, or a reflex behavior in a specific set of circumstances."  Perrin v. Anderson, 784 F.2d at 1046.  This conduct, repeated though it may be, does not rise to the level of near-reflexive behavior that rule 406 contemplates.

The Court has not, in this opinion, disposed of the Plaintiffs' arguments regarding the relevancy of such evidence under the Wrongful Death Act, because the parties developed that argument more fully in connection with other motions.  See Apr. 1 Tr. at 76:14-110 (discussing the Wrongful Death Act at length in connection with Defendant AmRest, LLC's Motion *in Limine* to Exclude Plaintiffs' Expert Gill Woodall's Opinions on Negligent Training, Supervision and Retention, Negligent Creation, Formation and Enforcement of Beverage Service Policies, and Alleged Deficiencies in the NMRA's Server Training Participant Guide, filed March 10, 2014 (Doc. 179)). The Court need not reach that issue to dispose of the motions at issue in this Memorandum Opinion and Order.  The Court will, in a future Memorandum Opinion and Order, dispose of this argument.

[12] AmRest, LLC did not raise its argument under State Farm Mutual Automobile Insurance Co. v. Campbell in the Prior Conduct Motion, but only in the Cumulative Conduct Motion.  Accordingly, although the Court concludes that the evidence of this prior conduct is relevant within rule 401's meaning, as the Court explains below, the Court also concludes that State Farm Mutual Automobile Insurance Co. v. Campbell eliminates some of the prior conduct at issue in the Prior Conduct Motion.

this evidence.

Rule 404(b) does not require the Court to exclude this evidence.  The Plaintiffs do not seek to admit the prior-conduct evidence for the conduct-in-conformity inference that rule 404(b) prohibits, but to demonstrate that AmRest, LLC was on notice of a problem with its liquor service and failed to act accordingly.  The evidence is, as the Court has explained, relevant, and, as the Court will explain, the risk of unfair prejudice does not substantially outweigh the evidence's probative value.  Accordingly, the Court concludes that rule 404(b) does not require the Court to exclude this evidence.  The Court will, upon request, issue an appropriate limiting instruction.

Rule 403 does not require the Court to exclude the evidence of these prior incidents. Although allowing evidence of the prior incidents does present certain risks, the Court can control those risks using limiting instructions.  Moreover, the Court concludes that those risks do not substantially outweigh the prior incidents' probative value regarding whether AmRest, LLC had notice of these events and did not act on that knowledge.  Accordingly, the Court concludes that rule 403 does not prohibit the evidence.

Finally, the rule against hearsay does not require the Court to exclude the evidence about the complaints.  Although the evidence about the complaints would be hearsay, if the Court allowed the jury to consider the evidence for its truth, see Fed. R. Evid. 801, the Court concludes that it may allow the jury to consider the evidence for the purpose of notice.  The Court will, upon request, issue an appropriate limiting instruction.

## II.     THE COURT WILL DENY THE SUBSEQUENT LIQUOR LAW VIOLATIONS MOTION.

The Court will deny the Subsequent Liquor Law Violations Motion.  The evidence is relevant, and no risk listed in rule 403 substantially outweighs its probative value.  Moreover, the

evidence is relevant as to state of mind, a permissible purpose under rule 404(b).  Accordingly, the Court will deny the motion.

The evidence of subsequent liquor law violations is relevant.  Relevancy under rule 401 is a low bar: if the evidence makes any fact of consequence more or less likely than the fact would be in the evidence's absence, it is relevant.  See Fed. R. Evid. 401.  The evidence of these subsequent liquor violations tends to make more likely that AmRest, LLC had the wanton, willful, and reckless state of mind that the law requires for the Plaintiffs to establish their punitive damages claim.  See O'Gilvie v. Int'l Playtex, Inc., 821 F.2d 1438, 1449 (10th Cir. 1987)(allowing evidence of subsequent bad acts if and only if the evidence is "probative of the defendant's state of mind at the time of the transaction").  AmRest, LLC had notice of the accident at issue here and continued to have overservice violations.  Accordingly, the evidence is relevant.

Moreover, rule 403 does not require the Court to exclude this evidence.  Although admitting the evidence of subsequent liquor law violations runs a risk that the jury will confuse the issues and seek to punish AmRest, LLC for acts that did not harm the Plaintiffs, the Court concludes that it can control those risks, if necessary, using limiting instructions, and that those risks do not substantially outweigh the evidence's probative value.  Accordingly, the Court will not exclude the evidence under rule 403.

For similar reasons, rule 404(b) does not require the Court to exclude this evidence.  The Plaintiffs do not offer the evidence for the conduct-in-conformity inference that the rule prohibits, but instead offer it for the permissible purpose of showing AmRest, LLC's state of mind for punitive damages.  Put differently, the Plaintiffs do not offer evidence of subsequent overservice to show this chain of reasoning: (i) AmRest, LLC overserved patrons after the event;

(ii) AmRest, LLC is, therefore, the sort of entity that regularly overserves patrons; and (iii) AmRest, LLC. therefore, probably overserved Ruiz and Mendoza.  Rule 404(b) prohibits that inference.  Instead, the Plaintiffs offer this evidence to show this chain of reasoning: (i) AmRest, LLC oversered patrons after the event; (ii) AmRest, LLC, therefore, had a malicious, willful, reckless, or wanton state of mind with respect to service of alcohol shortly after it overserved Ruiz and Mendoza; and (iii) AmRest, LLC, therefore, probably had a malicious, willful, reckless, or wanton state of mind with respect to service of alcohol when it overserved Ruiz and Mendoza.  Although the line between impermissible character inferences and permissible state-of-mind inferences may be finely drawn, see 1 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual § 404.02[10], at 404-20 (10th ed. 2011)("It is obviously not an easy task to distinguish between acts offered to prove propensity and acts offered for another purpose."), the Court believes that there is a permissible purpose here and that it can control the risk that the jury will use the evidence for an improper purpose using limiting instructions.  The Court has already determined that the evidence is relevant and that rule 403 does not bar its admission, because it does not believe that the risk that the evidence will confuse the jury or that jury will use the evidence for an impermissible purpose substantially outweighs the evidence's probative value.  The Court will, upon request, instruct the jury to consider this evidence only for proper purposes.

## III.    **THE COURT WILL DENY THE POST-ACCIDENT CONDUCT MOTION.**

The Court will deny the Post-Accident Conduct Motion.  The evidence of AmRest, LLC's treatment of Kirby is relevant, rule 403 does not require its exclusion, the Plaintiffs offer it for a proper purpose under rule 404, and the acts are not properly understood as subsequent remedial measures.  Accordingly, the Court will exclude the evidence.

The evidence is relevant, because it shows AmRest, LLC's state of mind for purposes of punitive damages, and because it shows that the events of March 5, 2010, were not merely an accident.  Moreover, rule 403 does not require its exclusion: the evidence's unfair prejudicial effect does not substantially outweigh its probative value.  Further, those risks do not substantially outweigh the evidence's probative value.  Accordingly, the evidence is relevant, and rule 403 does not require the Court to exclude it.  Moreover, because, as the Court has explained, the Plaintiffs do not offer the evidence for the impermissible conduct-in-conformity inference, but to show AmRest, LLC's state of mind for punitive damages purposes, rule 404 does not require the Court to exclude the evidence.  The Court will, upon request, give an appropriate limiting instruction.

Rule 407 also does not require the Court to exclude this evidence.  Rule 407 provides:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> - negligence;
> - culpable conduct;
> - a defect in product or design; or
> - a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment or -- if disputed -- proving ownership, control, or the feasibility of precautionary measures.

Fed. R. Evid. 407.  The rule's language does not prohibit a plaintiff from showing evidence that a defendant took no subsequent remedial measures -- or took ineffective measures -- and arguing that the jury could, from those facts, infer that the defendant had culpable state of mind at the time the defendant acted.

Wanke v. Lynn's Transportation Co. is not to the contrary.  The case sprung from a collision between a truck that Lynn's Transportation Co. owned and a vehicle that the decedent,

Dwight Wanke, drove.  See 836 F. Supp. at 591.  Wanke sought to admit evidence that Lynn's

Transportation had fired the truck driver after the accident.  See 836 F. Supp. at 595.  Judge

Miller noted:

> Rule 407 provides that evidence of post-event measures that would have
> reduced the likelihood of the event at issue if taken earlier is not admissible to
> prove negligence or culpable conduct in connection with the event. The rule
> encompasses post-event dismissal or discipline of an employee responsible for the
> event.

836 F. Supp. at 595.   Wanke argued that the evidence was, nonetheless, admissible to

demonstrate that it was feasible to fire the driver before the accident.  See 836 F. Supp. at 595.

The court noted that Lynn's Transportation had not contested that it was feasible and held that,

"without such a contention, Rule 407 prohibits the evidence."  836 F. Supp. at 595.  Wanke v.

Lynn's Transportation Co. is, therefore, distinct from this case: the Plaintiffs do not offer

information that AmRest, LLC did not more severely discipline Kirby to show that it was

feasible to discipline him more severely, and AmRest, LLC does not argue that it was not

feasible to discipline him more severely.  The case correctly applies rule 407, but is, otherwise,

largely beside the point.

The rule's purpose also does not require the Court to exclude the evidence.  The rule

exists because the alternative rule would deter defendants from taking subsequent remedial

measures, thereby endangering the public.  See Herndon v. Seven Bar Flying Service, Inc., 716

F.2d 1322, 1327 (10th Cir. 1983)(stating that "Rule 407's underlying purpose" is to "encourag[e]

tort[]feasors to take steps to remedy a hazardous condition under their control").  That the jury

will hear of AmRest, LLC's failure to discipline Kirby will not discourage it from disciplining its

employees -- far from it, admitting the evidence will encourage AmRest, LLC to discipline its

employees.  Accordingly, AmRest, LLC's invocation of rule 407 is inapposite.

IV.   **THE COURT WILL GRANT IN PART AND DENY IN PART THE CUMULATIVE CONDUCT MOTION.**

The Court will grant the Cumulative Conduct Motion in part and deny it in part.  State Farm Mutual Auto Insurance Co. v. Campbell limits the evidence that the Plaintiffs may use, but does not exclude it entirely.  It also does not create a bright-line rule that later acts are inadmissible.

State Farm Mutual Auto Insurance Co. v. Campbell trims the evidence that the Plaintiffs wish to use, but does not exclude it entirely.  The Plaintiffs view all of these violations as part of a single category -- failure to responsibly serve alcohol -- but this category sweeps in too much conduct that is, although relevant in the rule 401 sense, too dissimilar to the conduct that harmed the Plaintiffs.  Issues like serving alcohol to minors or failing to update server cards are not sufficiently similar to conduct that harmed the Plaintiffs -- the alleged overservice of Ruiz and Mendoza -- that the Court could properly call them "repeated misconduct of the sort that injured" the Plaintiffs.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 423.  The overservice events are, however, sufficiently similar to the events of March 5, 2010, that State Farm Mutual Automobile Insurance Co. v. Campbell does not bar evidence about those events.

The Court has reexamined its opinion in Pedroza v. Lomas Auto Mall, Inc., No. CIV 07-0591 JB/RHS, 2009 WL 1300944 (D.N.M. Apr. 2, 2009), that evidence of subsequent conduct might be inadmissible under State Farm Mutual Automobile Insurance Co. v. Campbell.  In that case, the plaintiff sought to admit evidence of a complaint filed in a subsequent case in a different case for purposes of punitive damages.  See Pedroza v. Lomas Auto Mall, Inc., 2009 WL 1300944, at *1.  The defendant sought to exclude that complaint under rules 403, 404, 406, 407, and 408; the defendant did not raise State Farm Mutual Automobile Insurance Co. v. Campbell.  See Defendant USAA's Motion in Limine, filed February 9, 2009, in Pedroza v.

Lomas Auto Mall, Inc., No. CIV 07-0591 JB/RHS (Doc. 371).  At the hearing, the defendant

argued, for the first time, that State Farm Mutual Automobile Insurance Co. v. Campbell also

barred the evidence:

> At the hearing, Charles J. Vigil, USAA's counsel, argued that admitting
> out-of-state cases for punitive damages would be contrary to State Farm Mut.
> Auto. Ins. Co. v. Campbell and BMW of North America, Inc. v. Gore, 517 U.S.
> 559 . . . (1996).  Rob Treinen, the Plaintiffs' attorney, contended that the Texas
> case they would seek to introduce at trial was admissible as pattern and practice
> evidence and that the evidence would only be used for punitive damages.  Other
> than the punitive-damages issue, the Court was able to resolve most of the other
> evidentiary issues USAA raised during the hearing.

Pedroza v. Lomas Auto Mall, Inc., 2009 WL 1300944, at *2 (selected citations omitted).

 The Court excluded the evidence under rule 403, using State Farm Mutual Automobile

Insurance Co. v. Campbell and BMW of North America, Inc. v. Gore "to inform its

analysis . . . of the probative value and potential unfair prejudice of the evidence."  Pedroza v.

Lomas Auto Mall, Inc., 2009 WL 1300944, at *3.  After discussing other dimensions of State

Farm Mutual Automobile Insurance Co. v. Campbell, see 2009 WL 1300944, at *3-*4, the Court

turned to the issue whether State Farm Mutual Automobile Insurance Co. v. Campbell bars

evidence of subsequent conduct for punitive damages:

> Another problem with allowing the complaint into evidence is that the
> alleged conduct in [the subsequent case] took place after the conduct here, raising
> concerns about whether it could properly be considered for punitive damages.
> "Although '[the Supreme Court's] holdings that a recidivist may be punished
> more severely than a first offender recognize that repeated misconduct is more
> reprehensible than an individual instance of malfeasance,' in the context of civil
> actions courts must ensure the conduct in question replicates the prior
> transgressions."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 423
> (quoting BMW of North America, Inc. v. Gore, 517 U.S. at 577)(emphasis
> added)(citation omitted).  Recidivist behavior may be properly considered when
> determining reprehensibility, but later conduct is not evidence that earlier conduct
> is recidivist.  Later conduct does not amount to "prior transgressions."  State Farm
> Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 423.  USAA's alleged conduct in
> this case might be proper evidence in [the subsequent case], but not the reverse.

While the Court is not aware of any court specifically excluding evidence for punitive damages on the basis that the evidence involved later actions -- or, for that matter, any court relying on such evidence in upholding a punitive damages award -- the decisions discussing punitive damage have invariably referred to prior acts. See, e.g., Williams v. ConAgra Poultry Co., 378 F.3d 790, 797 (8th Cir. 2004)(discussing need for "prior bad acts" and "prior incidents" to be sufficiently related to conduct at issue in case); Berardi v. Village of Sauget, Ill., 2008 WL 2782925 at *5 (S.D. Ill.)(refusing to admit evidence of "prior incidents"). Arguably, the later conduct at issue in [the other case] could show that USAA was becoming a recidivist, but it does not show that USAA's actions in this case were recidivist.

The Court need not decide whether all allegations of misconduct that occurred after the conduct at issue in a case, rather than evidence of past conduct, also runs afoul of the due-process limitations on punitive damages. All the Court need decide here is that, in the circumstances of this case, such allegations are not admissible as a basis for punitive damages or as evidence of reprehensibility. The allegations remain allegations, there is only one set of allegations, and one set of allegations about events in another state does not establish and is not particularly probative of any pattern. The Court will therefore exclude, under rule 403, the complaint from [the subsequent case]. The allegations have limited probative value, are unduly prejudicial, and will require the trial of another set of allegations in a case that is complicated enough.

Pedroza v. Lomas Auto Mall, Inc., 2009 WL 1300944, at *5 (emphasis and second alteration in original)(footnote omitted).  In a footnote, the Court expressed some puzzlement with the Supreme Court's reasoning:

The Supreme Court does not explain why recidivism may be reprehensible but why prior incidents -- and apparently not later incidents -- may be considered in the reprehensibility analysis.  It may be that the theoretical underpinnings of any such concept are that, when a person or entity commits a bad act and then later commits other bad acts, the initial slice of time -- the first bad act -- should be viewed in isolation.  At that first time, the person or entity has not shown any other related bad behavior, and looking to future events and imposing punishment for subsequent events arguably conflicts with basic notions of fairness.

Pedroza v. Lomas Auto Mall, Inc., 2009 WL 1300944, at *5 n.2.  Although the Court was reluctant to adopt as a bright-line rule the notion that it may not admit evidence of subsequent acts for punitive damages, the Court sought to respect the Supreme Court's guidance and particular language.

On closer examination, however, the Court has determined that it may allow evidence of subsequent acts, but for a limited purpose.  The parties have identified cases, including O'Gilvie v. Int'l Playtex, Inc. and its progeny, that contemplate the limited use of subsequent acts in relation to punitive damages -- that is, to show the defendant's state of mind at the time of the transaction.  The parties in Pedroza v. Lomas Auto Mall, Inc., did not bring O'Gilvie v. Int'l Playtex, Inc. and its progeny to the Court's attention.

Those cases initially appear to be in tension with State Farm Mutual Automobile Insurance Co. v. Campbell.  Under State Farm Mutual Automobile Insurance Co. v. Campbell, the jury may punish a defendant "for the conduct that harmed the plaintiff, not for being an unsavory individual or business."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 423.  That is, "[t]he reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 424.  Where a plaintiff fails to show conduct by a defendant "similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 423-24.  Accordingly, under State Farm Mutual Automobile Insurance Co. v. Campbell, "[d]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 423.  Instead, plaintiffs seeking punitive damages on the basis of recidivism must identify similar conduct -- that is, "repeated misconduct of the sort that injured" the plaintiff.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 423-24.

On closer inspection, O'Gilvie v. Int'l Playtex, Inc. coheres with State Farm Mutual

Automobile Insurance Co. v. Campbell.  Under O'Gilvie v. Int'l Playtex, Inc., a defendant's subsequent acts are admissible, but only for a limited purpose: to help the jury decide the defendant's state of mind when the defendant engaged in the conduct that harmed the plaintiff. See O'Gilvie v. Int'l Playtex, Inc., 821 F.2d at 1449.  In other words, the Court does not admit subsequent acts to show recidivism -- that is, a series of similar acts committed on multiple occasions -- but to show the state of mind that accompanied an act that AmRest, LLC committed on a single occasion.

Accordingly, the Court must: (i) instruct the jury not to punish AmRest, LLC for its subsequent acts, but only to consider those subsequent acts insofar as they explain its state of mind on March 5, 2010, see O'Gilvie v. Int'l Playtex, Inc., 821 F.2d at 1449; and (ii) exclude evidence of dissimilar conduct that lacks a nexus to the harm that the Plaintiff suffered, see State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. at 422-24.  Indeed, in a 2011 opinion, the Tenth Circuit discussed State Farm Mutual Automobile Insurance Co. v. Campbell and O'Gilvie v. Int'l Playtex, Inc. in adjacent paragraphs, see Farm Bureau Life Ins. Co. v. Am. Nat'l Prop. & Cas. Co., 408 F. App'x 162 (10th Cir. 2011), indicating that the Tenth Circuit sees no conflict between the Supreme Court's decision in State Farm Mutual Automobile Insurance Co. v. Campbell and the Tenth Circuit's earlier decision in O'Gilvie v. Int'l Playtex, Inc.  Accordingly, evidence that relates to similar events that occurred after March 5, 2010, is admissible for the limited purpose of demonstrating AmRest, LLC's state of mind on March 5, 2010.

For the reason that the Court has already explained, Rule 404(b) does not bar this evidence: it is admissible for the limited purpose of showing AmRest, LLC's state of mind on March 5, 2010.

New Mexico law does not require the Court to exclude this evidence.  The cases that

AmRest, LLC cites allow parties to introduce evidence of conduct that caused the Plaintiffs' harm and cumulative conduct from which the jury could infer the corporation's culpable mental state on the date that the actual event sued upon occurred.  See Clay v. Ferrellgas, 1994-NMSC-080, ¶¶ 14-24.

The result in Behrens v. Gateway Court, LLC -- a Court of Appeals of New Mexico case that does not, therefore, bind the Court[13] -- is consistent with this principle.  In that case, a resident brought a lawsuit against the owners and operators of a mobile home park for a fire that "an electrical short in the wiring of an old air conditioner that had been left under the porch of the mobile home" caused.  Behrens v. Gateway Court, LLC, 2013-NMCA-097, ¶ 3.  The plaintiff sought punitive damages; in support, the plaintiff offered evidence that the mobile home park's owner had advanced several theories about the fire's cause, "blamed a plumber for the installation, and then failed to retract her statement even after learning that the plumber did not work on the wiring of the air conditioner," and argued that this evidence proved the owner's culpable state of mind.  2013-NMCA-097, at ¶ 24.  The Court of Appeals of New Mexico explained:

---

[13] Under the Erie R. Co. v. Tompkins, 304 U.S. 64 (1938)("Erie") doctrine, federal courts sitting in diversity must apply the substantive law of the state that would otherwise have jurisdiction over the claims at issue.   See Erie, 304 U.S. at 78; Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 421 (1996). In the absence of an authoritative pronouncement from the highest court, a federal court's task under the Erie doctrine is to predict how the state's highest court would rule if presented with the same case.  See Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007).  The federal court "must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently."  Stoner v. New York Life Ins. Co., 311 U.S. 464, 467 (1940).  To predict how the state's highest court would rule, the federal court "may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and 'the general weight and trend of authority' in the relevant area of law."  Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007)(citations and internal quotation marks omitted).

> [T]his Court has stated the "conduct giving rise to the punitive damages claim must be the same conduct for which actual or compensatory damages were allowed." Gonzales v. Sansoy, 103 N.M. 127, 129, 703 P.2d 904, 906 (Ct. App. 1984) (internal quotation marks and citation omitted).  Plaintiff's compensatory damages claim was based solely on Defendant's liability for causing the fire that destroyed Plaintiff's mobile home and personal possessions.  The compensatory damages claim therefore does not support a punitive damages award for post-fire conduct.

Behrens v. Gateway Court, LLC, 2013-NMCA-097, at ¶ 24.

The Court first notes that the Supreme Court of New Mexico has granted certiorari in Behrens v. Gateway Court, LLC, see 2013-NMCERT-009, 311 P.3d 452.  Moreover, because it is a Court of Appeals of New Mexico case, it does not bind the Court.  The case may, therefore, be of limited value.  Even still, the Court concludes that the result is correct, because the acts were so dissimilar to those that caused the underlying fire.  The statement that "the conduct giving rise to the punitive damages claim must be the same conduct for which actual or compensatory damages were allowed" does not change the result: the conduct that gives rise to the Plaintiffs' punitive damages claim is AmRest, LLC's conduct on March 5, 2010, and the jury may not punish AmRest, LLC for later conduct; its subsequent conduct may, however, explain its mental state in connection with its conduct on March 5, 2010.   O'Gilvie v. Int'l Playtex, Inc., 821 F.2d at 1449.

In short, with the exceptions that this Memorandum Opinion and Order outlines, the Court concludes that it need not exclude the evidence that AmRest, LLC has identified in its Cumulative Conduct Motion under State Farm Automobile Insurance Co. v. Campbell.

**IT IS ORDERED** that: (i) Defendant AmRest, LLC's Motion in Limine to Exclude Evidence of Applebee's Guest Contact Reports, filed March 3, 2014 (Doc. 159)("Guest Report Motion"), is granted in part and denied in part; (ii) AmRest, LLC's Opposed Motion in Limine to Exclude References to and Evidence Regarding Prior Incidents and Prior Liquor Law Violations

at Any AmRest Restaurant, filed March 5, 2014 (Doc. 162)("Prior Conduct Motion"), is granted in part and denied in part; (iii) Defendant AmRest, LLC's Motion in Limine to Exclude Evidence of Subsequent Liquor Law Violations at Any AmRest Locations, filed February 26, 2014 (Doc. 144), is denied; (iv) Defendant AmRest, LLC's Motion in Limine to Exclude Evidence of its Post-Accident Conduct, filed March 10, 2014 (Doc. 196), is denied; and (v) Defendant AmRest, LLC's Motion in Limine to Exclude "Cumulative Conduct" Evidence of Alleged Wrongful Acts by AmRest That Did Not Cause, and Are Not Similar to Conduct That Caused, Plaintiffs' Injuries, filed March 10, 2014 (Doc. 200)("Cumulative Conduct Motion"), is granted in part and denied in part.  With respect to the Guest Report Motion and the Prior Conduct Motion, the Court will admit the first complaint -- which involves a complaint of overservice in April, 2008 -- the third complaint -- in which an anonymous person alleged that a bartender had been suspended because she refused to serve intoxicated patrons -- and the fourth complaint -- about overservice on May 4, 2010 -- to show that AmRest, LLC was on notice of problems with overservice.  The Court will exclude the second complaint, which relates to the noise level in the Santa Fe Applebee's Neighborhood Grill & Bar, because it is irrelevant, and because it is hearsay not within any exception.  In all other respects, the Court denies the Guest Report Motion and the Prior Conduct Motion.  With respect to the Cumulative Conduct Motion, the Court will admit evidence of subsequent overservice within Debbie Passmore's and Jake Gandhi's area for the limited purpose of showing AmRest, LLC's state of mind on March 5, 2010; it will not admit evidence of violations and acts that do not relate to overservice.  The Court will deny the other motions in full.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Zackeree S. Kelin
Philomena M. Hausler
Kelin Law Firm
Albuquerque, New Mexico

--and--

Scott M. Hendler
Sean M. Lyons
Hendler Law, P.C.
Austin, Texas

      *Attorneys for the Plaintiffs*

Jeff Ray
Ray McChristian & Jeans, P.C.
El Paso, Texas

--and--

W. Mark Mowery
Jose R. Blanton
Glenn A. Beard
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

      *Attorneys for Defendant AmRest, LLC*

Edward Shepherd
Allen, Shepherd, Lewis & Syra, P.A.
Albuquerque, New Mexico

--and--

Shannon A. Parden
Deena Buchanan Williams
Olsen Parden Williams, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Applebee's International, Inc.*