## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DAVID PESHLAKAI, DARLENE THOMAS,
CHARLES REYNOLDS AS THE PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATES OF DEL LYNN PESHLAKAI
(DECEASED) AND DESHAUNNA PESHLAKAI
(DECEASED), DANELL PESHLAKAI, DARNELL
PESHLAKAI, SHAWN BEGAY, DELACEY
PESHLAKAI, and DAVID PESHLAKAI, JR.,

        Plaintiffs,

vs.                                                                     No. CIV 13-0752 JB/ACT

JAMES RUIZ, GILBERT MENDOZA, AMREST, LLC
d/b/a APPLEBEE'S NEIGHBORHOOD GRILL AND BAR,
and APPLEBEE'S INTERNATIONAL, INC.,

        Defendants.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Sanctions Against

Defendant AmRest, LLC, filed in state court March 4, 2013, filed in federal court September 10,

2013 (Doc. 36-6)("Motion").  The Court held hearings on November 21, 2013, and December 9,

2013.  The primary issue is whether the Court should sanction AmRest, LLC for various

discovery violations.  The Court will grant the Motion in part and deny it in part.

## FACTUAL BACKGROUND

The Court takes its facts from the Plaintiffs' Third Amended Complaint for Wrongful

---

[1]In its Sealed Memorandum Opinion and Order, filed April 12, 2014 (Doc. 330)("Sealed
MOO"), the Court inquired whether the parties had any proposed redactions to protect
confidential information within the Sealed MOO before the Court published a public version of
the Sealed MOO.  See Sealed MOO at 1 n.1.  The Court gave the parties 14 calendar days to
provide notice of any proposed redactions.  See Sealed MOO at 1 n.1.  The parties have not
contacted the Court or made any filings within CM/ECF to indicate that they have any proposed
redactions.  Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

Death, Personal Injuries, Loss of Consortium and Other Damages, filed in state court January 16, 2013, filed in federal court August 14, 2013 (Doc. 2-1)("Complaint").  Two restaurants in Santa Fe, New Mexico -- Applebee's Neighborhood Grill and Bar, and the Blue Corn Café and Brewery -- served alcohol to Defendants James Ruiz and Gilbert Mendoza, as well as non-party Veronica Castro, despite that it was reasonably apparent that they were drunk.  See Complaint ¶¶ 26-29, at 4-5.  Ruiz, Mendoza, and Castro then got into Mendoza's car, with Ruiz driving -- until he crashed into a vehicle that carried Plaintiffs David Peshlakai and Darlene Thomas, who lived together as common-law husband and wife, and their daughters DeShauna and Del Lynn Peshlakai.  See Complaint ¶¶ 30-31, at 5; id. ¶¶ 81-84, at 16.  The crash badly injured David and Darlene, and it killed Del Lynn and DeShauna, who were then nineteen and seventeen years old. See Complaint ¶¶ 1-2, at 1.  Ruiz ran away without trying to help the family.  See Complaint ¶¶ 32, at 2.

The accident happened on March 5, 2010.  In the following days, AmRest, LLC discovered that Ruiz had been at the AmRest, LLC restaurant that evening. On March 8, 2010, law enforcement executed a search warrant, and AmRest, LLC handed over certain materials to the Santa Fe Police Department.  AmRest, LLC's counsel picked up the bag from the Santa Fe Police Department in September, 2012, and produced the materials that the bag contained to the Plaintiffs in November, 2013.  These materials did not include the receipt or the server check-out form from David Kirby, the server from Ruiz' and Mendoza's table.

Shortly after the incident, AmRest, LLC began an internal investigation.  Employees involved in the investigation included Barry Jenkins, the General Manager of AmRest, LLC's Santa Fe Applebee's Franchise; AmRest, LLC's "area coach" -- a manager -- Jake Ghandi; its "district coach" -- a lower level manager -- Debbie Passmore; and its Applebee's Neighborhood

Grill and Bar brand president, Mike Muldoon.  Ghandi created an electronic investigation file and sent it to others by electronic mail transmission.  The Plaintiffs are unsatisfied that AmRest, LLC has produced this electronic investigation file or the electronic mail transmissions that discussed it.

## PROCEDURAL BACKGROUND

The Plaintiffs allege seven causes of action in their Complaint.  Against Defendants Applebee's International, Inc. and AmRest, LLC, they bring: (i) common-law and statutory dram-shop liability claims, see Complaint ¶¶ 33-48, at 8-9; and (ii) negligence claims related to alcohol marketing and distribution, see Complaint ¶¶ 49-58, at 9-12.  Regarding the individual Defendants, the Plaintiffs bring: (i) negligence and negligence per se claims against Ruiz and Mendoza related to driving while intoxicated, see Complaint ¶¶ 59-68, at 12-14; and (ii) a negligent-entrustment claim against Mendoza for allowing Ruiz to drive Mendoza's vehicle while intoxicated, see Complaint ¶¶ 69-79, at 14-15.  Against all Defendants, (i) David Peshlakai and Darlene Thomas bring a negligent infliction of emotional distress claim, see Complaint at ¶¶ 80-85, at 15-16; and (ii) all Plaintiffs bring a loss-of-consortium claim, see Complaint ¶¶ 86-89, at 16-17.

The Plaintiffs move the Court to sanction AmRest, LLC for various alleged discovery violations.  The Plaintiffs' first argument relates to an "electronic investigation file" created in the wake of AmRest, LLC's accident investigation.  Motion for Sanctions at 2.  According to the Plaintiffs, the investigation's purpose "was to determine how many alcoholic drinks Mr. Mendoza and Mr. Ruiz consumed while they were at Applebee's on March 5, 2010," and "[t]he AmRest employees who conducted the investigation included Barry Jenkins, the General Manager of AmRest's Santa Fe Applebee's Franchise, AmRest's area coach Jake Ghandi, its

district coach Debbie Passmore and its Applebee's brand president Mike Muldoon."  Motion for

Sanctions at 2.  The Plaintiffs allege that Ghandi created an "electronic investigation file . . . and

passed it up the chain of command by email."  Motion for Sanctions at 2.  The Plaintiffs contend

that, in Muldoon's deposition, he stated that he reviewed electronic mail transmissions that

included employees' written statements; that Ghandi "is sure that AmRest discussed the amount

of alcohol that Mr. Ruiz drank"; and that he

> acknowledged that certain key materials such as the server checkout form,
> original checks and credit card slips associated with Mr. Ruiz's and
> Mr. Mendoza's food and beverage orders -- which are now missing, despite the
> fact that they were supposed to be produced to Santa Fe Police Department
> pursuant to a search warrant -- could have been separated from the rest of the
> sever checkout materials during AmRest's investigation.   Mr. [Ghandi] also
> agreed that these materials would have been copied to his investigation folder and
> forwarded to his superiors at AmRest corporate.

Motion for Sanctions at 3.

The Plaintiffs contend that such an investigation file would respond to their requests for

production: first, one asking for "all incident reports or other documents and written reports

made by you or your agent or employee about the sale of alcohol to James Ruiz and/or Gilbert

Mendoza, or about the accident involving those individuals on March 5, 2010"; and second, a

request "that AmRest '[p]roduce all checks, receipts, credit card receipts for service or of food

and/or beverages made from open to close on March 5, 2010."  Motion for Sanctions at 3-4.

According to the Plaintiffs, AmRest, LLC "should have" the checks, receipts, and credit card

receipts, but has responded throughout this litigation that all such documents were provided to

the Santa Fe Police Department in response to a search warrant."  Motion for Sanctions at 4.  The

Plaintiffs continue: "[A]s all parties are now aware, that body of evidence does not include the

checks, receipts and credit card receipts for service to Mr. Ruiz and Mr. Mendoza, nor does i[t]

include any such items at all from server David Kirby."  Motion for Sanctions at 4.  In their

- 4 -

view, "[n]ow that the seized items have been returned to AmRest by the Santa Fe Police department, AmRest responded by giving Plaintiffs the 201 pages of documents that AmRest says the Santa Fe Police Department returned." Motion for Sanctions at 4. The Plaintiffs contend that Ghandi testified at his deposition that the electronic investigation file probably contains copies of the missing documents. See Motion for Sanctions at 4. According to the Plaintiffs, AmRest, LLC has not searched for this electronic investigation file; its deposition representatives failed to review related documents; and, because AmRest, LLC no longer employs Ghandi, he cannot access "his investigation file unless AmRest provides it to him." Motion for Sanctions at 5. The Plaintiffs raise similar concerns regarding their deposition of Jenkins. See Motion for Sanctions at 6. The Plaintiffs contend that, when they deposed Muldoon, he "remembered participating in the development of Mr. [Ghandi's] investigation file on this incident" and stated that he had not asked AmRest, LLC's information technology department to find that file. Motion for Sanctions at 6-7.

The Plaintiffs also complain that AmRest, LLC has not produced certain documents related to customer complaints and incident reports. See Motion for Sanctions at 7. In the Plaintiffs' telling, they requested "all documents, reports and complaints generated from January 1, 2006 to December 31, 2010 describing rude, loud or intoxicated behavior by any customer of the Santa Fe Applebee's." Motion for Sanctions at 7 (quotation marks omitted). The Plaintiffs state that AmRest, LLC has admitted that it has responsive documents, but has not looked for them. See Motion for Sanctions at 7-8.

The Plaintiffs also state that AmRest, LLC has not identified every employee present on the day of the incident: in their view, AmRest, LLC has identified "only servers and perhaps hosts," but not "bartenders and managers on duty for the afternoon shift of March 5, 2010."

- 5 -

Motion for Sanctions at 8-9.

The Plaintiffs also contend that AmRest, LLC has not produced "all point of sale information regarding food and beverage sales made at the Santa Fe Applebee's on March 5, 2010," as the Plaintiffs have requested.  Motion for Sanctions at 9 (internal quotation marks omitted).  The Plaintiffs complain that AmRest, LLC has disclosed only minimal information in response to their request.  See Motion for Sanctions at 9.  The Plaintiffs state that AmRest, LLC has produced "a report of sale that shows it sold ten Brewtus-sized[2] draft beers to Mr. Ruiz' party" and "bears a hand[-]scribed notation at the bottom that reads, 'Tab containing 3 Bud Lights served to Ruiz."  Motion for Sanctions at 9.  The Plaintiffs have since learned that Mark Riley, AmRest, LLC's former counsel, wrote this notation.  See Motion for Sanctions at 9-10. The Plaintiffs complain that the Defendants have yet to produce "an unadulterated report," and point out that, by itself, "the report does not rule out that Mr. Ruiz and Mr. Mendoza were served drinks not reflected on this particular check."  Motion for Sanctions at 10.  The Plaintiffs believe that AmRest, LLC possesses more point-of-sale information, but has not produced it: they point to Ghandi's deposition testimony, at which he disclaimed knowledge whether AmRest, LLC retained a copy of the original check and noted that, because AmRest, LLC no longer employs him, he cannot access his investigation file.  See Motion at 11.  According to the Plaintiffs, Ghandi testified that AmRest, LLC lacked an information technology department that would have allowed him to investigate what data storage exists from the point-of-sale system from the Santa Fe Applebee's Neighborhood Grill; in their view, subsequent testimony has revealed that Ghandi's testimony is false, and has revealed that AmRest, LLC may have the capacity to

_____

[2] Although the parties do not explain what this product is in their briefing on the Motion for Sanctions, "Brewtus" refers to a large beer glass that Applebee's Neighborhood Grill & Bar restaurants serve.

identify more information, and has not looked for it.  See Motion at 12.  The Plaintiffs also contend that the point-of-sale ("POS") information that Defendant Applebee's International, Inc. has disclosed reveals that AmRest, LLC can get more information than it has provided: according to them, an Applebee's International information technology analyst has produced a document showing "that AmRest sold a total of ten Brewtus beers to a table of nine guests" -- presumably, Ruiz' and Mendoza's table -- "and shows that guests numbers 4 and 5 were served four Brewtus beers each."  Motion at 13-14.

The Plaintiffs argue that the Court should sanction AmRest, LLC for each of the following reasons.  First, they argue that the Court should sanction AmRest, LLC "for refusing to produce its investigation file," because "[i]t would be unfair and extremely prejudicial to allow AmRest to continue to challenge Plaintiffs' proof that Mr. Ruiz and Mr. Mendoza were served while known to be intoxicated, while AmRest is purposefully obstructing Plaintiffs' access to such proof."  Motion at 17.  Second, they argue that the Court should sanction AmRest, LLC for "refusing to produce its customer complaint files," because "[i]t would be unfair and extremely prejudicial to Plaintiffs to allow AmRest to take" the position that it responded appropriately to complaints that it had overserved its customers "while they violate the Court's order that they fully respond to Plaintiffs' request for documents to show what response, if any, they made to these customer complaints."  Motion at 18.  Third, the Plaintiffs contend that the Court should sanction AmRest, LLC "for refusing to identify managers and bartenders," because that failure delays the case.  Motion at 18-19.  Fourth, the Plaintiffs maintain that the Court should sanction AmRest, LLC "for refusing to produce point of sale information."  Motion at 19.  In their view, the jury must decide how many drinks Ruiz and Mendoza consumed, how large those drinks were, and how quickly they consumed them; in light of those issues, "AmRest has refused to

look for and produce the information it has available that might answer these questions," and takes "the position that [it] cannot obtain this information, but Plaintiffs show that they can obtain it but simply have not tried."  Motion at 19.  Further, the Plaintiffs complain that AmRest, LLC's counsel instructed Michael Muldoon, its designee under rule 30(b)(6) of the Federal Rules of Civil Procedure, not to answer certain questions.  See Motion at 19-20.  In their view, "[i]t is clear AmRest does have an IT department, despite its testimony to the contrary and its attempts to obstruct discovery so that Plaintiffs could not learn otherwise."  Motion at 20.  In their view, "[t]he simple fact is that AmRest has not looked for" more POS information than it already has produced "in blatant violation of the Court's Order," and, therefore, "to allow it to pretend to search its database now would be naïve, so other sanctions must be issued by the Court to prevent unfair prejudice to Plaintiffs."  Motion at 20-21.

The Plaintiffs ask the Court to issue orders establishing: (i) "that Mr. Ruiz and Mr. Mendoza were served a number of drinks in a short enough amount of time sufficient to elevate their blood alcohol level well beyond .08"; (ii) "that AmRest became aware after the accident that Mr. Ruiz and Mr. Mendoza drank more than three rounds of Brewtus beers, yet told the Santa Fe Police Department, SID[3] and Plaintiffs that Mr. Ruiz and Mendoza drank only Brewtus beers each"; and (iii) "that AmRest received the customer complaints described in Exhibit E and did nothing about them."  Motion at 21.  Further, they ask the Court to order that the Plaintiffs may "continue discovery related to bartenders and managers not identified in answer to interrogatory No. 14, and precluding AmRest from arguing for a continuance of trial as a result of that discovery or from arguing unfair surprise at trial to any evidence developed

---

[3] Although the Plaintiffs did not define "SID," the Court understands it to refer to the Special Investigations Division of the Department of Public Safety of the State of New Mexico.

therefrom."  Motion at 22.

        In Defendant AmRest, LLC's Response to Plaintiffs' Motion for Sanctions, filed in state

court April 29, 2013, filed in federal court September 10, 2013 (Doc. 36-15)("Response"),

AmRest, LLC states that the Motion for Sanctions "is without merit and, as discovery is ongoing,

also moot."  Response at 1.[4]  It contends that it "has participated in discovery in good faith and

fully responded with the information available to it."  Response at 1-2.  AmRest, LLC contends

that the Plaintiffs overlook that it has produced responsive documents and supplemented its

discovery, and "ignore[] testimony that particular items weren't in the possession of AmRest."

Response at 2.  AmRest, LLC continues: "Notably, those items that weren't in the possession of

AmRest were produced to Plaintiff by [Applebee's International], so Plaintiffs already have

possession of the requested items."  Response at 2.  Further, AmRest, LLC points out that the

Plaintiffs requested some of the same documents from AmRest, LLC "**only four days before**

**filing the present Motion**" for sanctions, "thus undercutting their entire argument for sanctions,

showing that the Motion was not filed in good faith," violating the state court's local rules, and

"effectively admitting that there is no violation of any discovery on AmRest's part."  Response at

2 (emphasis in original).  AmRest, LLC further asserts that the Plaintiffs' requested sanctions

"are akin to seeking outright dismissal or default and are not warranted under the law as there

has been no willful, bad faith, or intentional refusal to comply with discovery."  Response at 2.

Further, AmRest, LLC asserts that "[t]here is no equitable relationship between Plaintiffs'

---

        [4] AmRest, LLC also incorporates by reference Defendant AmRest, LLC's Motion to
Strike Plaintiffs' Motion for Sanctions, filed in state court April 29, 2013, filed in federal court
September 10, 2013 (Doc. 37-1), which objected to the Motion based on the state court's local
rules.  Because the case no longer resides in state court, the Court will omit AmRest, LLC's
discussion of this issue from this Memorandum Opinion and Order.  Moreover, AmRest, LLC
withdrew that motion.  See Defendant AmRest, LLC's Withdrawal of its Motion to Strike
Plaintiff's Motion for Sanctions Against AmRest, LLC, filed January 10, 2014 (Doc. 111).

requested sanctions and AmRest's conduct."  Response at 2.

AmRest, LLC contends that "the Santa Fe Police served a search warrant for the receipts and related service/sales documents that were generated on March 5, 2010," and that it, therefore, no longer possesses "any of the receipts or other documents related to the service of James Ruiz's table since the date they were seized."  Response at 3.  With respect to the electronic investigation file, AmRest, LLC contends that it "has previously produced all documents that comprise the investigative file."  Response at 3.  AmRest, LLC contends that the file contained the following documents: "a copy of a statement from server David Kirby, a copy of a statement from server Marcella Barton, a copy of a statement from Anthony Bonnefil,[5] the search warrant the Santa Fe Police Department executed in this matter, and a copy of the point of sale receipt."  Response at 3.  AmRest, LLC contends that it has produced these documents repeatedly.  See Response at 3-4.  Further, AmRest, LLC points out that the Motion "seeks sanctions for the alleged failure to produce documents that were only **requested four days before the Motion was filed**."  Response at 4 (emphasis in original).  AmRest, LLC also contends, without explaining, that the "motion violates the First Judicial District rules regarding discovery disputes."  Response at 4.

AmRest, LLC also contends that it has produced POS data for Ruiz' and Mendoza's table; further, AmRest, LLC contends that Applebee's International "has produced all sales data for the entire day of March 5, 2010," and that "[t]here is nothing inappropriate or non-responsive about AmRest referring to a co-defendant's production."  Response at 4-5.  AmRest, LLC also contends that Applebee's International produced further POS information after it "wrote a new

---

[5] Although the parties did not identify Bonnefil in their briefing, the Court understands that Bonnefil was a manager of the Santa Fe Applebee's Neighborhood Grill on duty when the Santa Fe Police Department served the search warrant.

program code . . . in order to generate [new POS production] from data that AmRest did not have access to."  Response at 5.  AmRest, LLC submits that the Plaintiffs ignore "Rule 1-026 NMRA which states that a court shall limit discovery i[f] the discovery sought is duplicative, unreasonably cumulative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive."  Response at 5.  AmRest, LLC characterizes the Plaintiffs' argument as follows: "Plaintiffs are not contending AmRest didn't produce[] point of sale data; rather, they are essentially contending that it wasn't complete because it didn't include a seat number designating which menu items were served to which seat at the table."  Response at 6.  AmRest, LLC contends, however, that "such a document did not even exist until February 5, 2013," when Applebee's International's information technology workers wrote a new program to extract this previously unavailable information from Applebee's International's proprietary computer program.  Response at 6.  AmRest, LLC states that it lacked "the level of clearance necessary within the . . . data warehouse to even access the raw data to generate the document."  Response at 6.  In sum, in its view, "no document could be produced until representatives of [Applebee's International] actually wrote new program code for [its] own point of sale program in an attempt to retrieve that data."  Response at 7.  Moreover, AmRest, LLC states: "Plaintiffs now have those documents.  AmRest complied with discovery."  Response at 7.

AmRest, LLC also contends that years of experience qualified its POS rule 30(b)(6) designee to discuss "the limited subject matter at issue -- point of sale data for March 5, 2010, at the Santa Fe store, including the Ruiz table."  Response at 7.  It states that it would be inappropriate to provide an information-technology witness to address POS data related to the Santa Fe store, because such a witness "would have no knowledge whatsoever of what the in-store serving procedures were nor any familiarity with the hard copies of the types of documents

utilized by servers." Response at 8. It asserts that Applebee's International produced an information-technology witness, "because the only point of sale information [it] had was the electronic raw data that had been downloaded directly into their system from the store." Response at 8.

AmRest, LLC further states that it "has produced more than a hundred pages of work schedules, including schedules for March 5, 2010, as part of its document production and identified all individuals that it has knowledge of that were present on the afternoon of March 5, 2010." Response at 8. It points out that the Plaintiffs have deposed two managers and one bartender who worked the day of the accident, and states that it "will supplement its responses should further responsive information be located." Response at 8. Further, AmRest, LLC states that, because discovery is ongoing, there is no reason for the Court to issue the Plaintiffs' requested "sanction of being allowed to proceed with discovery on the issues of managers and bartenders." Response at 9.

AmRest, LLC states that it "has produced hundreds of pages of documents responsive to all requests related to incident reports," including "all written incident reports in its possession," and "hundreds of pages of daily managerial entries that include entries on customer incidents, customer complaints, and resolution of those complaints." Response at 9. Moreover, it contends that, because "all 800 telephone number complaints are made directly to [Applebee's International] and not AmRest, AmRest referred Plaintiffs to the four separate 800 telephone number complaint documents produced by" Applebee's International. Response at 9. In light of its discovery efforts, AmRest, LLC argues that the "Plaintiffs['] claim that AmRest has refused to participate in discovery just simply isn't credible, and it certainly doesn't meet any burden for showing that sanctions are warranted." Response at 9. AmRest, LLC emphasizes that the

Plaintiffs seek "sanctions for the alleged failure to produce documents that **were only requested four days before the Motion** was filed."  Response at 9-10 (emphasis in original).

In the Plaintiffs' Reply in Support of Plaintiffs' Motion for Sanctions Against Defendant AmRest, LLC, filed in state court May 14, 2013, filed in federal court September 10, 2013 (Doc. 41-13)("Reply"), the Plaintiffs argue that "AmRest has never produced paper or electronic copies of the actual investigation file or the emails regarding the investigation."  Reply at 2.  The Plaintiffs explain their repeated requests for these documents as an effort "to ensure that they left no stone unturned in their effort to secure all documentary evidence pertaining to the Investigation File, including any electronic communications [about] it."  Reply at 2-3.  Further, they state that this request would be duplicative only if AmRest, LLC "had already produced documentary evidence on the Investigation File in some other format," and argue that AmRest, LLC "has failed to produce any emails documenting transmission and/or receipt of electronic versions of the Investigation File, any responses, forwards, or replies thereto, paper or electronic copies of the actual Investigation File, or all of the contents of the Investigation File that" AmRest, LLC's rule 30(b)(6) designee, Ghandi, described.  Reply at 3-4.

The Plaintiffs state that AmRest, LLC's position is that it need not look for the electronic investigation file, "because a former employee has represented in an affidavit that she is familiar with the contents of this Investigation File and they do not include all of the materials described in" Ghandi's testimony.  Reply at 4.  In their view, this position is unreasonable for several reasons.  First, they state, "there is absolutely no dispute that there were multiple emails regarding the investigation and emails transmitting the electronic investigation itself," but AmRest, LLC has not produced the electronic mail transmissions or the electronic investigation file.  Reply at 4-5.  Second, they argue, Ghandi described the electronic investigation file and its

contents, which are "now missing, despite the fact that AmRest was supposed to produce the information to the Santa Fe Police Department pursuant to a search warrant and the Santa Fe Police records show that all seized documents were returned to AmRest back in September of 2012." Reply at 5. The Plaintiffs contend that "Debbie Passmore's[6] affidavit cannot be used to refute the binding testimony of AmRest's 30(B)(6) representative about what the Investigation File contained," because Ghandi's testimony binds AmRest, LLC, and, "[m]oreover, [it] offers no rationale for AmRest's failure to turn over the evidence that the Santa Fe Police Department . . . seized from AmRest now that the evidence has been returned." Reply at 5.[7]

Third, the Plaintiffs contend that AmRest, LLC has neither shown that it tried to find the evidence that the Plaintiffs seek nor explained its failure to look for it. See Reply at 5-6. Fourth, the Plaintiffs submit that the fact that Santa Fe Police executed a search warrant does not absolve AmRest, LLC of its discovery responsibilities, because the electronic investigation file contained copies of materials, not original materials that the Santa Fe Police may have taken, and because the Santa Fe Police department's records show that the department returned all evidence it seized to AmRest, LLC. See Reply at 6.

The Plaintiffs also submit that, over a week after AmRest, LLC filed its Response in which it states that it produced all customer-complaint information, it produced more electronic mail transmissions "documenting customer complaints about the sale and service of alcohol that Plaintiffs knew existed." Reply at 6. In their view, AmRest, LLC "has offered no explanation for why it delayed production of these materials." Reply at 7. The Plaintiffs submit that this

---

[6]Although the parties did not identify Passmore in their briefing, the Court understands that she is a "district coach" -- that is, a regional manager.

[7] The Plaintiffs also argue that they complied with the state court's local rules. Reply at 1-2. Because the case no longer resides in state court, the Court will omit the Plaintiffs' discussion of this issue from this Memorandum Opinion and Order.

disclosure evinces that AmRest, LLC has possessed this information and, possibly, other information for some time, and has "willfully refused to produce it."  Reply at 7.  The Plaintiffs also argue that AmRest, LLC has "clearly and fully identif[ied] managers and bartenders who were present on March 5, 2010."  Reply at 8.

The Plaintiffs renew their contention that AmRest, LLC has not looked for the  POS information within its possession.  See Reply at 8.  They submit that, even if Applebee's International could

> search its own records for data that was transmitted from AmRest's POS system and provide Plaintiffs with information that documents which drinks were served to particular guests in Defendants Ruiz and Mendoza's party based on their seat assignments does not mean that this information duplicates all of the relevant information that is available through AmRest's POS system.  And, it does not excuse AmRest's failure to ever look for its own POS system information.  It also does not excuse AmRest from instructing its 30(B)(6) witness not to answer deposition questions regarding this issue on no less than six separate occasions.

Reply at 8.  The Plaintiffs state that the POS  system records would be very useful to them, because they would show

> how much time elapsed between the service of successive alcoholic beverage orders by Defendants Ruiz and Mendoza, how many alcoholic drinks were served to Defendants Ruiz and Mendoza but not charged to their tabs . . . , whether members of the Ruiz and Mendoza party paid separately from the other members of their tables, and how much alcohol AmRest actually served Ruiz and Mendoza.

Reply at 9.

With respect to an appropriate remedy, the Plaintiffs submit that it would be appropriate for the Court to enter establishment and preclusion orders, "given the circumstances described," because otherwise "AmRest will be allowed to benefit from its willful failure to comply with basic discovery obligations and its willful violations of Court orders."  Reply at 9-10.

The Court held a hearing on November 21, 2013.  See Transcript of Hearing, taken November 21, 2013, filed February 6, 2014 (Doc. 133)("November 21 Tr.").  The Court began

by indicating that it was not inclined to give most of the substantive relief that the Plaintiffs request, but invited the Plaintiffs to share their thoughts.  See November 21 Tr. at 150:7-153:18 (Court, Lyons).  The Plaintiffs began by noting that they filed the Motion for Sanctions on the eve of the parties' first trial setting and that their request for establishment preclusion reflected the limitations that the pending trial date imposed on the remedies they could seek.  See November 21 Tr. at 153:19-154:7 (Lyons).  The Plaintiffs began by noting that a "critical piece of evidence" in this case is the receipt from Ruiz' and Mendoza's visit to the AmRest, LLC restaurant.  November 21 Tr. at 154:8-18 (Lyons).  The Plaintiffs clarified that they have extracted the following chronology from evidence they already obtained: the accident happened on March 5, 2010; on March 6, March 7, or, by the latest, March 8, 2010, the Defendants realized, from reading the newspaper and from an AmRest, LLC server who had been Ruiz' friend, that Ruiz had been at the AmRest, LLC restaurant that evening; on March 8, law enforcement executed a search warrant; and on March 11 -- nearly a full week after the accident occurred -- the POS report was printed.  See November 21 Tr. at 154:19-155:21 (Court, Lyons).  According to the Plaintiffs,

> Mr. Ghandi, Mr. Jenkins, who is the manager -- Mr. Ghandi, who was the area director -- and Ms. Passmore, who is a higher up than Mr. Ghandi, area director -- and Mr. Muldoon, the brand president, gets involved at that time in an e-mail communications:
>
> > What happened?
> >
> > A couple girls were killed.
> >
> > Find out what they were drinking.
>
> And there, they amass an investigation file at that time, after the service of the search warrant, that's been forwarded up the chain of command through e-mails -- and we haven't seen any of that stuff, none of it.

November 21 Tr. at 155:22-156:10 (Lyons).  The Court pointed out that the Plaintiffs would not

see the material that was subject to the search warrant, because that material would be in the Santa Fe Police Department's custody; the Plaintiffs pointed out that the police tag describes what the police officers picked up from the AmRest, LLC restaurant, including "rosters reports . . . [,] cash receipts, [and the] daily total," and state that AmRest, LLC's counsel picked up the bag from the Santa Fe Police Department in September, 2012, and produced it to the Plaintiffs in November, 2013.  November 21 Tr. at 156:11-157:3 (Court, Lyons).  According to the Plaintiffs, AmRest, LLC's counsel produced 200 pages of documents, including credit card slips and a number of receipts, but not the receipt or the server check-out form from Kirby.  See November 21 Tr. at 158:10-18 (Lyons).  The Plaintiffs stated that the officer who executed the search warrant testified at his deposition that the police "just threw everything into these bags," and never went through their contents; according to this unnamed officer, AmRest, LLC's counsel picked up those bags on the day the police served the search warrant.  November 21 Tr. at 157:11-25 (Lyons).  According to the Plaintiffs, the evidence will show an unbroken chain of custody between law enforcement and AmRest, LLC's counsel, which demonstrates that "nothing was altered"; the Plaintiffs state that this chain of custody creates an ambiguity: either they did not give it to the police or the police lost it.  November 21 Tr. at 158:1-9 (Lyons).

The Plaintiffs' counsel stated that he had spoken with AmRest, LLC's rule 30(b)(6) designee, Jake Ghandi, who "didn't realize that we hadn't received the actual receipts," and did not realize that the receipts and checkout forms had been lost until the Plaintiffs' counsel informed him of that fact.  November 21 Tr. at 158:10-159:18 (Lyons).  The Plaintiffs contended that, during Ghandi's deposition, they had learned that AmRest, LLC "had sold all their Applebee's franchises to Apple American, and that Ghandi was now an employee of Apple American."  November 21 Tr. at 158:19-23 (Lyons).  Because Ghandi no longer worked for

AmRest, LLC, he could no longer access AmRest, LLC's POS and back office systems, or "his own emails to look for this chain of evidence that he created and sent up the chain of command." November 21 Tr. at 158:23-159:5 (Lyons). The Plaintiffs maintained that AmRest, LLC's behavior is the sort of behavior that rule 30(b)(6) depositions were intended to avoid. See November 21 Tr. at 159:9-24 (Lyons).

The Plaintiffs then stepped back to give more context to this dispute: according to them, AmRest, LLC "took a second bite at the apple in producing the corporate representative on the subject of the point of sales information." November 21 Tr. at 159:25-160:9 (Lyons). According to the Plaintiffs, Ghandi, the first corporate representative on the POS subject, did not "go and look and see what he could find with the point of sales system," and he testified "that there was no IT department at AmRest, which we later found out to not be true." November 21 Tr. at 160:10-20 (Lyons). The Plaintiffs maintain that they gave AmRest, LLC "a second chance" by allowing it to designate a second witness, Jenkins, to testify about that subject. November 21 Tr. at 160:21-161:2 (Lyons). The Plaintiffs asserted that, while Sean Lyons, an attorney for the Plaintiffs, deposed one witness, Zackeree Kelin, another attorney for the Plaintiffs, asked Jenkins "what, if anything, he did to find out what the point of sales system could tell us about this." November 21 Tr. at 161:3-13 (Lyons). The Plaintiffs asserted that Mr. Kelin "learn[ed] what we heard with Mr. Ghandi, that he" -- presumably referring to Jenkins -- "has no access to AmRest's point of sales system anymore. Basically, what he did was get a good night's sleep." November 21 Tr. at 161:14-17 (Lyons). In sum,

> in other words, nobody ever actually went to the computer -- certainly no corporate representative designated to talk about it -- went to the computer to see if you could look at: Guest numbers; how many drinks were served to who; the timing of the service.
>
> There is going to be some argument whether they were served these drinks

within two-and-a-half hours, versus an hour and 40 minutes, which is an overservice case.  Nobody actually looked to see if that discrete information could be found with the point of sales system or the back office system.

Meanwhile, I'm speaking with Mr. Muldoon.  And I happened to talk to him a little bit about this subject.  And he says that they have -- we were actually talking about finding the e-mails.  And he says, Oh, yeah, we've got a IT guy named Otis Brenson here, and he's down the hall.  And if we want to find e-mails, or look at something of a technical nature, that's who we'd ask.

And I asked if he'd ever done that.

No.

Has anybody ever asked you to do that?

No.  He's never done it.

So, obviously, AmRest never asked the people that needed to be asked to look for the evidence that would make up for what was lost.

November 21 Tr. at 161:23-162:20 (Lyons).

The Plaintiffs identified categories of evidence that, they contend, AmRest, LLC has not provided: (i) the sales receipts, checks, and credit card slips for Ruiz' and Mendoza's table; (ii) Kirby's check-out form, which summarizes service during the shift, "which may include, for example, the two bottled beers which one witness said Mr. Ruiz and Mr. Mendoza were drinking, in addition to the Brewtuses.  And we might find that those were comped," or "on a separate check.  But since all this evidence is lost," the Plaintiffs complained, "we don't have that"; (iii) the electronic investigation file, which Ghandi testified that he compiled and sent to other individuals by electronic mail transmission; and (iv) internal electronic mail transmissions related to the electronic investigation file, in which employees and management discussed the incident within days after it occurred.  November 21 Tr. at 162:20-164:23 (Lyons).  With respect to the latter category, the Plaintiffs assert that they have made requests encompassing those categories, that the state court ordered AmRest, LLC to produce that material, and that AmRest,

- 19 -

LLC withdrew its objections to those requests.  See November 21 Tr. at 163:22-164:2 (Lyons).

The Plaintiffs contend that there is, therefore, "no excuse at all that we're still here talking about

this.  We don't have what we need to begin to look -- to make up for this evidence that was

somehow mysteriously lost here."  November 21 Tr. at 164:3-7.

The Plaintiffs asked that the Court consider instructing the jury with regard to spoliation;

the Court indicated that it was not inclined to give that sanction in response to the Motion,

because AmRest, LLC might have approached the Motion differently if the Plaintiffs had

requested a spoliation instruction in the Motion.  See November 21 Tr. at 164:8-167:2 (Lyons,

Court).  The Court asked if the Plaintiffs were instead interested in exploring what the Court

could order AmRest, LLC to produce; the Plaintiffs indicated that, at a minimum, AmRest, LLC

must produce what they have not so far produced, and the Court agreed with that statement.  See

Tr. at 167:3-22 (Court, Lyons).  The Plaintiffs asked the Court to render findings that AmRest,

LLC's failure to provide this information prejudiced them, because they did not have this

information during important fact depositions.  See November 21 Tr. at 167:23-168:7 (Lyons).

The Court asked what it should do if AmRest, LLC states that the Santa Fe Police

Department did not return the receipts, checks, and credit card slips for Ruiz' and Mendoza's

table, or Kirby's check-out form; the Plaintiffs indicated that the parties were probably "stuck

with their positions," and that AmRest, LLC would probably say that the information was "lost

forever."  November 21 Tr. at 168:8-169:19 (Court, Lyons).  The Court asked how the Plaintiffs

respond to AmRest, LLC's contention that it has provided everything in the electronic

investigation file to the Plaintiffs; the Plaintiffs asserted that AmRest, LLC's argument is

specious.  See November 21 Tr. at 169:20-170:6.   The Plaintiffs clarified that the electronic

investigation file is a collection of electronic mail transmissions with attachments, and stated that

AmRest, LLC had produced only "three statements" and told the Plaintiffs "that's all there was

in the investigation file."   November 21 Tr. at 170:6-171:5 (Lyons).   The Plaintiffs further

clarified that, when they say that AmRest, LLC has taken the position that it has provided all of

the documents, the Plaintiffs

> mean Debbie Passmore in an affidavit that was clearly written by defendants . . . .
> Debbie Passmore is not the person who compiled the investigative file.
>
> Their corporate representative, Jake Ghandi, already testified what may
> have been in that investigation file.   And it included copies, potentially, of
> receipts, checks, credit card slips for Mr. Ruiz.
>
> So one thing I want is for them to stop pretending they provided that, and
> stop trying to confuse the court.

November 21 Tr. at 171:5-17 (Lyons).   The Court asked if the Plaintiffs had any evidence for

that contention; when the Plaintiffs pointed out that Ghandi had said it was "possible," the Court

indicated that qualification presented a problem.   November 21 Tr. at 171:19-172:2 (Court,

Lyons).  The Plaintiffs emphasized that, unlike Passmore's statement, Ghandi's statement was an

"educated guess," because Ghandi had created the file and had stated that "it would likely have

included these documents; that they would have put together . . . for Ms. Passmore everything

that they had."   November 21 Tr. at 172:7-173:1 (Court, Lyons).   The Plaintiffs also asserted

that, on March 11, 2010,

> three days after they'd already begun investigating . . . their lawyer, Patrick Riley,
> was on the scene, and that he printed out from the point of sales machine a report,
> and then he wrote on it "three beers for Mr. Ruiz."   Okay, so the lawyer's on the
> scene now, and they're doing damage control.
>
> But two or three days before that they were reporting upstairs, and printing
> up, who knows what, from the point of sales machine.   They are representing to
> us now that the point of sales machine is cut off the very day --
>
> The Court:  All right.  Tell me --
>
> Mr. Lyons:  -- day of sales, but obviously that's not true.

- 21 -

November 21 Tr. at 173:2-17 (Lyons, Court).

The Court asked what the Plaintiffs want the Court to do about the electronic investigation file. See November 21 Tr. at 173:18-20 (Court). The Plaintiffs asked the Court to order AmRest, LLC to produce its electronic investigation file and any associated electronic mail transmissions; the Court indicated that it would probably not order AmRest, LLC to produce something that it represents does not exist. See Tr. at 173:18-174:21 (Lyons, Court). The Plaintiffs then suggested that the Court order AmRest, LLC to search for those materials or to search through its POS records; they clarified that they only had a report that AmRest, LLC had provided, but argued that it was adulterated, insofar as it reflects Riley's belief that Mr. Ruiz was served three beers, which the parties now understand to be false. See November 21 Tr. at 174:22-175:8 (Lyons, Court). The Court asked the Plaintiffs whether they had the underlying POS data sufficient to interpret it for themselves, regardless of Riley's incorrect interpretation of the data; the Plaintiffs indicated that they could interpret the data, but argued that more information should be available, and that they do not know what information is available, because AmRest, LLC has not looked for it. See November 21 Tr. at 175:9-16 (Court, Lyons). The Plaintiffs confirmed that, if AmRest, LLC has searched for the electronic investigation file, it has not told the Plaintiffs about its search. See November 21 Tr. at 175:19-25 (Court, Lyons).

The Court then turned to the Plaintiffs' issues regarding AmRest, LLC's handling of customer complaints and asked what the Plaintiffs would need; the Plaintiffs indicated that AmRest, LLC could do another rule 30(b)(6) deposition, but emphasized that the Court should require AmRest, LLC to be prepared. See Tr. at 176:4-15 (Court, Lyons). The Plaintiffs contend that, when customers call Applebee's International's 1-800 telephone number to complain about an experience, it is routed through an Applebee's International subsidiary, who

- 22 -

"relate[s] the complaint, via e-mail, to the franchisee," so the franchisee can handle the complaint.  November 21 Tr. at 177:24-177:5 (Lyons).   The Plaintiffs explained:

> The reason it's relevant is because we have three very serious complaints, which Mr. Kelin highlighted for you, one of which occurred before the incident, and a woman was basically pulled from the bar and pulled as a server because she cut someone off.  We've taken her testimony.
>
> What I want to know is what records there are on the AmRest side of having done anything about that situation, looking into these complaints. I think the answer is: They did nothing, they ignored them.
>
> Right now they're saying they just haven't looked for the evidence.  I think we have a right for them to say, We've looked, we can't find anything, or we've looked and here it is.

November 21 Tr. at 177:6-20 (Lyons).

When AmRest, LLC began to respond, the Court asked AmRest, LLC if it could produce an affidavit stating that it gave the checks and credit card slips for Ruiz' table to the police.  <u>See</u> November 21 Tr. at 178:4-179:14 (Court, Blanton, Mowery).  AmRest, LLC confirmed that, at its counsel's instructions, its counsel's courier picked up the bag of evidence from the Santa Fe Police Department and brought it to counsel's office, still sealed with a police seal; AmRest, LLC's counsel's employees unsealed it and copied every item in the bag, under AmRest, LLC's lead counsel's supervision.  <u>See</u> November 21 Tr. at 179:15-180:23 (Court, Mowery).  AmRest, LLC then produced those documents and resealed the bag, which remains at AmRest, LLC's counsel's office.  <u>See</u> November 21 Tr. at 180:24-181:7 (Court, Mowery).  The Court asked if one of AmRest, LLC's representatives could provide an affidavit discussing such a process; AmRest, LLC said it could, and, further, that the manager on duty at the time the Santa Fe Police executed the search warrant, Bonnefil, had testified that he gave the Santa Fe Police "everything."  November 21 Tr. at 181:8-21 (Court, Mowery).  The Court indicated that "gave them everything" differs from "I gave them the actual sales receipts, checks and credit card

slips," and asked if Bonnefil would say what the Court had stated; AmRest, LLC stated that he could, and pointed to the deposition of Anthony Tapia, the police officer who had executed the warrant, who testified that he was able to collect "'cash, credit card, and debit card receipts to include the associated meal and drink tickets describing any food items, and/or beverages, alcoholic and nonalcoholic, purchased by James Ruiz, Gilbert Mendoza, and Veronica Castro from Applebee's Neighborhood Grill and Bar, and recorded on all cash register terminals, digital media, or otherwise.'"  November 21 Tr. at 181:22-172:17 (Court, Mowery)(quoting Deposition of Officer Anthony Tapia (taken February 4, 2013), read into the record in relevant part November 21, 2013).  AmRest, LLC also read into the record other portions of Tapia's testimony that, in its view, demonstrate that the Santa Fe Police Department received everything it sought. See November 21 Tr. at 184:3-185:6 (Blanton, Court, Mowery).

The Court asked the Plaintiffs whether they were satisfied and, if not, what they would want to demonstrate conclusively that the evidence went from the AmRest, LLC restaurant to the Santa Fe Police Department.  See November 21 Tr. at 185:20-24 (Court).  The Plaintiffs asserted that they were not satisfied, and that they thought AmRest, LLC was "avoiding the question on whether or not the actual sales receipts and checks and server check-out form for Mr. Kirby for Mr. Ruiz went in that bag."  November 21 Tr. at 185:25-186:4 (Lyons).  The Plaintiffs asserted that "[w]hat they did is took everything they have. That's why we have 200 pages; they took out March 5th's pile and stuck it in a bag."  November 21 Tr. at 186:5-7 (Lyons).  The Court asked whether the Plaintiffs were satisfied; the Plaintiffs asserted that other portions of Tapia's deposition "make[] it very clear that he just picked up a big stack of stuff and put it in the bag. And that's exactly what Mr. Bonnefil says as well . . . .  Nobody said, Okay, here is the Ruiz one, let's put it in the bag."  November 21 Tr. at 186:8-19 (Court, Lyons).  The Court asked if the

Plaintiffs would be satisfied if Tapia and Bonnefil spoke to that issue, and whether they could provide competent evidence on that issue; the Plaintiffs indicated that that those individuals could speak to that issue, but argued that an affidavit would be insufficient to that task, because, in their view, Bonnefil, Tapia, Joshua McFarland -- an assistant manager who was present -- and Anthony Armour -- a Special Investigations Division officer from Regulation and Licensing -- would be the ones to testify to that issue. See November 21 Tr. at 186:20-188:8 (Court, Lyons).

AmRest, LLC confirmed that McFarland was present the day of the accident, but stated that it had not been able to locate him. See November 21 Tr. at 188:9-11 (Blanton). AmRest, LLC expressed some skepticism whether McFarland had much to do with the search warrant, "because Mr. Bonnefil testifies it's he himself that provided the documents." November 21 Tr. at 188:11-14 (Blanton). AmRest, LLC also explained Armour's role more thoroughly, saying that Special Investigations Division officers "just rode along with the police" and "would not have had anything to do with actually executing the search warrant itself. That's the job of the police department." November 21 Tr. at 188:15-21 (Blanton). The Court asked whether Amour or anyone else looked at the evidence bag later; AmRest, LLC stated "that's an interesting question" and pointed out that all levels of law enforcement, including the Attorney General's office, "have had pending investigations in this matter." November 21 Tr. at 188:22-189:15 (Court, Blanton).

The Court then gave its inclination, pointing out that it was in AmRest, LLC's interest to comply, given that it was looking at a potential spoliation instruction. See November 21 Tr. at 189:16-23 (Court, Mowery). The Court indicated that AmRest, LLC must provide affidavits from Bonnefil, Tapia, McFarland, and Armour. See November 21 Tr. at 189:24-190:2 (Court). The Court continued:

Now, if you can't find somebody, you can't find somebody.  But what I think you ought to do is to seal this off, at least going in.

And it should track this language.  It shouldn't track the language of the deposition.  I'm not faulting the depositions.  People are doing different things.  But it should track this: That we picked up, or we gave -- whichever one it is -- gave actual sales receipts, checks, and credit card slips for Ruiz, and we saw them -- saw them -- we took custody of them.  And there we are.

And then I think for coming out, I as a Court, am satisfied with your representations.

November 21 Tr. at 190:2-14 (Court).  AmRest, LLC stated that the only evidence before the Court was "surmise by plaintiffs' counsel: Well, perhaps they didn't give it at all, or perhaps it was misplaced later."  November 21 Tr. at 190:15-18 (Mowery).  AmRest, LLC began to argue that this argument does not provide an adequate basis for a spoliation instruction, and the Court stated that "[it] may not be.  But rather than  just waiting till the day of trial to sort this out, I think we need to seal this off.  Because I think that the rest of the motion is built on that."  November 21 Tr. at 190:18-24 (Mowery, Court).  The Court also stated that, if the Plaintiffs are unsatisfied with the affidavits that AmRest, LLC provides, then the Court will allow the Plaintiffs to redepose the witnesses about their affidavits.  See November 21 Tr. at 191:1-7 (Court).  The Court indicated that it would start with the assumption that the documents are "not in AmRest's possession, custody, or control.  And then I think I can rationally deal with the rest of these."  November 21 Tr. at 191:8-11 (Court).  AmRest, LLC indicated that this approach was reasonable.  See November 21 Tr. at 191:12-13 (Mowery).

AmRest, LLC then returned to the Court's earlier question whether the information was important, and argued that the correct answer is "yes and no."  November 21 Tr. at 191:14-19 (Mowery).  AmRest, LLC continued:

Yes, in that yes, we're all trying to determine from any document industry evidence that's available, how many drinks were actually served to individuals at

this table.  But it's not -- the specific pieces of paper are not important, because there has been subsequent production of documents by Applebee's International, documents that we could not generate.  All of the point of sales information, as I understand it, that's generated at a local restaurant [and] gets fed to Applebee's International into their massive computer database.

Only by writing a special code, and then developing a program, were they able, in response to a request by the plaintiffs, to generate a document that showed where individual drinks were being served to individual seats.  That is the most specific information that you're ever going to find.  You wouldn't even be able to -- I don't think -- collect or create such a summary based upon the information they say is so critical to them.

I think this entire motion is based upon a false premise: That we don't have the information to go forward.  It's simply not true.  They have a very detailed report now from Applebee's.

November 21 Tr. at 191:19-192:18 (Mowery).  The Court responded that, even so, the Plaintiffs "are entitled to the information in the form they want it."  November 21 Tr. at 192:19-21 (Court).  The Court reiterated that the Plaintiffs can redepose the witnesses if necessary, and stated that, if AmRest, LLC is unable to obtain affidavits in accordance with the Court's order, it should notify the Court.  See November 21 Tr. at 192:24-193:2 (Court).

The Court then turned to Kirby's check-out form, and asked AmRest, LLC to explain what that form is; AmRest, LLC relayed its understanding that, at the end of a workday, a waiter or waitress must "check out . . . all their receipts for the day.  And that's when that form is generated and everything is grouped together."  November 21 Tr. at 193:4-19 (Court, Blanton).  AmRest, LLC stated that the police took the check-out forms as part of the search warrant and reminded the Court that Kirby "would have been the server that had served Ruiz and Mendoza."  November 21 Tr. at 193:20-24 (Blanton).   The Court asked AmRest, LLC to clarify the relationship between Kirby and Brenda Castillo; AmRest, LLC and the Plaintiffs confirmed that Kirby served Ruiz and Mendoza at the Santa Fe Applebee's Neighborhood Grill, and Castillo was the waitress at Blue Corn "who was cited by the state for overservice."  November 21 Tr. at

193:25-194:16 (Court, Blanton, Mowery, Lyons).  Upon the Court's request for clarification, AmRest, LLC confirmed that, like the receipts and checks, the Kirby check-out form was given to the police; AmRest, LLC stated that

> all these things are kept together.  So when they say we gave them everything we have, which as Mr. Lyons related was 200 pages of what we've produced to him after we got the evidence bags.  Every server's check-out forms for that day and all their receipts would have been in there.

November 21 Tr. at 194:17-195:2 (Court, Blanton).  The Court said that the affidavit would need to include "two things: One it was produced, but secondly, that they saw it; they saw it and produced it."  November 21 Tr. at 195:3-6 (Court).  AmRest, LLC suggested that the Court consider that Bonnefil "testifies that until SID educates them on the dollar amounts related to what was allegedly served that night, they can't even determine what table or who the server was."  November 21 Tr. at 195:7-12 (Blanton).  AmRest, LLC stated that, accordingly, the person who provided the evidence pursuant to the search warrant testified that, before the search warrant was served, "they didn't even know what table or who the server was, literally until SID is in their restaurant, and they're giving information that they the[n] backtrack and look for a check based on that dollar amount, to figure out which table they were at."  November 21 Tr. at 495:13-20 (Blanton).  The Court asked how SID got the dollar amount; AmRest, LLC stated that SID had a particular dollar amount, and that it did not "know if it was a receipt that Ruiz had in his pickup or what, or a credit card."  November 21 Tr. at 195:21-196:1 (Court, Blanton).

The Court asked AmRest, LLC to clarify the role of Blue Corn, asking whether the individual defendants had left their wallets on the table; AmRest, LLC stated that

> Blue Corn is where they dined and dashed.  They come to Applebee's around 4:00 in the afternoon.  We can argue about times.  Around, I think, 6:30 to 7:00, they are at Blue Corn Restaurant and Cafe.  And that's however many hours later they dine and dash there, even leaving their purse, and, I think, cell phones behind.

Tr. at 196:2-11 (Court, Blanton).  AmRest, LLC further stated:

> One clarification on the David Kirby check-out form, only because my recollection from some testimony was that for these check-out forms that are made available to the servers, but they aren't necessarily kept.  And I could be mistaken on this.  But I want the record to be -- is somewhat muddied on this.  The checkers then can use these to calculate their tips or what they're going to report for income tax.  But that's not a piece of paper that's normally retained.  In fact, routinely it gets tossed.  So I'm not certain if that was actually provided to the police.  If the testimony is to the contrary, I'll be corrected.

Tr. at 196:12-25 (Mowery).  The Court directed AmRest, LLC to disclose its position on that issue -- that is, whether AmRest, LLC gave that information to the police, or threw it away -- given that the information might be useful down the road.  See Tr. at 197:1-8 (Court, Mowery).

The Court then turned the parties' attention to the electronic investigation file.  See November 21 Tr. at 197:9 (Court).  The Court stated its understanding of the parties' positions: AmRest, LLC's position that it has disclosed the information, and the Plaintiffs' position that Ghandi might have said that other things could be a part of the electronic investigation file.  See November 21 Tr. at 197:9-18 (Court, Blanton).  AmRest, LLC stated that Ghandi had not testified what other information could be missing; the Court asked AmRest, LLC to elaborate:

> THE COURT: He just said he would expect it to be, or likely is, or something like that?

> MR. MOWERY: It was actually in response to a question by plaintiffs' counsel: Is it possible that these materials were included?  Well, yes, it was possible.  But he didn't have personal knowledge of that.  And then the person --

> THE COURT: And why does he not have personal knowledge if he put the investigation file together?

> MR. MOWERY: Well, you're talking about an incident at the time of his deposition that had occurred, what, three years earlier.

> THE COURT: So he simply doesn't have a memory of what's in the file?

> MR. BLANTON: Your Honor, what he does have memory of -- and he

states it repeatedly in his deposition -- are the point of sale receipts, which they do
have, and which we've always maintained is the investigative file.

November 21 Tr. at 197:20-198:14 (Court, Mowery, Blanton).  AmRest, LLC asserted that the

Plaintiffs relied on Ghandi's deposition, but ignore other portions; they quoted the following

section:

> "Q. You asked to see the check?
>
> "A. I said yes. Yes, I did. I asked him to get the check.  I asked him to get
> statements from anybody that was there or the people that were involved."
>
> ****
>
> Then Mr. Lyons, or Mr. Kelin, I don't know who took this, says:  "We're
> using the term 'check.'  What was the format of the check that you were looking
> at when you got asked for the check and got it?
>
> "A. It was a check that we pulled from the back office computer that was
> generated from the POS."  Point of sale.
>
> That is the document that has been repeatedly produced by us since before
> we were ever involved in the case.

November 21, Tr. at 198:10-199:10 (Blanton).  AmRest, LLC elaborated, somewhat confusingly,

that

> Mr. Lyons referred to Patrick Riley.  It's actually Mark Riley, a different law
> firm.  AmRest was not ever sued.  They were responding to subpoenas.  From day
> one, literally at all facets of this particular matter, including, as he's repeatedly
> noted, within a week of the accident itself, the point of sale receipt has been
> generated and produced --

Tr. at 199:11-18 (Blanton).   The Court asked whether this investigation file was solely

electronic; AmRest, LLC responded that the Plaintiffs had been misleading in their papers, but

that they had recently cleared up the error.  See Tr. at 199:19-25 (Court, Blanton).  AmRest, LLC

explained that

> they were faxing things to Mr. Ghandi.  Well, if you look at the investigative file
> that Debbie Passmore -- who ordered the investigation -- attests was given to

her by Jake Ghandi -- every single document within that file has a facsimile
number and a facsimile date across the top of it, generated as part of the process.
And all of them, except for the search warrant, had March 11, 2010. This is one
week after the accident.

Tr. at 200:6-15 (Blanton).[8]   Upon the Court's request, AmRest, LLC indicated that Ghandi

prepared and sent this material after the search warrant. See November Tr. at 200:16-22 (Court,

Blanton).  According to AmRest, LLC,

> everybody in the food chain, Bonnefil, Barry Jenkins, the general manager, Jake
> Ghandi, and Debbie Passmore will all testify their first notice of this, in terms of
> confirmation that their restaurant was even in any way, shape, or form involved,
> was SID and the police department showing up with a warrant.

November 21 Tr. at 200:22-201:4 (Blanton).  AmRest, LLC also stated that Passmore -- the

manager of the region -- did not know about this incident until Ghandi called her, and told her

that the police had served a search warrant. See November 21 at 201:5-9 (Blanton).  The Court

stated that it was inclined to "pin[] down" Ghandi, November 21 Tr. at 201:10-15 (Court):

> I'd like for him to say, This is in the investigation file that I've sent; here's what is
> not in the investigation file.  You know, doesn't have to be everything.  But the
> things that Mr. Lyons is pointing out that he thinks should be in there.  If he can't
> do that, then I want him to identify in a third paragraph everything that he cannot
> swear to being in or out.
>
>     MR. BLANTON: Absolutely, Your Honor.
>
>     THE COURT: That's all we got.  And then I want an affidavit at the other
> end -- who is this lady that received the investigation file?
>
>     MR. BLANTON: Debbie Passmore.  And they actually had possession of
> it and deposed her on it already, Your Honor.
>
>     THE COURT: I'd like to have an affidavit from her stating exactly what
> she received: What she received; what she didn't receive.  And if she cannot
> swear to certain items, then she needs to state that she cannot swear to those

---

[8]  AmRest, LLC transmitted this information by "e-faxing" -- that is, a procedure by
which one sends a facsimile transmission from a facsimile machine to a number that produces an
electronic document rather than a physical document.  See Tr. at 200:1-5 (Blanton).

items.

November 21 Tr. at 201:17-202:12 (Court, Blanton).  Mr. Blanton read the following portion of

an affidavit from Passmore:

> "In March of 2010, I served as a district coach [9]for the southeast region
> for AmRest, LLC, and make this affidavit based on my own personal knowledge
> and belief.
>
> "Number 2.  The Southeast Region included the Applebee's store located
> on Cerrillos Road in Santa Fe, New Mexico.
>
> "Number 3.  In March of 2010, Jake Ghandi, the area coach for New
> Mexico, reported directly to me.
>
> "Number 4.  Jake Ghandi conducted an informal investigation into the
> service of James Ruiz and Gilbert Mendoza that occurred in the Cerrillos Road
> Applebee's on March 5, 2010.
>
> "Number 5.  Mr. Ghandi created an electronic file that contained
> documents which he gathered during his investigation.
>
> "Number 6.  Mr. Ghandi forwarded that investigation file to me, as I was
> his immediate supervisor.
>
> "Number 7. This investigation file consisted of one, the statement of
> David Kirby; 2, the statement of Marcella Barton; 3, the statement by Anthony
> Bonnefil; 4, the search warrant served on the Cerrillos Road Applebee's by the
> Santa Fe Police Department; and 5, the point of sales receipts for tables 53 and 54

---

[9] AmRest, LLC explained where the "district coach" position fits into its organizational
structure as follows:

[I]n the restaurant jargon, essentially a manager.  But we're talking a region of
like five or six states.  So there may be different corporate structures, all VP type
positions.

But I think the region of the United States -- when AmRest was operating
all these stores, I think it was divided into six or seven, and they had a district
coach that watched over the entire district.  Underneath her was Jake Ghandi, who
did a portion of the State of New Mexico, I believe.  And then every other state
within her district also had its own particular manager. But I don't know where
the term 'district coach' comes from, but that's essentially a regional manager.

November 21 Tr. at 202:20-203:9 (Blanton).

concerning restaurant service to James Ruiz and the rest of his party.

> "8. Those documents listed above comprise the entire investigation file sent to me by Mr. Ghandi."

November 21 Tr. at 203:25-204:16 (Blanton).   The Court asked the Plaintiffs what other

documents should be in the file; the Plaintiffs stated:

> MR. LYONS: The only ones we've listed there, Your Honor, and the e-mails themselves.
>
> THE COURT: Just the full sales receipts, checks, credit cards, Kirby check-out form --
>
> MR. LYONS: Whatever they copied in order to understand what happened that day.  Whatever happened was three days before they printed out the point of sale receipt we have now.
>
> THE COURT: I want the affidavit to specifically address those four items. If you have anything else that you think should be in that file, you send a letter promptly to them.  Because I want the next affidavit to negate those four.
>
> MR. LYONS: Your Honor, we've taken  depositions on the subject.  What we want are the e-mails themselves.
>
> THE COURT: Well, we're not to the e-mails yet.  We're in the electronic investigation file.
>
> MR. LYONS: Understood.
>
> THE COURT: So, if you've got anything else; otherwise, I'm going to limit it to those four.  I want her to comment in the affidavit that those four items were not sent to her.
>
> MR. BLANTON: Yes, Your Honor.

November 21 Tr. at 204:17-205:23 (Court, Lyons, Blanton).

The Plaintiffs clarified the relationship between the electronic investigation file and the

electronic mail transmissions:

> [T]he electronic investigation file is transmitted as attachments to e-mails. That's why they are basically one and the same things. And so that's why that's important to be part of your order to be produced.

- 33 -

What Ms. Passmore is very, I think, cleverly doing is saying these are the documents in the investigation file, and saying these are the attachments.  We can see the e-mails to see whether that's true or not, whether that's everything.  Not to mention that the e-mails may very well have commentary related to what that information is.  And what we believe Mr. Ghandi meant is that these initial documents that -- you know, we're debating about whether the police lost them or the Rodey Law Firm lost them, whatever -- they are almost certainly photocopied or faxed, e-fax, such that they then become an electronic attachment.

So while the original ones may have been lost, we believe there are electronic copies of these documents that have not been produced.  And they haven't been searched.  That's what Mr. Lyons' point was earlier, that they haven't made an effort to search that.  And they produced Mr. Ghandi who says, I don't have access to the e-mail system at AmRest anymore.

So that's why I think these things are related. And I'd like the order to reflect both of those things, to the extent AmRest is required to go back and try to produce that.

November 21 Tr. at 207:8-208:15 (Hendler).  The Plaintiffs also suggested as follows:

[W]ith respect to the witnesses involved in this document mystery, that the plaintiffs be allowed to obtain the affidavits from these nonparty witnesses, and AmRest get their affidavit from Mr. Ghandi about it, which may end up requiring another deposition about that.

But we'd like to talk to the police and SID ourselves about that, to get what we think will be a more reliable interview, to understand, with open-ended questions, about what they are willing to put in an affidavit.  I think that would be reasonable.

THE COURT: Well, I'm not going to preclude you from getting affidavits, but I'm not ordering you to get affidavits.  These guys I'm ordering to get an affidavit.  So if they can't get it, you know, then that's going to tell me a lot.  But it doesn't preclude you from getting a competing affidavit, and it also doesn't preclude you from deposing them after you get this affidavit.

November 21 Tr. at 213:5-25 (Hendler, Court).

The Plaintiffs also noted that, despite AmRest, LLC's suggestion that many authorities had considered investigations, "in fact, the chain of custody form doesn't show that anyone ever went into the bag of evidence."  November 21 Tr. at 214:1-6 (Hendler).  AmRest, LLC replied

that it "was responding to a direct question" from the Court.  November 21 Tr. at 214:8-9

(Blanton).  The Court stated:

> You know, I don't know what to do with the period of time it's at the police
> department, because nobody in this room really either controls or represents those
> people.  I think that's fair game for everybody.  If they want to go talk to SID
> people, city police department, attorney general's office, and explore that area.
> But I think I can only deal with the parties here, and make requirements of that.
>
> So I think it's fair game. I think if you want to go and talk to those people
> and say, yeah, we had this over at the AG's office, and we were rummaging
> through it, and this is what we saw or didn't see, I think that's fair game.

November 21 Tr. at 214:10-23 (Court).

After AmRest, LLC asked the Court to clarify the affidavits that it must obtain, the Court

gave the parties the following detailed guidance:

> I wanted four affidavits: From Tapia, Bonnefil, Armor, and McFarland on one
> and two up there.  The investigation file, I wanted an affidavit from Ghandi, and
> then -- what's her name?
>
> MR. MOWERY: Debbie Passmore.
>
> THE COURT: Passmore.
>
> MR. MOWERY: Yes.  And I understood that. But I don't know that we
> can compel a detective to provide --
>
> THE COURT: I know you can't compel, but you can ask.  If you can't get
> it, that's something I need to know, if they can't supply the affidavit, I'm looking
> for.
>
> MR. MOWERY: All right.
>
> THE COURT: And I'll use my next two minutes just to say that I think on
> the electronic investigation file, if in fact, we get those affidavits, that's probably
> going to satisfy me as to, then, the representations that everything has been
> produced from those files.
>
> On the e-mails, I guess the reason -- maybe Mr. Hendler is right that these
> are all connected -- but I still think there is some distinction on the e-mails.  It
> seemed to me that reading that AmRest had not bottomed out, at least at the time
> these motions were filed on finding and talking to the IT people and producing all

e-mails regarding the incident, including those four to the investigation file.  If that hasn't occurred -- and probably when we get back together, I'm going to require you to do that.

MR. BLANTON: Sure, Your Honor.

THE COURT: And then you're going to have to file an affidavit from somebody at AmRest that's going to say: This is what we've done to find all the e-mails regarding the incident: Even those that just forwarded to the investigation file, those that talk about the investigation files, those that talk about, you know, any of those documents that would have been either, you know, in the materials that are secured by the search warrant -- very broadly, you're going to have to explain -- your either going to have to produce -- you're going to have to produce anything you can find, and you're going to have to give an affidavit of everything you've done to find, so that if that doesn't satisfy the plaintiff, you may have to go back and look some more.

November 21 Tr. at 214:24-217:2 (Court, Mowery, Blanton).

The Plaintiffs made another request:

MR. HENDLER: May I request that the order -- that the Court consider explicitly making the order requiring any e-mails addressing the incident by their employees.

THE COURT: Yeah. I think that's true.

MR. LYONS: Your Honor --

THE COURT: All right. Well, I've got to let you go, unless you want to stay.  It's on your clock.  All I was doing was sort of previewing what I'd probably do.  On the AmRest handling of customer complaints, I'm not prepared to say anything.

MR. BLANTON: Your Honor, we've supplemented discovery with the e-mails related to the handling of the customer complaints that we could locate. So it's simply not true that we didn't look for them. We did that on the 8th day of May, 2013, as supplemental. There are four complaints total.

November 21 Tr. at 214:3-22 (Hendler, Court, Lyons, Blanton).  The Court left the resolution of

the remaining category of information -- customer complaints -- to the next hearing.  See

November 21 Tr. at 218:2-6 (Court, Blanton).  The Plaintiffs made another request:

MR. LYONS: The question on the e-mails -- before I forget this thought,

we all walk out of here -- I would urge, if we order the defendant to look for the e-mails, that they also -- if they find that the e-mails cannot be found, that they give us something in writing to say when they last looked for them.  Because if they've been destroyed now, or deleted now, they're going to take the position --

THE COURT: Well, when I say, you know, detail what you've done, it's to provide you with that sort of information.  So I will require that it have some time frame as well.

November 21 Tr. at 219:17-220:3 (Lyons, Court).

The Court held a hearing on the remainder of the Motion on December 9, 2013 (Doc. 134)("December 9 Tr.").  After a brief discussion of who would begin argument, see December 9 Tr. at 28:3-23 (Court, Lyons), the Court stated that its memory was that AmRest, LLC would produce all of the customer complaints to Applebee's International's 1-800 telephone number.  December 9 Tr. at 28:23-29:8 (Court).  AmRest, LLC stated that there were four complaints related to the Santa Fe restaurant and that one occurred before it owned the business, so it would not have data about that incident.  See December 9 Tr. at 29:9-15 (Blanton, Court).  AmRest, LLC stated that it had completely responded to one complaint and had sent the Plaintiffs' counsel that response.  See December 9 Tr. at 29:15-17 (Blanton).  AmRest, LLC asserted that it had not located electronic mail transmissions related to the other complaints, "but all parties involved with those particular complaints have already been deposed and were questioned on them."  December 9 Tr. at 29:17-21 (Blanton).  According to AmRest, LLC, it has produced everything it has with respect to the first complaint, and, if it finds anything related to the other two complaints, it will produce that information.  See December 9 Tr. at 29:21-25 (Blanton).  AmRest, LLC continued:

Now, in the 91,000 pages of documents that were just produced in the last week-and-a-half, it is my understanding with some of those 800 number complaints that were produced, there is some sort of accounting as to what was done in response.

And here's what's being looked for, Your Honor, basically if somebody doesn't like the fish and chips or whatever at the Santa Fe restaurant, they call the 800 number maintained by Applebee's International.  Applebee's International takes that information down and forwards it to the particular franchisee and tells them to take care of it.  So what they're looking for are not the complaints themselves.  What they are looking for is an e-mail trail of, Well, did you call this guy and offer him a gift card for 20 bucks, or did you call this person and find out what their problem is?

In regards to the one we did produce, it was an anonymous complaint.  And as set forth in the e-mail itself, you have an anonymous complaint about anonymous people.  They were questioned on it at their depositions.  The people that were working on that date, but in that regard, as of today's date, Your Honor, we do not have e-mails to produce as to 800 number complaints, between the years of 2009.

December 9 Tr. at 30:1-25 (Blanton).  Upon the Court's inquiry, AmRest, LLC confirmed that it had produced "all e-mails related to AmRest's handling of customer complaints to Applebee's 1-800 number . . . that [were in its] possession, custody, and control as to the Santa Fe restaurant." December 9 Tr. at 31:1-8 (Court, Blanton).  The Court asked if the Plaintiffs were satisfied; the Plaintiffs asserted that their request is for "the electronic documents that show how it handled all reports and complaints generated from January 1st, 2008 to December 31, 2010 describing rude, loud, or intoxicated behavior by any customer from Santa Fe Applebee's.  So it's more specific than has been made out."  December 9 Tr. at 31:9-11 (Court, Lyons).

The Court asked whether there was just one complaint within that category; the Plaintiffs parsed AmRest, LLC's statement more carefully:

There were three complaints that we were provided from Applebee's. Now, this -- they may have limited their search to only looking for responses to those three complaints.  And it's important to point out, Your Honor, that their supplementation came to us on May 9, 2013. So after we filed the motion for sanctions that you're presently hearing, months after that did they supply this supplementation.  So first of all, we had to go through filing this motion for sanctions before we finally got some sort of meaningful response.

And in May of 2013, they were able to unearth an e-mail between some people you've heard of: Debbie Passmore; Jake Ghandi, who is the area coach;

Barry Jenkins, who was the general manager; and Nina Pelissier, Mike Muldoon, the president, says is the person who can find e-mails.

So we know they can find e-mails going back to 2010 as late as May of 2013. And now we're getting, you know, some more complaints from -- sent to us from Applebee's, which we'll all have to sift through at this stage.  But why cannot AmRest just do its own search for the complaints like the request says? We made this request now years ago.

December 9 Tr. at 31:12-32:22 (Lyons, Court).  The Court asked the Plaintiffs why they believe there are more than four complaints; the Plaintiffs asserted that AmRest, LLC was falsely limiting its search "to only those things we know you should have.  In other words, they are just defending themselves against the complaints that we know they should have responses to." December 9 Tr. at 32:23-33:5 (Court, Lyons).  The Court asked how the Plaintiffs knew that assertion to be true; the Plaintiffs stated that AmRest, LLC had not answered that request until the Plaintiffs had filed a motion to compel.  <u>See</u> December 9 Tr. at 33:6-11 (Court, Lyons).  The Court acknowledged that the Plaintiffs might, therefore, be entitled to costs and fees for filing that motion, but asked how the plaintiffs knew that there was another complaint.  <u>See</u> December 9 Tr. at 33:12-15 (Court).  The Plaintiffs responded:

[W]e have three complaints about the Applebee's in Santa Fe.  This request is to AmRest, which owned over 100 restaurants.  Now, unless we believe that the only complaints about rude or obnoxious behavior happened to be at the Santa Fe Applebee's, there must be some other complaints out there, but they haven't searched for --

THE COURT: So your request was not limited to the Santa Fe restaurant?

MR. LYONS: That's correct, Your Honor.

December 9 Tr. at 33:19-34:3 (Lyons, Court).  The Plaintiffs stated that there had been other citations for restaurants in Gallup, New Mexico, and Taos, New Mexico, and that "two lawsuits came out of the Taos restaurant under the same management, the same behavior.  And it all leads to the same knowledge of a systemic problem."  December 9 Tr. at 34:3-8 (Lyons).  The Court

asked, and the Plaintiffs confirmed, that the Plaintiffs do not believe there are more complaints

regarding the Santa Fe restaurant, but that they want evidence of the complaints in "Grants[,

New Mexico,] and Gallup[, New Mexico,] as well."  December 9 Tr. at 34:9-13 (Court, Lyons).

The Plaintiffs continued, stating that

> it appears as to the Santa Fe restaurant, Applebee's has provided what there is.
> I'm only guessing, but I think there is plenty -- more probably 100 times this --
> that should apply to AmRest's restaurants.  And not having been given any reason
> why they shouldn't provide it to us or haven't looked for it -- in fact, I have
> testimony from Mike Muldoon that Otis Brinson and Nina Pelissier, who might
> have access to this information, was never asked to look for it.

December 9 Tr. at 34:13-22 (Lyons).  The Court stated that it sounded like the attorneys were

limiting the request as well and that it did not seem like the parties disputed this matter.  See

December 9 Tr. at 23-25 (Court).

The Court asked for general background facts about AmRest, LLC; AmRest, LLC

asserted that it had approximately 104 restaurants in 2010, and that all restaurants had been

Applebee's Grill restaurants.  See December 9 Tr. at 35:6-13 (Court, Blanton).  AmRest, LLC

asserted that, at the time of the hearing, it no longer owned Applebee's Grill restaurants.  See

December 9 Tr. at 35:14 (Blanton).  AmRest, LLC stated that it used to be a "quarter-billion-

dollar operation," but that at the time of the hearing, "it's a skeleton crew.  Corporately it is

opening a chain of restaurants on the east coast, none of which are Applebee's."  December 9 Tr.

at 35:14-18 (Blanton).  Its counsel asserted that he could not inform the Court how many

employees it has or the exact size of its operations, but stated that it is not currently operating

and that it does not "have net operating value at this point."  December 35:19-22 (Blanton).  It

asserted that it had sold "every single Applebee's . . . in the United States" and that it is now

"literally a startup corporation on the east coast, as it relates to the new food chain."  December 9

Tr. at 35:23-25 (Blanton).  In response to the Court's inquiry, AmRest, LLC asserted that "eight

restaurants . . . have been opened" and that "I would guess [it has] a couple hundred [employees] at most."  December 9 Tr. at 36:4-8 (Court, Blanton).  AmRest, LLC's counsel asserted that, excluding the restaurant employees, it had "maybe a dozen" corporate employees, and that its offices were in Atlanta, Georgia.  December 9 Tr. at 36:9-17 (Court, Blanton).

The Plaintiffs asserted that they were asking for information about AmRest, LLC's handling of customer complaints for all of AmRest, LLC's Applebee's stores -- possibly as many as 104 stores.  See December 9 Tr. at 36:21-37:2 (Court, Lyons).  AmRest, LLC asserted that "the request says of Applebee's Neighborhood Bar and Grill located at 4246 Cerrillos Road, Santa Fe, New Mexico.  So how am I supposed to read that to produce something for the entire United States?"  December 9 Tr. at 37:3-8 (Blanton).  The Court asked:

> THE COURT: Well, Mr. Lyons, you got a reason I should read that broader than Santa Fe?
>
> MR. LYONS: You know what, actually I don't know what Mr. Blanton is reading from.  There are probably a couple different requests that we're talking about.  But I do see it says rude, loud, or intoxicated behavior by any customer at the Santa Fe Applebee's.  So I'm afraid that's correct.  And I misspoke earlier.

December 9 Tr. at 37:9-17 (Court, Lyons).

The Court then asked whether the Plaintiffs had anything further "on this fifth category." December 9 Tr. at 37:18-19 (Court).  The Plaintiffs asserted that AmRest, LLC "should be looking for [its] own complaints.  We're not satisfied that they have done that work, that they have looked for their own documents of complaints made from the Santa Fe restaurant." December 9 Tr. at 37:24-38:3 (Lyons).  The Court asked whether the Plaintiffs were referring to what AmRest, LLC did with complaints that it had received; the Plaintiffs confirmed that it was seeking such information, and elaborated by saying they looked for "how they responded to learning of the reports and complaints that were generated about the Santa Fe Applebee's

restaurant."   December 9 Tr. at 38:5-11 (Court, Lyons).   The Court stated that it thought AmRest, LLC had looked for all such documentation; AmRest, LLC asserted that it had produced "the daily manager's log . . . for every day for -- I think, over a period of an entire year -- already for the Applebee's restaurant.  Every single incident that is brought to management's attention on every single day is within this.  They are in possession of that."  December 9 Tr. at 38:12-21 (Court, Blanton).  The Court stated that the log appeared to be "a lot more paper than maybe four complaints"; AmRest, LLC stated: "What's being talked about here, Your Honor, are actually 800 number complaints.  AmRest does not maintain an 800 number.  Applebee's the franchisor does.  What he's referring to are complaints that were made to Applebee's itself.  And he wants to know what did we do to resolve those complaints."  December 9 Tr. at 38:15-39:5 (Court, Blanton).

The Plaintiffs offered to simplify the confusion: if AmRest, LLC could represent "that they have nothing further; that there were no other responses at AmRest, no other discussions at AmRest regarding the other complaints, other than the one that they -- in May of, May 9, 2013 -- sent us, then we're satisfied."  December 9 Tr. at 39:7-15 (Lyons).  The Court asked AmRest, LLC if it could give that representation, and AmRest, LLC stated:

> MR. BLANTON: Your Honor, I have produced in response to RFP number 12, which is what we read in RFP 11, number[s] 9 and 49, which are customer complaints and resolution of complaints, and as to RFP number 58, which relates to the 800 number itself, I've produced everything.

> THE COURT:   I think they are looking for something else here, a representation from you there were no other responses at AmRest or discussions within --

> MR. BLANTON: I'm not aware -- and I've requested -- and I'm not aware of any other responses to 800 number complaints within the AmRest corporation as it relates to the Santa Fe store in the years 2009 and 2010.

> THE COURT: And you've made a good faith effort to discover whether

- 42 -

there is any?

      MR. BLANTON: Yes, Your Honor.

      THE COURT: All right. Can you live with that representation or is there some qualification I'm missing, Mr. Lyons?

      MR. LYONS: As long as -- we anticipate -- and the Court understands -- we intend to share that representation with the jury.

      THE COURT: All right. Can you live with that, Mr. Blanton?

      MR. BLANTON: Yes, Your Honor.

December 9 Tr. at 40:20-39:19 (Court, Blanton, Lyons).  The Court indicated that it would put in its order that the Plaintiffs could use AmRest, LLC's representation "that there is no other internal or any other responses, internal or otherwise, related to the complaints that were made about the Santa Fe complaints."  December 9 Tr. at 40:21-41:1 (Court).

      The Plaintiffs stated that they

> want to impress upon the Court the importance of these actual sales receipts, checks, and credit card slips for Mr. Ruiz in the second category [of] David Kirby's check-out form.
>
> We have testimony from people that were drinking with Mr. Ruiz, one person in particular, that says that they saw them drinking bottled beers.  But we have not been able to see the receipts that showed that.  Those receipts should have been in Mr. Kirby's pile of receipts or checks or credit card slips, and should be reflected in his check-out form. But we don't have those actual documents.

December 9 Tr. at 41:9-21 (Lyons).  The Court stated that the Plaintiffs would receive the affidavits that the Court had ordered, and, recognizing that the affidavits might not satisfy them, if an issue arose in the future, "then, you know, there it will be.  But I think we agreed on what the wording of that affidavit is going to be to cover the David Kirby check-out form."  December 9 Tr. at 41:22-42:3 (Court).  The Plaintiffs stated that they did not understand why they had not received those affidavits if they were ever going to come and reiterated their request for

"findings by the Court"; the Court denied that request, stating that the Plaintiffs would need to prove that to the jury.  December 9 Tr. at 42:5-17 (Lyons, Court).  The Court stated however, that there seemed to be "a lot of circumstantial evidence that they drank a lot of beers . . . .  So I'm not sure you're going to find -- I'm not sure you can find what you want there.  But I think you've got a lot of circumstantial evidence, don't you?"  December 9 Tr. at 42:18-23 (Court).  The Plaintiffs stated that they had "what they've allowed us to have.  What I think we're entitled to is the evidence that they've lost or at least some clarity to the issue of where it's gone."  December 9 Tr. at 42:24-43:2 (Lyons).  The Court stated that it would set dates by which the affidavits would be due, and that the parties would "probably explain to the jury what's happened to these things.  But I'm not sure there is much more I can do than what I said at the last hearing."  December 9 Tr. at 43:4-9 (Court).

The Plaintiffs stated that the final issue that concerned them "is the electronic investigation file."  December 9 Tr. at 43:10-12 (Lyons).  The Plaintiffs stated that, in their view, they had showed the Court "supplementation from May of 2013, where they were somehow able to find an e-mail going back between all the parties that would be included in these e-mails, for 2010."  December 9 Tr. at 43:15-19 (Lyons).  The Plaintiffs confirmed that they meant to point out the complaint electronic mail transmission regarding a complaint from June, 2010, which AmRest, LLC found in May, 2013.  See December 9 Tr. at 43:22-23 (Court).  The Plaintiffs asked why AmRest, LLC had not looked for and produced

> e-mails that Jake Ghandi said he sent to Debbie Passmore and Mike Muldoon that show what happened to this investigation file, and why are we still asking for it and never been provided with any explanation of their efforts looking for that? We've, in a second part of the hearing gone through a motion to compel.  And there has been no explanation of where that is and why they haven't produced it. So we ask [not only for] them be compelled to produce all the e-mails, but also for our costs for having to bring this motion.

December 9 Tr. at 43:23-44:10 (Lyons).  The Court stated to AmRest, LLC its recollection that

the parties had worked out an affidavit which would detail AmRest, LLC's search for "the e-

mails regarding the incident, including those forwarding the investigation file."  December 9 Tr.

at 44:11-15 (Court).  AmRest, LLC stated that this statement is correct, but asserted that it had

found the electronic mail transmissions for which they had searched, could produce them the day

of the hearing, and could explain why it had not been able to locate them until that time.  See

December 9 Tr. at 44:15-24 (Mowery, Court).

> MR. BLANTON: Your Honor, if I may, my paralegal is out of town, so I have these Bates stamped.  I will formally produce them.  And what they are are a series of e-mails that are entirely consistent with every ounce of testimony and with every document that we've produced since before counsel were ever even involved in this case, back at the time they were subpoenaing people when there wasn't representation.
>
> And I will start with the first e-mail, if I may, Your Honor.  And I'd like to read these in, being that I feel both the integrity of our client and our firm have been impugned as it relates to what was going on with these documents.  And if not, I'd just like to hand it to Your Honor as an exhibit so it can be part of the record.

December 9 Tr. at 45:1-16 (Blanton).  The Court indicated that it would probably assess costs,

and invited AmRest, LLC to state its position.  See December 9 Tr. at 45:17-20 (Court).

AmRest, LLC described the electronic mail transmissions in detail and defended its failure to

produce them in the following extended colloquy:

> The first one is dated March 9th, 2010, from Jake Ghandi, Your Honor.  The search warrant is served March 8, the evening of March 8, 2010.  March 9th, 2010 at 8:00 in the morning, the beginning of the workday, Mr. Ghandi sends an e-mail to Debbie Passmore, as well as other individuals saying, "Hello, there was a fatal accident involving a DUI in Santa Fe last Friday.  Last night we found out that the drunk driver was at Applebee's that day.  The police showed up at the restaurant with a warrant last night and asked for some specific documents, including our DVR and credit card report.  They were not able to see if the check was paid by the driver with a credit card.  They have taken the DVR with them.  So far there is no documented paper evidence of the driver being in the restaurant.  The police did tell us that the driver was at Applebee's first, and then went on to another

- 45 -

restaurant, Blue Corn Cafe, prior to the wreck.  At this stage I'm having the managers gather more info to get some clarity of events.  The link below is a news report on the accident."  Then there is a link to a KOAT report.  And attached to this e-mail an[d] e-fax stamped -- as I stated at the last hearing -- March 8, 2010 is the warrant.

The second e-mail is from March 11, 2010.  "Hello all."  And this, again, is from Jake Ghandi.  "Please see attached statements and a copy of the receipt from the table."  And without going into the rest of it, Your Honor, the attachments to that are the very receipt that he's been in possession of since 2011, and the statement of the server that he's been in possession of since 2011, and since the time of their depositions in 2011, and a statement by -- I'm sorry, there is a third e-mail that says, "Tony's statement."  That's all it says.  And attached to that is the statement of the manager that responded to the search warrant, and which it says, "The officers asked for any sales information, credit card reports, and employee rosters for March 5, with phone numbers, server check-outs and any video surveillance we might have.  All of the above the officers took with them."

Again, there is a statement they had at the time they deposed this individual.  But we have located these e-mails.  And we are producing them, Your Honor.

THE COURT: All right. Well --

MR. BLANTON: And in terms of an explanation, here's my understanding -- and I have an affidavit signed as to this.  I can't speak to what occurred before we were involved.  I know Mark Riley responded to a subpoena at the time.   To my knowledge, nobody was complaining about what was produced related to that subpoena.  Since then, it is my understanding, as it relates to at least Debbie Passmore's server -- it was her mailbox we've extracted these from -- it is our understanding that at the time of 2010 -- within this time, not just on this date -- she had server problems.  Her entire profile was separated from the entire organization to maintain the data, that she could continue to function within AmRest electronically while they fixed her system.

It wasn't until their last IT guy, after my request a couple weeks ago after our hearing -- the IT guy had nothing to do with that, and is the only IT guy at AmRest -- searched the system, found there was a gap in time, and then ran an additional search looking for hidden profiles and found her e-mail box separate and apart from where it would have been, only because they had done so in the first place to protect the data.

THE COURT: All right. Mr. Mowery, anything else you want to say on that?

MR. MOWERY: Other than what these e-mails demonstrate, is that there is nothing that's been hidden from the plaintiffs.  We have maintained all along that this quote/unquote investigative file consists of nothing more than the receipt that was part of this file, three statements and some very innocuous e-mails saying, Look, we learned the other night when the police showed up that there had been this accident and these people had been at our restaurant.

So all the suggestions that we've been hiding important information critical to the plaintiff's [sic] case is just not true.  If the Court is inclined to impose some sanctions -- and in terms of costs, we'll accept whatever decision Your Honor makes on that.  But the allegations that have been made that plaintiffs have been prejudiced that we've hid the ball, the information they need, it's the heart of this case, they haven't been able to get access to, it's just not true.  They've had these very documents since even before Applebee's and AmRest were even named in this lawsuit where they were pursuing claims only against Blue Corn.

December 9 Tr. at 45:20-48:17 (Blanton, Court).

The Court asked the Plaintiffs whether they had the electronic mail transmissions described.  See December 9 Tr. at 22-23 (Court).  The Plaintiffs said they had not had those electronic mail transmissions and emphasized that they also did not have

the point of sales receipt without Mark Riley's certification three drinks were served to Ruiz, which we know to be false.  I'm not sure the defendants pretend to be exonerated.  We don't have a lot of satisfaction that they've looked under stones, and gotten to see what is under the stones, which is what we need to stop doing the hours and hours and hours of work that we've had to do in order to get to the bottom of evidence that should have been available at the time.

What I'm hearing just now also is that they checked the e-mail box of Debbie Passmore, which is their excuse, because their e-mail was down.  But I don't hear that they checked the e-mail boxes of Mike Muldoon or Jake Ghandi, or the other people that were involved in this e-mail chain still today.  And I'm not satisfied necessarily that -- that may be a good way to excuse why they haven't looked for these e-mails before.  But the fact is they didn't look at any of those.  They didn't ask Nina Pelissier to look at these e-mails.  They are not saying that they looked at Mike Muldoon's e-mail box, which is also where these e-mails could have been, and should have been found.  So I'm not sure what benefit they're getting from the excuse of saying, Well, Debbie Passmore's e-mail was down for two years, or whatever it was.

So in any case, I still think costs should be shifted here, Your Honor.  If this is what they are producing as the entire e-mail chain, and that's the

representation, we'll live with that.  And I'm happy that we've finally brought this long search to an end.

December 9 Tr. at 49:24-51:8 (Lyons).  AmRest, LLC stated that, given that it had produced electronic mail transmissions related to Ghandi's recent deposition, it did not "know why [it] would then be required to check other people's mailboxes, when the entire investigation was between Jake Ghandi and Debbie."  December 9 Tr. at 51:11-18 (Blanton).  AmRest, LLC wanted on the record "that it" -- evidently referring to the investigation -- "was done at Debbie Passmore's behest."  December 9 Tr. at 19-21 (Blanton).

The Court stated that it would take AmRest, LLC's counsel up on his offer of "an affidavit explaining the production," and would "require [AmRest, LLC] to look at Muldoon's and Ghandi's computer for these e-mails as well."  December 9 Tr. at 52:1-52:5 (Court).  The Court also stated that it still wanted two affidavits: "One that I required on the last hearing" with respect to "category 4," and "the one that [AmRest, LLC's counsel] offered."  December 9 Tr. at 52:6-12 (Court).  It also stated that it would "shift the costs for those last two categories.  So I'll award the plaintiffs 40 percent of the cost of filing the motion to compel, as well as arguing them at the last hearing and today.  That will include costs and fees."  December 9 Tr. at 52:13-17 (Court).  Upon the Plaintiffs' request, the Court clarified that AmRest, LLC must search in-boxes and out-boxes for these electronic mail transmissions, and that the affidavit will need to make clear that both in-boxes and out-boxes have been examined.  See December 9 Tr. at 52:20-23 (Lyons, Court).  After some discussion about limits to the scope, see December 9 Tr. at 53:6-56:10 (Blanton, Court, Lyons, Mowery), the Court underscored that what was at issue is "all e-mails regarding an incident regarding those forwarding the investigation file," December 9 Tr. at 13-15 (Court), and that it would limit the search to before "the date the complaint was filed.  If it looks like it's any more than that . . . you may re-approach the Court on that," December 9 Tr. at

18-22 (Court).

## LAW REGARDING DISCOVERY

The proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  Information sought is relevant "if the discovery appears reasonably calculated to lead to discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  Federal courts have held that the scope of discovery under rule 26 is broad.  See Gomez v. Martin Marrietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve full disclosure of all potentially relevant information.").  The federal discovery rules reflect the courts' and Congress' recognition that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  Hickman v. Taylor, 329 U.S. 495, 507 (1947).  As a result of this policy, rule 26 "contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or may be raised in a case."  Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 649-650 (D.N.M. 2007)(Browning, J.)(internal quotation marks omitted).

A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim."  McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002)(unpublished).[10]  "'Discovery . . . is not intended to be a fishing expedition, but rather

---

[10] McGee v. Hayes is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its

is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" Rivera v. DJO, LLC, 2012 WL 3860744, at *8 (quoting Tottenham v. Trans World Gaming Corp., No. 00 Civ. 7697, 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)). See Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(noting that courts do, and should, remain concerned about "fishing expeditions, discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests" (internal quotation marks omitted)). "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than that required for admissibility at trial, "the object of inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue." Zenith Elecs. Corp. v. Exzec, Inc., No. 93 C 5041, 1998 WL 9181, at *2 (N.D. Ill. Jan. 5, 1998). Courts have also recognized that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery." Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

Rule 26, which once stated that a party may obtain discovery on any matter "relevant to the subject matter," was amended in 2000 to state that the material must be "relevant to the claim or defense of any party." Fed R. Civ. P. 26(b)(1). Under the 2000 amendment, however, "[f]or

_____

disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that McGee v. Hayes and Miller v. Regents of the Univ. of Colo., 188 F.3d 518, 1999 WL 506520 (10th Cir. 1999)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

good cause, the court may order discovery of any matter relevant to the subject matter involved

in the action." Fed. R. Civ. P. 26(b)(1).  The Advisory Committee explained that the amendment

was "designed to involve the court more actively in regulating the breadth of sweeping or

contentious discovery."  Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2000 amendment

(stating that the amendment was made with the intent "that the parties and the court focus on the

actual claims and defenses involved in the action").  The Advisory Committee further explained:

> Under the amended provisions, if there is an objection that discovery goes beyond
> material relevant to the parties' claims or defenses, the court would become
> involved to determine whether the discovery is relevant to the claims or defenses,
> and, if not, whether good cause exists for authorizing it so long as it is relevant to
> the subject matter of the action.  The good-cause standard warranting broader
> discovery is meant to be flexible.

Fed R. Civ. P. 26(b)(1) advisory committee's note to 2000 amendment.

Rule 34 requires a party on whom a request for production is served to "state that

inspection and related activities will be permitted as requested or state an objection to the

request, including the reasons."  Fed. R. Civ. P. 34(b)(2)(A).  If objection is made to part of an

item or category, the part shall be specified and inspection permitted of the remaining parts.  See

Fed. R. Civ. P. 34(b)(2)(C).  Rule 37 provides enforcement mechanisms for rule 34.  According

to rule 37, if a party does not respond to an interrogatory or to a request for production, the party

requesting the discovery may move the Court to compel the opposing party to respond.  See Fed.

R. Civ. P. 37(a)(2)(B).  "[A]n evasive or incomplete disclosure, answer, or response is to be

treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(3).  Accord Lewis v.

Goldberry, No. 11-0283, 2012 WL 681800, at *4 (D.N.M. Feb. 27, 2012)(Browning, J.).

The Federal Rules of Civil Procedure provide redress for a party's abuses of the

discovery process, including failures to disclose.  "As a general rule, the imposition of sanctions

for abuse of discovery under Fed. R. Civ. P. 37 is a matter within the discretion of the trial

court." Coletti v. Cudd Pressure Control, 165 F.3d 767, 777 (10th Cir. 1999)(citations and internal quotation marks omitted). "'Bad faith is not required for a district court to sanction a party for discovery abuses. Sanctions are proper upon a finding of willfulness, bad faith, or fault on the part of the noncomplying litigant.'"   Stranger v. Checker Auto Parts, No. CIV 05-0632 JB/WPL, 2006 WL 4109673, at *3 (D.N.M. June 30, 2006)(Browning, J.)(original alterations omitted)(quoting Melendez v. Illinois Bell Tel. Co., 79 F.3d at, 671 (7th Cir. 1996)).  "A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." Coletti v. Cudd Pressure Control, 165 F.3d at 777 (citations and internal quotation marks omitted).

## LAW REGARDING RULE 37

Rule 37(b) states that, if a party fails to obey "an order to provide or permit discovery, including an order under Rule 26(f), 35 or 37(a), the court where the action is pending may issue further just orders," including:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

> (iii) striking pleadings in whole or in part;

> (iv) staying further proceedings until the order is obeyed;

> (v) dismissing the action or proceeding in whole or in part;

> (vi) rendering a default judgment against the disobedient party; or

> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).  "Determination of the correct sanction for a discovery violation is a fact-specific inquiry that the district court is best qualified to make." Ehrenhaus v. Reynolds,

965 F.2d 916 (10th Cir. 1992).   Although the court has discretion to choose an appropriate

sanction, the sanction must be just.   See The Procter & Gamble Co. v. Haugen, 427 F.3d 727,

738 (10th Cir. 2005)(citation omitted).

## LAW REGARDING RULE 30(b)(6)

Rule 30(b)(6) of the Federal Rules of Civil Procedure provides:

> In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination.   The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify.   A subpoena must advise a nonparty organization of its duty to make this designation.   The persons designated must testify about information known or reasonably available to the organization.   This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules

Fed. R. Civ. P. 30(b)(6).   "Under Rule 30(b)(6), when a party seeking to depose a corporation

announces the subject matter of the proposed deposition, the corporation must produce someone

familiar with that subject."   Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 268 (2d Cir. 1999).

"To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available

'such number of persons as will' be able 'to give complete, knowledgeable and binding answers'

on its behalf."   Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d at 268.   Accord Gulfstream

Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., No. 06-1165, 2007 WL 5704041, at *5

(D.N.M. Oct. 24, 2007)(Browning, J.)("A corporation must prepare its designated representative

to provide complete, knowledgeable, and binding answers on the corporation's behalf.").[11]   "The

_____

[11] The Court uses the word "binding" in a technical sense.   A corporate witness' statement in a rule 30(b)(6) deposition "binds" the corporation in that the Court and the jury will attribute the statement to the corporation, but the corporation is still free to testify to the contrary at another time.   As the Court has explained:

> Rule 30(b)(6) requires organizations to designate representatives to speak for

- 53 -

purpose behind designating a witness to represent the corporation is to prevent bandying, which is the practice of presenting employees for their depositions who disclaim knowledge of the facts known by other individuals within the organization."   Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., 2007 WL 5704041, at *5 (internal quotation marks omitted).

> As the United States District Court for the District of Connecticut has recognized:
>
> A deponent under Rule 30(b)(6) has an affirmative obligation to educate himself as to the matters regarding the corporation.  This includes all matters that are known or reasonably available to the corporation.  Even if the documents are voluminous and the review of the documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed.

Concerned Citizens v. Belle Haven Club, 223 F.R.D. 39, 43 (D. Conn. 2004)(citations omitted)(internal quotation marks omitted).  The court in Concerned Citizens v. Belle Haven Club went on to hold that this duty to review, and in essence become educated about the information available to the corporation, applies even if the information is voluminous and multiple people must be consulted to collect the information known to the corporation.  See 223 F.R.D. at 43.  The United States District Court for the District of Columbia has stated:

> Although there is not an abundance of case law on the topic of Rule 30(b)(6), and nearly no case law in this circuit, certain principles are consistent in every court opinion to address these issues so far.  First, the deponent has the duty of being knowledgeable on the subject matter identified as the area of inquiry.

---

them.  Absent rule 30(b)(6), organizations would either have no voice, being legal abstractions, or else speak in a cacophony of disparate statements, given the many people that make up most organizations.  Nothing in rule 30(b)(6)'s language, however, indicates that, aside from officially speaking for the organization, the representative's testimony is somehow treated differently than others' testimony.  Any fact witness may say one thing at a deposition and another at trial.  If rule 30(b)(6) meant for corporate representatives to be treated differently than other witnesses, presumably the rule would have said so.

Pedroza v. Lomas Auto Mall, No. CIV 07-0591 JB/RHS, 2009 WL 1325400, at *9 (D.N.M. April 6, 2009)(Browning, J.).  Accord 8A C. Wright & A. Miller, Federal Practice and Procedure § 2103, at 469-71 (ed. 2010).

> Clearly, a deponent that does not know about the subject matter to be inquired about is useless as a deponent at all.  Second, the designating party is under the duty to designate more than one deponent if it would be necessary to do so in order to respond to the relevant areas of inquiry that are specified with reasonable particularity by the plaintiffs.  Third, the designating party has a duty to prepare the witness to testify on matters not only known by the deponent, but those that should be reasonably known by the designating party.  Obviously, the purpose of a Rule 30(b)(6) deposition is to get answers on the subject matter described with reasonable particularity by the noticing party, not to simply get answers limited to what the deponent happens to know.  Fourth, the designating party has a duty to substitute an appropriate deponent when it becomes apparent that the previous deponent is unable to respond to certain relevant areas of inquiry.

Alexander v. FBI, 186 F.R.D. 137, 141 (D.D.C. 1998)(citations omitted).  Accord 17 J. Moore,

Moore's Federal Practice § 30.25[3], at 30-67 (Matthew Bender 3d ed. 2013)(stating the factors

from Alexander v. FBI).  The United States District Court for the District of Utah has ruled the

same way, holding that the entity receiving a rule 30(b)(6) notice has a duty

> to prepare those persons in order that they can answer fully, completely, unevasively the questions posed . . . as to the relevant subject matters.  The duty to prepare the designee imposed by the rule goes beyond matters personally known to the designee or to matters in which that designee was personally involved.  Such preparation requires a good faith effort [by] the designate to find out the relevant facts -- to collect information, review documents, and interview employees with personal knowledge.  The duty of preparation may require the interviewing of past employees.

United States v. Magnesium Corp. of Am., No. 2:01-CV-40DB, 2006 WL 6924985, at *4 (D.

Utah November 27, 2006)(Nuffer, J.)(footnote omitted)(internal quotation marks omitted).

Accord Peshlakai v. Ruiz, No. CIV 13-0752 JB/ACT, 2014 WL 459650, at *25 (D.N.M. Jan. 9,

2014)(Browning, J.).  As a general matter, a corporation may designate any person as a corporate

representative if they can meet the necessary criteria to satisfy rule 30(b)(6).  See Gulfstream

Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., 2006 WL 6924985, at *5 (discussing how

it may sometimes be necessary for a corporation to designate former employees as a rule

30(b)(6) deponent; 7 J. Moore, supra § 30.25[3], at 30-69 ("There is no rule that would prevent

corporate counsel, or even a corporation's litigation counsel, from serving as a Rule 30(b)(6) deponent.").

## ANALYSIS

The Court will largely deny the Motion.  The Court does not find that AmRest, LLC acted willfully, with bad faith, or with fault. Moreover, the Court does not believe that the establishment preclusion sanctions that the Plaintiffs have requested are appropriate, given that the Plaintiffs have the opportunity to develop the facts at issue.  Accordingly, the Court will deny the Motion to the extent that it asks for that relief.  The Court will grant the Motion only to the extent that the Plaintiffs may continue to conduct discovery regarding bartenders and managers that AmRest, LLC did not previously identify.  In light of AmRest, LLC's late disclosure of the electronic mail transmissions for which the Plaintiffs have asked, the Court will also shift forty percent of the costs of filing the Motion.

The Court does not believe that the sanctions which the Plaintiffs request are appropriate, now that the Defendants have removed the case to federal court.  The danger of a looming trial date has passed, and the Plaintiffs now have an opportunity to obtain the information from AmRest, LLC, and to present that information to the jury.  The Court understands why the Plaintiffs, on the eve of a state trial, and without some evidence on or an iron-clad assurance that the evidence did not exist, sought establishment sanctions; the situation now, in federal court, with a trial setting for late April, is significantly different.  The Court can now give the Plaintiffs this evidence or assurance, and establishment sanctions are therefore not necessary.  The Court would strongly prefer to have the jury decide the case on the merits and on the evidence rather than on the Court's rulings.  The Court would also strongly prefer to put in place a structure that gets the Plaintiffs what they need - evidence or reliable assurances that evidence does not exist --

rather than put its thumb on the scale and enter something that causes one side to win on something other than the evidence or merits.   Accordingly, the Court will not grant the establishment sanctions that the Plaintiffs seek.   The Court will, however, put in place a structure by which AmRest, LLC will either produce the documents that the Plaintiffs have sought, or provide affidavits assuring the Court and the Plaintiffs that it has searched diligently for that information.   The Court will memorialize its rulings from the hearing here.

With respect to the full sales receipts, checks, and credit card slips related to the Ruiz and Mendoza table, AmRest, LLC must produce affidavits from Bonnefil, McFarland, Armour, and Tapia, if those people will cooperate and produce affidavits.   In those affidavits, the affiants must state that they either gave to the police or picked up for the police the full sales receipts, checks, and credit card slips for Ruiz, saw them, and took custody of them.   If the Plaintiffs are not satisfied with the affidavits that AmRest, LLC produces, they may redepose Bonnefil, McFarland, Armour, and Tapia.

With respect to the Kirby check-out form, AmRest, LLC must produce the same affidavits: that is, Bonnefil, McFarland, Armour, and Tapia must state that they saw the Kirby check-out form and that they gave it to the police or picked it up for the police.   To clarify the Court's statement on the record, Armour and Tapia must state that they saw the Kirby check-out form and that they picked it up for the police.

With respect to the electronic investigation file, Ghandi must provide an affidavit stating whether the electronic investigation file included copies of sales receipts, checks, credit card receipts, and the Kirby check-out form for Ruiz were a part of the investigation file -- that is, he must indicate what was part of the investigation file and what was not part of the investigation file.   If he cannot identify whether a particular item was in the investigation file, he must identify

that item and state clearly that he does not know if it was in the investigation file.

With respect to the electronic investigation file, Passmore must provide an affidavit stating whether the electronic investigation file that she received included copies of sales receipts, checks, credit card receipts, and the Kirby check-out form -- that is, she must indicate what she received and what she did not receive in the investigation file. If she cannot identify whether she received a particular item in the investigation file, she must identify that item.

AmRest, LLC also must produce all electronic mail transmissions regarding the incident from the time of the incident until the date that the Plaintiffs filed their first complaint. It must search both in-boxes and out-boxes. It must search Muldoon's computer and Ghandi's computer for these electronic mail transmissions. It must also provide an affidavit explaining the efforts to which it has gone to find all electronic mail transmissions regarding the incident.

If AmRest, LLC is unable to secure these affidavits, they should inform the Plaintiffs and the Court. Regardless, the Plaintiffs may redepose these individuals.

With respect to the customer complaints within AmRest, LLC as they relate to the Santa Fe restaurant in 2009 and 2010, the Court accepts AmRest, LLC's representation that it has made a good-faith effort to discover whether there exist any complaints other than the four that it has already produced. The Plaintiffs may represent to the jury that there are no other responses, internal or otherwise, to the complaints that were made about the Santa Fe restaurant.

The Motion raises other bases for sanctions that the Plaintiffs did not pursue during the hearing -- principally that AmRest, LLC has not identified every employee present on the day of the incident and that it instructed Muldoon not to answer questions at AmRest, LLC's rule 30(b)(6) deposition. The Court has considered these bases in arriving at its decision, and, for the same reasons that the Court has denied the Motion's request for establishment sanctions as to

those matters that the Plaintiffs raised at the hearing, the Court will deny that request as to those matters that the Plaintiffs did not raise at the hearing.  The structure the Court has put in place will allow the Plaintiffs to develop their case and present the evidence to the jury.  Establishment sanctions are, therefore, unnecessary.[12]

The Court will shift forty percent of the Plaintiffs' costs for briefing and arguing the Motion to AmRest, LLC.[13]   AmRest, LLC's disclosure of the electronic mail transmissions related to the electronic investigation file only near the close of the second hearing on the Motion unjustly caused the Plaintiffs to expend needless resources briefing and arguing the issue.  Accordingly, the Court will shift forty percent of the Plaintiffs' costs for briefing and arguing the Motion to AmRest, LLC -- that is, the costs for two of the five main issues that the Motion addressed.

**IT IS ORDERED** that the Plaintiffs' Motion for Sanctions Against Defendant AmRest, LLC, filed in state court March 4, 2013, filed in federal court September 10, 2013 (Doc. 36-6), is granted in part and denied in part.  The Plaintiffs may continue to conduct discovery regarding bartenders and managers that AmRest, LLC did not previously identify.  All other requests for the sanctions in the motion are denied.  AmRest, LLC must pay forty percent of the Plaintiffs' costs for briefing and arguing the motion.

---

[12] Based on comments during a portion of the December 9 hearing regarding a different motion, it seems that the Plaintiffs and AmRest, LLC reached an agreement regarding the rule 30(b)(6) issue.  See December 9 Tr. at 59:22-24 (Blanton).  For guidance on this issue, the parties may look to the Court's Memorandum Opinion and Order, filed January 9, 2014 (Doc. 109), in which the Court granted in part and denied in part Defendant Applebee's International, Inc.'s Motion for Protective Order Regarding Plaintiffs' Notice of 30(b)(6) Deposition of Brenda Flood and Jeffrey Hull and Request for Emergency Hearing, and discussed its approach to rule 30(b)(6) depositions.

[13] Although the Court stated at the hearing that it would award forty present of the costs of filing and arguing "the motion to compel," December 9 Tr. at 52:13-17 (Court), the Court intended to refer to the Motion.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Zackeree S. Kelin
Philomena M. Hausler
Kelin Law Firm
Albuquerque, New Mexico

--and --

Scott M. Hendler
Sean M. Lyons
Hendler Law, P.C.
Austin, Texas

     *Attorneys for the Plaintiffs*

Jeff Ray
Ray McChristian & Jeans, P.C.
El Paso, Texas

--and--

W. Mark Mowery
Jose R. Blanton
Glenn A. Beard
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

     *Attorneys for Defendant AmRest, LLC*

Edward Shepherd
Allen, Shepherd, Lewis & Syra, P.A.
Albuquerque, New Mexico

--and--
Shannon A. Parden
Deena Buchanan Williams
Olsen Parden Williams, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Applebee's International, Inc.*